UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



FILED by _____ D.C.

AUG 21 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

YASMIN IRANI, an individual,

      Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

      Defendants.

_____/

CASE NO.:

# 02-61169

MAGISTRATE JUDGE
SIMONTON

CIV - GOLD

## DEFENDANT'S NOTICE OF FILING COPIES OF PLEADINGS SERVED RE: REMOVAL

    Defendant, BP PRODUCTS NORTH AMERICA, INC. formerly known as AMOCO

OIL COMPANY, pursuant to 28 U.S.C. § 1446(a), hereby files copies of the following process,

pleadings, and orders served upon this defendant in this action:

1.    8/13/02    SUMMONS AND COMPLAINT

2.    8/13/02    EMERGENCY MOTION FOR EVIDENTIARY HEARING REGARDING PLAINTIFF'S MOTION FOR TEMPORARY PROHIBITORY AND MANDATORY INJUNCTIVE RELIEF AND MOTION FOR EXPEDITED TRIAL DATE AND TO SHORTEN TIME TO RESPOND TO DISCOVERY

3.    8/13/02    PLAINTIFF'S NOTICE TO PRODUCE DOCUMENTS AND FIRST SET OF INTERROGATORIES TO DEFENDANTS

4.    8/13/02    PLAINTIFF'S REQUEST FOR ADMISSION

5.    8/20/02    NOTICE OF HEARING ON PLAINTIFF'S EMERGENCY MOTION FOR EVIDENTIARY HEARING REGARDING PLAINTIFF'S MOTION FOR TEMPORARY PROHIBITORY AND MANDATORY INJUNCTIVE RELIEF AND MOTION FOR EXPEDITED TRIAL DATE AND TO SHORTEN TIME TO RESPOND TO DISCOVERY (8-22-02 @ 8:45 a.m. – JUDGE E. MORIARTY)

(with attachments) 2 of 1

6.    8/21/02    BP'S NOTICE OF FILING AFFIDAVIT OF JIMMY MORAN AS TO
COMMISSION MARKETER AGREEMENTS

7.    8/21/02    BP'S SECOND NOTICE OF FILING AFFIDAVIT OF JIMMY MORAN
AS TO LETTER DATED APRIL 1, 2002

8.    8/21/02    BP'S NOTICE OF FILING REGARDING RELATED ORDERS AND
TRANSCRIPT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

facsimile and by U.S. Mail to: Allan S. Reiss, Esq., Levine & Partners, P.A., Attorneys for

Plaintiff, 1110 Brickell Avenue, 7th Floor, Miami, FL 33131 this 21st day of August, 2002.

HEINRICH GORDON HARGROVE
WEIHE & JAMES, P.A.
Attorneys for Defendant, BP
500 East Broward Boulevard, Suite 1000
Ft. Lauderdale, FL 33394-3092
(954) 527-2800 (tel.); (954) 524-9481 (facsimile)

By: _____
John R. Hargrove, Esq.
Florida Bar No. 173745
jhargrove@heinrichgordon.com
Moises Melendez, Esq.
Florida Bar No. 908835
mmelendz@heinrichgordon.com

G:\law\82041\090\removal documents\notice of filing in support of removal.doc

2

**1**

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO: 02015707

05

YASMIN IRAN, an individual,

    Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

    Defendants.

_____/

**SUMMONS**

To Each Sheriff of the State:

    YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint, Plaintiff's Notice to Produce Documents and First Set of Interrogatories to Defendant, Plaintiff's Request for Admission and Plaintiff's Emergency Motion Emergency for Evidentiary Hearing regarding the Plaintiff's Motion for Temporary Prohibitory Mandatory Injunctive Relief and Motion for Expedited Trial Date and to Shorten Time to Response to Discovery.

        AMOCO OIL COMPANY, a Maryland corporation,
        n/ c/a BP PRODUCTS NORTH AMERICA, INC.

        By Serving its Registered Agent:

        The Prentice-Hall Corporation System Inc.
        1201 Hays Street
        Suite 105
        Tallahassee, Florida 32301

Each defendant is required to serve written defenses to the Complaint on Plaintiff's attorney: ALLAN S. REISS, ESQUIRE, Levine & Partners P.A., whose address is 1110 Brickell Avenue, 7th Floor, Miami, Florida 33131, within twenty (20) days after service of this Summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the Complaint.

Dated on _____ **AUG 1 3 2002** _____, 2002.

HOWARD G. FORMAN, Clerk
As Clerk of the Court

By:_____
      Deputy Clerk

DEBORAH A. LEWIS

**A TRUE COPY**
Circuit Court Seal

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:

YASMIN IRANI, an individual,

    Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

    Defendants.

_____/

DEPUTY_____ J V
ABACUS INPUT DATE _8-21_
DUE DATE _9/9_
REMINDER DATE(S)_____

02015707

05

A TRUE COPY
HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
AUG 13 2002

## COMPLAINT FOR DAMAGES AND FOR INJUNCTION

Plaintiff, YASMIN IRANI ("IRANI"), sues Defendants, AMOCO OIL
COMPANY, a Maryland corporation, n/k/a BP PRODUCTS NORTH AMERICA, INC.
("Amoco"), and KATLIN BENNETT ("BENNETT"), an individual, and alleges as
follows:

## GENERAL ALLEGATIONS

1.    This is an action for injunctive relief and monetary damages in excess of
$15,000 (excluding interest and costs) and is within the jurisdiction of this Court.

2.    IRANI, an individual, is a resident of Palm Beach County, Florida and is
over the age of the majority.

3.     Amoco is a corporation, that is organized and authorized to business under the laws of the state of Maryland and that has principal offices in Fort Lauderdale, Broward County, Florida and that is doing business and has agents and representatives in Broward County, Florida.

4.     BENNETT, Amoco's regional sales manager for South Atlantic area, resides and works in Broward County, Florida, is over the age of majority, and is otherwise sui juris.

5.     Sometime in the year 1998, Amoco was in the process of converting gas service stations it previously contracted to franchisees protected under the Petroleum Marketing Practices Act ("PMPA") to stations run by independent "Commission Marketer" contractors. PMPA franchisees controlled the price of gasoline at the pump and retained all profits from the station. Commission Marketer contractors worked as independent contractors dispensing Amoco's gasoline at prices set by Amoco, and Amoco kept all profits from the gasoline sales, and paid the Commission Marketers a commission of certain cents per gallon for all gasoline sold, while the contractors ran the stations and retained the profits, inter alia, of the inside food sales. The insidious and subversive purpose of Amoco's conversion was designed to avoid the PMPA's strictures precluding cancellation or non-renewal of Amoco's contractual relationship with franchisees except under certain limited circumstances. Those strictures are founded on the inherent grossly unequal position between a large oil company and a gas service station franchisee and the distinct potential that an oil company could abuse its position by, inter alia, enticing a franchisee to invest substantial sums to obtain a station and to build significant business and good will, only to have the oil company pull the rug out

from the franchisee by canceling or failing to renew and reap the windfall of the franchisee's efforts.

6. In July or August 2000, IRANI met with Grace Pinzon at Borders Books near Hillsborough Boulevard and Powerline in Palm Beach County, Florida to discuss acquiring the gas service station that Cam Cornish operated at 8736 West Commercial Boulevard, Ft. Lauderdale, Florida 33334.

7. Approximately a month later IRANI was informed that Amoco had decided that it did not want the station and declined its right of first refusal.

8. In or about September or October 2000, Amoco representative, BENNETT, contacted IRANI to arrange a meeting. The meeting was scheduled and occurred at the Denny's Restaurant located on Atlantic Boulevard in Ft. Lauderdale, Broward County, Florida.

9. At that meeting, acting for Amoco, BENNETT expressly <u>represented that, if IRANI acquired the station, then, provided that she was a good operator, she would get the existing contract for the station with an initial term of 4 years (i.e., Amoco had an existing contract with Cam Cornish with an initial term of 4 years, approximately 2 years of which remained), which contractual arrangement would automatically renew for 2 further consecutive terms of 4 years each thereafter, totaling 12 years in all.</u> BENNETT made this representation in the presence of IRANI and her husband.

10. In reliance on Amoco's and BENNETT's prior representation that she was purchasing an existing Commission Marketer franchise during the course of the initial 4-year term, which contractual arrangement <u>would then automatically renew for 2 further consecutive terms of 4 years each thereafter,</u> IRANI, on or about November 15, 2000:

entered into a Commission Marketer Transfer Agreement ("Transfer Agreement"), inter alia, with Amoco, by which agreement Amoco approved and effected the transfer to IRANI of all of Cam Cornish's right, title, and interest in her existing Commission Marketer Agreement, Commission Marketer Lease and other related agreements between Amoco and Cam Cornish pertaining to the subject station: paid $85,000 (plus approximately $15,000 more for inventory) for Cam Cornish's right, title, and interest in those agreements and in the assets of the station's business; paid Amoco a $25,000 security deposit including first month's rent; additionally paid Amoco $3,500 for what was represented as a mandatory training course; and entered into other related agreements with and assumed other obligations respecting the station.

11. At the time of signing the Transfer Agreement, the Commission Marketer Agreement (that she received through the Transfer Agreement) referenced only a 4-year "initial term," without specifying the 2 additional consecutive terms of 4 years each. BENNETT, however, had specifically represented to IRANI that the Commission Marketer Agreement being transferred to her was automatically renewable and had convinced and told IRANI to sign the Transfer Agreement on that basis. Amoco thus engaged in a classic case of "bait and switch."

12. But for Amoco's and BENNETT's misrepresentation that IRANI would receive a 12-year contract (including the balance of the existing initial 4-year term transferred from Cam Cornish) IRANI would not have made her substantial investment in the station and worked hard to increase volume of gas sales and revenues and build good will of the business. Amoco considered IRANI a very good operator of the station and further considered the business of the station profitable for Amoco. In fact, per attached

Exhibit "A," Amoco frequently recognized and commended IRANI's consistent excellent performance.

13.     After IRANI invested her savings, at least doubled (and sometimes tripled) revenue from the time she purchased Cam Cornish's interest and entered into the Transfer Agreement, and further dramatically augmented the good will of the station, Amoco advised IRANI that it is terminating all of her rights to the station at the end of the initial 4-year term and forcing her to leave her station, without any compensation, by October 5, 2002. Thus, Amoco, through its and BENNETT's deceit, abused its position by enticing IRANI to invest substantial sums to obtain the station and to build significant business and good will, with the intent of not allowing (or, alternatively, without any intent of allowing) automatic renewal and the full 12-year term represented to IRANI--all with the intent that Amoco reap the windfall of IRANI's investment and arduous efforts.

14.     Amoco has further engaged in a business policy, pattern and practice of similarly deceiving, and abusing its position regarding, other Commission Marketers.

15.     IRANI justifiably relied on Amoco's and BENNETT's representation that Amoco would give her a 12-year term to run the stations and was thereby damaged.

16.     IRANI has retained undersigned counsel and has agreed and become obligated to pay said counsel a reasonable attorney's fees for services rendered in this proceeding.

17.     All conditions precedent to the bringing and sustaining this action have occurred or been waived.

## COUNT I—FRAUD

IRANI reasserts paragraphs 1 through 17, inclusive, as if fully set forth herein and further alleges as follows:

18. This is an action for fraud in the inducement.

19. As a material inducement to enter into the Transfer Agreement and purchase the commission marketer franchise from an existing third-party franchisee, Amoco and BENNETT, through BENNETT, represented to IRANI that she would receive a 12-year term (including the existing initial term) to run the station.

20. That representation was false, and Amoco and BENNETT knew it to be false when made or advanced that misrepresentation with reckless disregard as to its truth or falsity and never intended that Amoco would enter into a 12-year contract (including the existing initial 4-year term) with IRANI.

21. Amoco and BENNETT made that representation with the intent to induce IRANI to act in reliance thereof.

22. IRANI reasonably and justifiably relied upon the above-referenced representation and acted upon it.

23. IRANI was damaged as a proximate result of the foregoing misrepresentation.

WHEREFORE, IRANI requests that this Court enter judgment against Amoco and BENNETT, jointly and severally, for consequential and other compensatory damages, interest, and costs, and such other or different relief deemed just and proper.

## COUNT II--Negligent Misrepresentation

IRANI reasserts paragraphs 1 though 17, inclusive, as if fully set forth herein and further alleges as follows:

24. This is an action for negligent misrepresentation.

25. As material inducement to enter into the Transfer Agreement and purchase the commission marketer franchise from an existing third-party franchisee, Amoco and BENNETT, through BENNETT, represented to IRANI that she would receive a 12-year term (including the existing initial term) to run the station.

26. That representation was false, and Amoco and BENNETT should have known, but did not know whether or not the representation was false.

27. Amoco and BENNETT made that representation with the intent to induce IRANI to act in reliance thereof.

28. IRANI reasonably and justifiably relied upon the above-referenced representation and acted upon it.

29. IRANI was damaged as a proximate result of the foregoing misrepresentation.

WHEREFORE, IRANI requests that this Court enter judgment against Amoco and BENNETT, jointly and severally, for consequential and other compensatory damages, interest, and costs, and such other or different relief deemed just and proper.

### CCUNT III--Florida Deceptive and Unfair Trade Practices Act

IRANI reasserts paragraphs 1 through 29, inclusive, as if fully set forth herein and further alleges as follows:

30. This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA")

31. Amoco is involved in the conduct of trade or commerce as defined under the Florida Deceptive and Unfair Trade Practices Act, and Amoco and BENNETT have

violated that Act, inter alia, by engaging in "unfair methods of competition, unconscionable acts or practices, [or] unfair or deceptive acts or practices in the conduct of any trade or commerce" (Fla. Stat. § 501.204(1)) by:

    (a)    Defrauding or negligently representing to IRANI that he would have a contract to operate the service station for a 12-year term (including the existing 4-year initial term) and have an option to purchase the real property and improvements which were owned by Amoco; and

    (b)    "Baiting and switching," as described in paragraph 8 above.

32.    IRANI has been damaged by Amoco's and BENNETT's violation of the Florida Deceptive and Unfair Trade Practices Act.

33.    IRANI is entitled to actual damages, attorney's fees and costs of bringing this action pursuant to Fla. Stat. §§501.2105 and § 501.211.

WHEREFORE, IRANI requests that this Court enter judgment against Amoco and BENNETT, jointly and severally, for compensatory damages, including lost profits, costs, and attorney's fees, and such other or different relief deemed just and proper.

## COUNT IV—Temporary and Permanent Prohibitory Injunctive Relief

IRANI reasserts paragraphs 1 though 33, inclusive, as if fully set forth herein and further alleges as follows:

34.    Money damages will not fully compensate IRANI for Amoco's and BENNETT's aforementioned misconduct.

35.    IRANI has a clear legal right to a preliminary and permanent injunction prohibiting Amoco from terminating its commission marketer franchise arrangement with IRANI.

36.     IRANI has a substantial likelihood of succeeding on the merits of her claim(s).

37.     IRANI has no adequate remedy at law.

38.     IRANI has suffered and will continue to suffer irreparable harm by virtue of being deprived of the use, benefit, and enjoyment of her franchise which was promised for a 12-year period (including the initial 4-year term in progress at the time of her purchasing her interest in the station.

39.     It is in the public interest that IRANI be able to maintain her franchise with Amoco and pursue the business of her station.

WHEREFORE IRANI demands judgment against Amoco and requests that this Court:

A.     Temporarily and permanently enjoin Amoco (and all their officers agents, servants, employees and attorneys and on those persons in active concert or participation with them who receive actual notice of the injunction) from terminating its commission marketer franchise arrangement with IRANI.

B.     Award attorney's fees pursuant to Fla. Stat. §501.211 and other applicable law;

C.     Award such further relief as this Court deems just and proper under the circumstances including, but not limited, to incidental damages.

### COUNT V—Temporary and Permanent Mandatory Injunctive Relief

IRANI reasserts paragraphs 1 though 33, inclusive, as if fully set forth herein and further alleges as follows:

40.    Money damages will not fully compensate IRANI for Amoco's and BENNETT's aforementioned misconduct.

41.    IRANI has a clear legal right to a preliminary and permanent injunction compelling Amoco to honor a 12-year commission marketer franchise arrangement with IRANI.

42.    IRANI has a substantial likelihood of succeeding on the merits of her claim(s).

43.    IRANI has no adequate remedy at law.

44.    IRANI has suffered and will continue to suffer irreparable harm by virtue of being deprived of the use, benefit, and enjoyment of her franchise which was represented as being for a 12-year period (including the initial 4-year term in progress at the time of her purchasing her interest in the station.

45.    It is in the public interest that IRANI be able to maintain her franchise with Amoco and pursue the business of her station.

WHEREFORE IRANI demands judgment against Amoco and requests that this Court:

A.    Temporarily and permanently compelling Amoco (and all their officers agents, servants, employees and attorneys and on those persons in active concert or participation with them who receive actual notice of the injunction) to honor the commission marketer franchise arrangement with IRANI which was represented as being for 12-year period (including the initial 4-year term in progress at the time of her purchasing her interest in the station).

B.    Award attorney's fees pursuant to Fla. Stat. §501.211 and other applicable law;

C.    Award such further relief as this Court deems just and proper under the circumstances including, but not limited, to incidental damages.

## Jury Trial Demand

IRANI demands trial by jury as to all matters triable as of right before a jury.

Dated this 16th day of August, 2002.

LEVINE & PARTNERS, P.A.
1110 BRICKELL AVENUE
SEVENTH FLOOR
MIAMI, FLORIDA 33131
(305)372-1350
FAX: (305)372-1352

By: _____
    ALLAN S. REISS, ESQ.
    FLORIDA BAR NO. 858500



# The Road to the Mexican R
## *May 2002 Flash Repor*
## *CM - ECBU/Gulf Coast*

### Qualifiers Recap:

Minimum 1% volume gain vs. 2001   /   Sell minimum 800,000 gals. of gasoline in 2002   /
4  qyarterly Mystery Shop scores must average a minimum of 88%   /   Must have no policy v
includes Internet access and CM training requirements   /   Site must be branded BP from
1/2001 - 5/2003   /   Winning operator must have operated site for a minimum of 6 months in
and operate the site through 5/2003   /   Multi Lease sites competing on an individual basis.
Multi Lease operators can only win once /

**\*MONTHLY AND FINAL RANKINGS ARE SUBJECT TO CHANGE AND/OR BU/R**

Net Rank "Qualifier" = CM currently disqualified from a net rank due to a
program qualifier.

| Net Rank | Site Number | Gulf Coast CM Name | Gal Rank | % Rank | MS Rank | Total Points | |
|---|---|---|---|---|---|---|---|
| 1 | 60021 | Jose Femandez | 3 | 4 | 1 | 996 | FRONT |
| 2 | 60186 | Dimitrios Koatsodend | 6 | 9 | 1 | 991 | RUNNERS |
| 3 | 60190 | Carlos Documet | 5 | 6 | 3 | 990 | |
| 4 | 3344 | Jose C. Mendoza | 8 | 5 | 2 | 990 | |
| 5 | 6190 | Antoun Rawda | 7 | 13 | 1 | 987 | |
| 6 | 60654 | Mohammed M. | 4 | 3 | 7 | 987 | |
| Qualifier | 4175 | Ali Fouladi | 1 | 1 | 10 | 987 | |
| 7 | 60872 | Mathew Simon | 12 | 10 | 3 | 982 | |
| 8 | 1808 | Mohammad Sheikh | 9 | 8 | 6 | 981 | |
| 9 | 6335 | Samuel Solls | 10 | 7 | 7 | 979 | |
| Qualifier | 60511 | Yong Ho Kim | 2 | 2 | 14 | 979 | |
| 10 | 7030 | Kent Snyder, Jr. | 11 | 12 | 5 | 978 | |
| Qualifier | 5304 | Yasmin Irani | 17 | 17 | 1 | 976 | |
| Qualifier | 7029 | Jay Goldwasser | 16 | 18 | 1 | 974 | |
| Qualifier | 138 | Peter Rubio | 13 | 11 | 9 | 971 | |
| Qualifier | 1588 | Gerardo Galtán | 21 | 21 | 1 | 970 | |
| Qualifier | 60494 | Amir Hooda | 19 | 20 | 3 | 969 | |

Contenders

# The Road to Vancouver
## November 2001 Flash Repo
## CM - Gulf Coast Region

### Qualifiers Recap:

Minimum 1% volume gain vs. 2000  /  Sell minimum 700,000 gals. of gasoline in 2001  /
Top 3 of 4 Mystery Shop scores must average a minimum of 82%  /  Must have no policy
violation

Includes Internet access and CM training requirements  /  Site must be branded BP Amoco

1/2000 - 5/2002  /  Winning operator must have operated site for a minimum of 6 months in

and operate the site through 5/2002  /  Multi Lease sites competing on an individual basis,

Multi Lease operators can only win once /

*MONTHLY AND FINAL RANKINGS ARE SUBJECT TO CHANGE AND/OR BU/R

Net Rank "Qualifier" = CM currently disqualified from a net rank due to a
program qualifier.

| Net Rank | Site Number | Gulf Coast CM Name | Gal Rank | % Rank | MS Rank | Total Points | |
|----------|-------------|---------------------|----------|--------|---------|--------------|---|
| 1 | 6190 | Antoun Rawda | 2 | 2 | 6 | 991 | FRONT |
| 2 | 7030 | Kent Snyder, Jr. | 3 | 4 | 8 | 989 | RUNNERS |
| 3 | 1806 | Mohammad Shaikh | 4 | 3 | 8 | 986 | |
| 4 | 60021 | Jose Femandez | 8 | 10 | 5 | 982 | |
| 5 | 60869 | John Grivess | 1 | 1 | 14 | 981 | |
| 6 | 3344 | Jose C. Mendoza | 13 | 13 | 2 | 981 | |
| 7 | 60186 | Dimitrios Kostaodend | 14 | 16 | 1 | 979 | |
| 8 | 60104 | James Perez | 11 | 15 | 5 | 977 | |
| 9 | 1665 | Gerardo Gaitán | 6 | 6 | 12 | 976 | |
| 10 | 4264 | Marc Katchay | 4 | 9 | 12 | 976 | |
| 11 | 4175 | Ali Fouladi | 12 | 12 | 10 | 970 | |
| 12 | 60872 | Mathew Simon | 19 | 19 | 4 | 969 | |
| 13 | 6335 | Samuel Solis | 10 | 7 | 15 | 967 | |
| 14 | 60869 | Ali Idries | 20 | 20 | 4 | 967 | |
| 15 | 43001 | Steve Guyadeen | 21 | 21 | 3 | 967 | |
| 16 | 918 | Salvatore Marietta | 9 | 11 | 15 | 966 | |
| Qualifier | 7043 | Felix Mejia | 5 | 5 | 21 | 964 | |
| 17 | 60026 | Travies Boutwell | 17 | 14 | 11 | 963 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 18 | 4372 | Jose Grana | 18 | 18 | 10 | 961 |
| Qualifier | 60089 | Travies Boutwell | 26 | 29 | 2 | 959 |
| Qualifier | 7029 | Jay Goldwasser | 24 | 24 | 6 | 958 |
| Qualifier | 60511 | Yong Ho Kim | 22 | 22 | 9 | 957 |
| Qualifier | 6304 | Yasmin Irani | 25 | 25 | 8 | 953 |
| 19 | 60130 | Carlos Documet | 16 | 17 | 17 | 953 |
| Qualifier | 60071 | Isolina Souto | 15 | 8 | 22 | 952 |
| Qualifier | 60670 | Jose A. Rosa | 31 | 31 | 4 | 950 |
| Qualifier | 616 | Pedro A. Nuñez | 27 | 26 | 9 | 950 |
| Qualifier | 60654 | Mohammad M. | 37 | 37 | 2 | 944 |
| Qualifier | 2120 | Roy Moss | 34 | 36 | 5 | 943 |
| Qualifier | 43012 | Norma Serrato | 23 | 23 | 18 | 941 |
| Qualifier | 60494 | Amir Hooda | 30 | 28 | 13 | 940 |
| Qualifier | 60831 | Arturo Boucugnani | 29 | 30 | 13 | 939 |
| Qualifier | 620 | Deyrdre González | 26 | 27 | 19 | 933 |
| Qualifier | 80109 | Mariano Cibran | 35 | 34 | 16 | 927 |
| Qualifier | 2129 | Madeline Torres | 38 | 38 | 13 | 926 |
| Qualifier | 138 | Peter Rubio | 36 | 35 | 16 | 926 |
| Qualifier | 60176 | Massimo Bonetti | 33 | 33 | 19 | 925 |
| Qualifier | 2211 | Silvio Diaz | 32 | 32 | 21 | 923 |

# Security Alert

Based on the current events, stricter security measures have been in effect at retail sites. One issue that is of high concern is "driver safety" during fuel drops. Please make sure you pass this checklist:

- Are all lights in working condition? (under canopy, back lot, perimeters, etc.)
- Have any and all burned out bulbs been replaced?
- Are employees instructed to turn on all lights at dusk?
- Is tank tank pad area clear of any unnecessary foliage or obstructions? (overgrown bushes, trees, signage, debris, etc.)
- Is dumpster area clean and gates always closed?
- Have you discussed site safety with your CSR's and managers?
- Is there adequate lighting in area of the tank pad?



If you can answer yes to these questions above, then you can count on getting your gasoline delivery without interruptions. However, if there is an issue with any of the above questions, drivers have instructions not to deliver fuel at your site. The personal safety of the transport driver as well as the general public is of concern to all. Your cooperation and immediate attention is greatly appreciated and valued by all.

# Semi-Annual POP

## STARTS

## JANUARY 1

## 2002



All sites should have received by now the 2002 Winter/Spring Semi-Annual POP "Made for Each Other". Please remember to display the new signage as of January 1, 2002. If you need additional signage please contact BP-Amoco Sales Support Services at 1-877-992-6626.

# Congratulations!



Congratulations to the following sites for scoring 92 and above on the Mystery Shops for 3QTR 2001. Palm Beach Territory scored an average of 88.75 compared to the Region's average score of 87.64.

| Name | Score | Site |
|---|---|---|
| Moe Mirzadeh | 98 | Sansbury Amoco |
| Yasmine Irani | 96 | North Lake Amoco |
| Ron Perkins | 96 | Jupiter Amoco |
| Linda Romano | 96 | 10th & Kirk Amoco |
| Jon Goldman | 96 | Green Acres Amoco |
| Bill Devlin | 96 | Dextex Amoco |
| Jose Rosa | 96 | Riviera Beach Amoco |
| Berry Reichenberg | 94 | Lighthouse Point Amoco |
| Kazi Iqbal | 94 | Powerline Amoco |
| Larry Schoch | 92 | Southern & Jog Amoco |
| The Pompoukas | 92 | Tasso's Amoco |

**2**

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:

YASMIN IRANI, an individual,

    Plaintiff,


vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

    Defendants.

_____/

### PLAINTIFF'S EMERGENCY MOTION FOR EVIDENTIARY HEARING REGARDING THE PLAINTIFF'S MOTION FOR TEMPORARY PROHIBITORY AND MANDATORY INJUNCTIVE RELIEF AND MOTION FOR EXPEDTIED TRIAL DATE AND TO SHORTEN TIME TO RESPOND TO DISCOVERY

Plaintiff, YASMIN IRANI ("Irani"), by and through his undersigned counsel and pursuant to Rule 1.610(a) moves this Court for an Evidentiary Hearing regarding the Irani's Motion for the issuance of Temporary Prohibitory and Mandatory Injunction and Motion for Expedited Trial Date and to Shorten Time to Respond to Discovery. In support hereof, Irani states:

1.      This is action for fraud, negligent misrepresentation, violation of the Florida Deceptive and Unfair Trade Practices Act and for temporary and permanent prohibitory and mandatory injunctive relief arising out of Irani's purchase of a leasehold interest in an

E:\WORK\B\0665.001\D\EMERGENCYMOTION.DOC

Amoco gasoline station which includes the right to receive support from Defendant, Amoco, under a Commission Marketer Agreement.

       2.      The Affidavit of Irani is attached as Exhibit "A". Irani was fraudulently induced into making an enormous personal and economic investment into the subject gasoline station by repeated representation that he would receive a twelve-year (12) term at the gas station with attendant support and services from Amoco.

       3.      Defendants repeatedly represented to Irani that the agreement would be renewed for a total of at least 12 consecutive years.

       4.      Irani fully performed all of his obligations, invested in excess of $85,000.00 cash, invested his time and energies, and repeatedly received commendations from Amoco including Amoco's repeated accommodation for his "excellent performance".

       5.      In return, Amoco recently served notice that its is terminating all of Irani's rights to the 980 Northlake Boulevard, Lake Park, Florida station (as referenced in the Complaint) at the end of the initial four term, forcing him to leave that station, without any compensation, by October 5, 2002. A copy of Amoco's correspondence dated April 1, 2002 is attached as Exhibit "B."

       6.      A temporary prohibitory and mandatory injunction must issue to preserve the status quo during the pendency of this litigation. Tamiami Trail Tours Inc. vs. Greyhound Lines Inc., Southern Greyhound Lines Division, 212 So.2d 365, 366 (Fla. 4th DCA 1968) ("The general function of a temporary injunction is to preserve the status quo until full relief can be granted following a final hearing").

       7.      Should Amoco evict Irani or fail to continue to provide the required support and service to Irani for the operation of his business during the pendency of this litigation,

E:\WORK\B\0665.001\D\EMERGENCYMOTION.DOC

Defendants will be successful in destroying the very subject matter of this litigation, i.e.
Irani's ongoing business and attendant good will.

8.     In Precision Tune Auto Care, Inc., vs. Radcliff, 731 So.2d 744 (Fla 4th DCA
1999) the Fourth District Court of Appeals held that the trial Judge acted within its
discretion in enforcing, by temporary injunction, a franchise agreement to preserve the
status quo until the issue of breach of the agreement was resolved.  Although there has been
no breach claimed by Defendants, the policy considerations in preserving the status quo
with respect to an ongoing business are identical.

9.     The potential loss of a franchise or the destruction of the business good will
of ongoing business is exactly the type of "irreparable harm" which will sustain the
issuance of temporary injunctive relief.  Wojciechowski v. Amoco Oil Company, 483
F.Supp. 109 (E.D. Wis. 1989); Roland Machinery Co. v. Dresser Industries, Inc., 749 F. 2d
380 (7thh Cir. 1984).  Conversely, there is no potential loss to Bennett if a preliminary
injunction issues. Amoco, is a multi-billion-dollar company, and loss to it (it any) by virtue
of the requested injunctive relief could not possibly be more than negligible, especially
when compared to Irani's complete loss of business and livelihood.

10.    Similarly, once the ongoing business is destroyed damages alone cannot
make Irani whole and therefore Irani has no adequate remedy at law. Id.

11.    There is a substantial likelihood of success on the merits where its clear that
Defendants set out on a business practice of misrepresenting the terms of its commission
marketer agreement and its intentions with regard thereto to potential gas station operators
in an effort to avoid the Federal Petroleum Marketers Act and in violation of the Florida's
Unfair and Deceptive Trade Practices Act and thereby committed law fraud and negligent

E:\WORK\B\0665.001\D\EMERGENCYMOTION.DOC

misrepresentation; Wojciechowski at 115 (franchisor oil company's misrepresentation that franchise of franchisee would be renewed if his performance was adequate constituted actionable fraud and supported preliminary injunctive relief) See also, Cummings vs. Warren Henry Motors, Inc., 648 So.2d 1230, 1233 (Fla. 4th DCA 1995) (Irani successfully stated cause of action for violation of Florida Deceptive and Unfair Trade Practices Act by alleging ... "bait and switch" tactic in a transaction...); Florida Statute §501.211 (1) (" any one aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part").

12.     Finally, it will clearly serve the public interest that these Defendants be precluded from continuing its deceptive and unfair trade practices, depriving Irani of her investment and hard work be means of fraud and deceit.

13.     Based upon the foregoing, Irani has established all elements necessary to the issuance of a temporary injunction. Infinity Radio Inc., vs. Whitby, 780 So.2d 248, 249 (Fla 4th DCA 2001) ("In order to prove a temporary injunction, a party must prove the following: (1) that it will suffer irreparable harm unless that status quo is maintained; (2) that it has no adequate remedy at law; (3) that it has a substantial likelihood of success on the merits; and (4) that a temporary injunction will serve the public interest.").

14.     Along with the Complaint, Irani served this Motion and a Request for Production, Interrogatories and Request for Admissions.

15.     Irani requests, that the court order Defendants to respond the subject discovery within ten (10) days, grant Irani leave to immediately take several depositions, grant an evidentiary hearing with thirty (30) days, and/or grant an expedited trial date.

E:\WORK\B\0665.001\D\EMERGENCYMOTION.DOC

16.     These requests are made in the interest of fair and just resolution of this cause on its merits where, after October 5, 2002, Irani's injury will be made irreparable by the passage of time.

WHEREFORE, Irani respectfully request that the Court issues a temporary prohibitory and mandatory injunction precluding Defendants from terminating the subject from terminating its commission marketer franchise arrangement with Irani and requiring that such arrangement be honored during the pendency this action and/or shortening time for Defendants to respond to the subject discovery and/or granting Irani leave to immediately take several depositions and scheduling an evidentiary hearing and/or setting an expedited trial date, and awarding such further and/or different relief as this Court deems just and proper under the circumstances.

DATED this _12th_ day of _AUGUST_, 2002.

LEVINE & PARTNERS, P.A.
ATTORNEYS FOR PLAINTIFF
1110 BRICKELL AVE., 7TH FLOOR
MIAMI, FL 33131
(305) 372-1850
FAX: (305) 372-1352

BY_____
ALLAN S. REISS, ESQUIRE
FLORIDA BAR NO: 858500

E:\WORK\B\0665.001\D\EMERGENCYMOTION.DOC

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:

YASMIN IRANI, an individual,

     Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

     Defendants.

_____/

### AFFIDAVIT OF IRANI

Plaintiff, YASMIN IRANI ("Irani") files this Affidavit in support of his Motion

for Temporary Injunction in this case:

STATE OF FLORIDA     )

                     ) SS:

COUNTY OF DADE)

BEFORE ME, the undersigned authority, personally appeared, Plaintiff, YASMIN

IRANI ("Irani"), in the above-styled cause, who after being duly sworn, deposes and states,

based on his personal knowledge, as follows:

1.     I, YASMIN IRANI ("Irani") am Plaintiff in this action, a resident of Palm

Beach County, Florida and over the age of the majority.

2.     The facts recited herein are based on my own personal knowledge.



EXHIBIT

3.    In July or August 2000, I met with Grace Pinzon at Borders Books near Hillsborough Boulevard and Powerline Road in Palm Beach County, Florida to discuss acquiring the gas service station that Cam Cornish operated at 8736 West Commercial Boulevard, Ft. Lauderdale, Florida 33334.

4.    Approximately a month later I was informed that Amoco had decided that it did not want the station and declined its right of first refusal.

5.    In or about September or October 2000, Amoco representative, Katlin Bennett, contacted me to arrange a meeting. The meeting was scheduled and occurred at the Denny's Restaurant located on Atlantic Boulevard in Ft. Lauderdale, Broward County, Florida.

6.    At that meeting, acting for Amoco, Bennett expressly represented that, if I acquired the aforementioned station, then, provided that I was a good operator, I would get the existing contract for the station with an initial term of 4 years (i.e., Amoco had an existing contract with Cam Cornish with an initial term of 4 years, approximately 2 years of which remained), which contractual arrangement would automatically renew for 2 further consecutive terms of 4 years each thereafter, totaling 12 years in all. Bennett made this representation in the presence of myself and my husband.

7.    In reliance on Amoco's and Bennett's prior representation that I was purchasing an existing Commission Marketer franchise during the course of the initial 4-year term, which contractual arrangement would then automatically renew for 2 further consecutive terms of 4 years each thereafter, I, on or about November 15, 2000: entered into a Commission Marketer Transfer Agreement ("Transfer Agreement"), inter alia, with Amoco, by which agreement Amoco approved and effected the transfer to me of all of

Cam Cornish's right, title, and interest in Cam Cornish's existing Commission Marketer Agreement, Commission Marketer Lease and other related agreements between Amoco and Cam Cornish pertaining to the subject station; paid $85,000 (plus approximately $15,000 more for inventory) for Cam Cornish's right, title, and interest in those agreements and in the assets of the station's business; paid Amoco a $25,000 security deposit, including first month's rent; additionally paid Amoco $3,500 for what was represented as a mandatory training course; and entered into other related agreements with and assumed other obligations respecting the station.

8.    At the time of signing the Transfer Agreement, the Commission Marketer Agreement (that I received through the Transfer Agreement) referenced only a 4-year "initial term," without specifying the 2 additional consecutive terms of 4 years each. Bennett, however, had specifically represented to me that the Commission Marketer Agreement being transferred to her was automatically renewable and had convinced and told me to sign the Transfer Agreement on that basis. Amoco thus engaged in a classic case of "bait and switch."

9.    But for Amoco's and Bennett's misrepresentation that I would receive a 12-year contract (including the balance of the existing initial 4-year term transferred from Cam Cornish) I would not have made my substantial investment in the station and worked hard to increase volume of gas sales and revenues and build good will of the business. Amoco considered me a very good operator of the station and further considered the business of the station profitable for Amoco. Per attached Exhibit "A," Amoco frequently recognized and commended my consistent excellent performance.

10.    After I invested my savings, at least doubled (and sometimes tripled) revenue from the time I purchased Cam Cornish's interest and entered into the Transfer Agreement, and further dramatically augmented the good will of the station, Amoco advised me that it is terminating all of her rights to the station at the end of the initial 4-year term and forcing me to leave my station, without any compensation, by October 5, 2002. Thus, Amoco. through its and Bennett's deceit, abused its position by enticing me to invest substantial sums to obtain the station and to build significant business and good will, with the intent of not allowing (or, alternatively, without any intent of allowing) automatic renewal and the full 12-year term represented to me--all with the intent that Amoco reap the windfall of my investment and arduous efforts.

11.    By terminating my rights regarding the station and not renewing, despite promise and representation otherwise through Amoco's representatives, Amoco positioned itself to receive a windfall based on my substantial investment and arduous efforts.

12.    I was damaged as a direct result of the foregoing misrepresentations.

13.    I have retained the law firm of Levine & Partners, P.A. on an hourly basis to represent me in this action and have agreed and become obligated to pay said counsel a reasonable attorney's fees for services rendered in this proceeding.

14.    Money damages will be seriously deficient as a remedy for the harm I have suffered and will not fully compensate me for Amoco's and Bennett's aforementioned misrepresentation and misconduct, one of the effects of which is to force me to close and lose my business and all my customers. This loss is irreversible. My husband and I both work in this business to support our family, and we do not have any

other means of support. We are not in a position to open up another gas station business in the immediate area or otherwise, cannot compete effectively in the marketplace, and cannot salvage or ever recoup the goodwill I have built regarding the subject station and franchise that Amoco is seeking to take from me. Any damage award would come too late to save my business and to help finance this lawsuit (which may be impossible without revenues from my subject business). Loss of my business is otherwise not measurable entirely in monetary terms; I want to run my Amoco gas station and not live on income from a damages award. I will also lose the attendant benefits including personal benefits from owning my own business such as freedom of schedule and not being subject ot an employment relationship.

15.    I have suffered and will continue to suffer irreparable harm by virtue of being deprived of the use, benefit, and enjoyment of my station and franchise, which was promised for a 12-year period and my right to sell that interest.


FURTHER AFFIANT SAYETH NOT.

BY: _____

YASMIN IRANI

The foregoing instrument was acknowledged before me this ___ day of August, 2002 by YASMIN IRANI. She is personally known to me and did take an oath.

_____
Notary Public, State of Florida
My commission expires:

OFFICIAL NOTARY SEAL
GRACE RUFIN
COMMISSION NUMBER
CC960649
MY COMMISSION EXPIRES
SEPT 6.2004

**R. B. (Ronnie) Manton**
Regional Vice President

BP Amoco Company
2475 Northwinds Parkway
Suite 400
Alpharetta, GA 30004

**VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

April 1, 2002

Yasmin Irani
980 Northlake Blvd.
Lake Park, FL. 33403

Service Station # 6804; Lake Park, FL. 33403

Dear Mr. Yasmin Irani:

This letter serves as a reminder that the terms of your Commission Marketer Agreement, Commission Marketer Lease, and other related agreements (collectively, "CM Agreements") will expire on 10/5/2002 and are not renewable. Please make arrangements to conclude your business affairs and quit and deliver possession of the service station premises, together with all Amoco-owned equipment located thereon, on 10/5/2002.

Please contact your Regional Account Executive if you have any questions.

Very truly yours,

Regional Vice President

cc:     Jimmy Moran, Regional Sales Manager
        Joe Eikenberg, Regional Account Executive
        Denise Flynn-Ortiz



EXHIBIT

3

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:

02015707

**05**

YASMIN IRANI, an individual,

    Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC, and
KATLIN BENNETT, an individual,

    Defendants.

                                 /

## PLAINTIFF'S NOTICE TO PRODUCE DOCUMENTS AND FIRST SET OF INTERROGATORIES TO DEFENDANTS

COMES NOW the Plaintiff, by and through its undersigned counsel, and pursuant to

the Florida Rules of Civil Procedure, hereby propounds upon the Defendants to this action,

Plaintiff's First Notice to Produce for inspection and/or copying all items listed on Schedule

"A" annexed hereto at the offices of the undersigned within forty-five (45) days from the

date of service of this Notice, and at hearing or trial, or any continuation to be had in this

cause.  The Notice to Produce is intended to cover all documents in the possession of the

Defendants or subject to its custody and control, specifically including, but not limited to,

documents of third persons in the possession, custody and control of the Defendants.

The Interrogatories attached hereto as Exhibit "B" shall be answered separately and fully, in writing, under oath, within forty-five (45) days from service thereof.

DATED this 12th day of AUGUST, 2002.

LEVINE & PARTNERS, P.A.
ATTORNEYS FOR PLAINTIFF
1110 BRICKELL AVE., 7TH FLOOR
MIAMI, FL 33131
(305) 372-1350
FAX: (305) 372-1352

BY: _____
ALLAN S. REISS, ESQUIRE
FLORIDA BAR NO: 858500

## DEFINITIONS

The following definitions shall apply herein:

A. "Person" means any individual natural person, partnership, firm, association, organization, corporation, business trust, or governmental or public legal or business entity, or its agents, employees, servants or other representatives.

B. "You" refers to any Defendant in this action, including, but not limited to, its agents, employees or other servants (including independent contractors and subcontractors), attorneys, outside advisors or consultants, investigators, representatives of any kind, and any other person acting on behalf or for the benefit of Defendant, either directly or indirectly.

C. "Document" includes the original and copies of any written, recorded, or graphic matter, however produced, reproduced, or fixed in a tangible medium of expression, of every kind and regardless of where located, including, but not limited to any summary, calculations, schedule, memorandum, note, statement, letter, telegraph inter- or intra-office communication, report, diary, desk or pocket calendar or notebook, day book, appointment book, pamphlet, periodical, work sheet, list, graph, motion picture, photograph, x-ray or other machine-produced diagnostic picture or depiction of any kind, chart, index, tape, record, drawing, partial or complete report of telephone or oral conversation, compilation, tabulation, computer-stored memory component or device, study, analysis, transcript, minutes, data sheet, data processing card or tape, phonerecords, and all memorials of any conversations, meetings or conferences, by telephone or otherwise, and any other writing, notation or recording in the possession, custody or control of Defendant or its attorneys. The term "document" shall also include the files in which any documents are maintained,

including file folders or file jackets, and adjacent or related supporting or background materials are filed or maintained.

D. "Record", listed above, includes, but is not limited to, all books of account and other books of every kind, journals, ledgers, statements, instruments, files, messages, writings of every kind, and other internal, external or other data or information of every description made or received by you in the regular course of business or otherwise, regardless of the mode in which it is recorded; the original of any such record includes the data or other information comprising a record stored or transmitted in or by means of any electronic, computerized, mechanized, or other information storage or retrieval or transmission system or device which can upon request generate, regenerate, or transmit the precise data or other information comprising the record, and an original also includes the visible data or other information so generated, regenerated, or transmitted if it is legible or can be made legible by enlargement or other process.

E. "Identify" or "identification" when used in reference to a "document", means to state the date, title, label, file number, or description code number, author, address (if any), and persons to whom copies of the document were addressed or sent, type of document (such as letter, memorandum, chart, or other descriptive term), and its present and last known location and custodian. If you claim that any such document was, but is no longer in your possession or subject to your control, state what disposition was made of it and when. Documents to be identified shall include both documents in your possession, custody and control and all other documents of which you have knowledge.

## INSTRUCTIONS FOR INTERROGATORIES

A.   These interrogatories are of an ongoing nature, and should Defendant acquire additional information responsive to these interrogatories, the answers shall be updated to provide the additional information.

B.   If a privilege not to answer is claimed, identify each matter as to which the privilege is claimed, the nature of the privilege, and the legal and factual basis for each such claim.

C.   If a refusal to answer an interrogatory is stated on the ground of burdensomeness, identify the number and nature of documents needed to be searched, the location of the documents, and the number of person-hours and costs required to conduct the search.

D.   Answer each interrogatory on the basis of the entire knowledge of Defendant, including information in the possession of any of the Defendant's officers, directors, employees, consultants, representatives, agents, attorneys, subsidiaries, and subcontractors.

E.   If any interrogatory cannot be answered in full, answer to the extent possible and specify the reason for inability to answer.

F.      The term "relating to" includes referring to, embodying, in connection with, commenting on, responding to sharing, describing, concerning, analyzing, reflecting or constituting.

G.      Terms in the plural include the singular and terms in the singular include the plural.

## SCHEDULE "A"
## ITEMS TO BE PRODUCED

1.      Any and all documents, as that term is defined herein, relating to the gasoline station, which is the subject matter of Plaintiff's Complaint.

2.      Any and all contracts and/or agreements between Plaintiff and Defendant (including officers, directors, agents or employees of Defendant) and all correspondence or other documents relating thereto.

3.      Any and all documents, as that term is defined herein, relating to any set-offs, counterclaims, or complaints regarding the goods and/or services provided by Plaintiff and which are the subject matter of Plaintiff's Complaint.

4.      If you are claiming to do business as a corporation, the corporate book, including the Articles of Incorporation, By-Laws, Organizational Statement, Minutes and Resolutions, and stockholder ledgers for said corporation.

5.      Any and all annual reports by the Defendant and/or filings required by the Secretary of State of Florida and/or the S.E.C. from 1998 to the present.

6.      Any and all occupational licenses during the past three years and fictitious name affidavits relating to any fictitious names used by the Defendant.

7.      Any and all internal accounting statements, ledgers, journals, or other documents, as that term is defined herein, relating to the gasoline station which is the subject matter of Plaintiff's Complaint.

8.      Any and all documents you intend to offer into evidence in this cause.

9.      All credit applications and guarantees issued or delivered by the Plaintiff to the Defendant (including its directors, officers, agents or employees) to this action.

10.     All invoices, correspondences, statements of account, bills, requests or demands for payment, payment receipts, invoices, purchase orders, and all other documents related to the sale of gasoline by the Plaintiff.

11.     All licenses, certificates, permits, applications, and plans concerning or related to the gasoline station which is the subject of the Complaint.

12.     All newsletters issued, published or circulated by any Defendant or its successors in Florida from Orlando South from January 1, 1998 through the present.

13.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials related to the "Commission Marketer Agreement" or similar agreement by any other name, including but not limited to the reasons for its creation, the business plan which was actually or intended to be furthered by its creation, all modifications to said type of agreement, and/or the relationship of said type of agreement to the Petroleum Marketing Practices Act.

14.     All business plans, or similar documents, which were intended to be furthered or which were furthered by the creation of "Commission Marketer Agreement" or similar agreement by any other name.

15.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials related to the affect of the Petroleum Marketing Act on Defendant's relationships to its dealers, franchisee, and/or retail sales locations of gasoline.

16.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials relating to the conversion of existing franchisees, retailers, and/or dealers of gasoline to "Commission Marketers", i.e., retail sellers of gasoline governed by a "Commission Marketer Agreement" or similar agreement by any other name.

17.     All financial analysis, reports, extrapolations, predictions concerning or related to the effect of converting existing franchisees, retailers, and/or dealers of gasoline to "Commission Marketers", i.e., retail sellers of gasoline governed by a "Commission Marketer Agreement" or similar agreement by any other name.

18.     All financial analysis, reports, extrapolations, predictions concerning or related to the effect of the acquisition of gasoline stations operated under a "Commission Marketer Agreement" or similar agreement by any other name by the Defendant.

19.     All business plans, or similar documents, which were intended to be furthered or which were furthered by the acquisition of gasoline stations operated under a "Commission Marketer Agreement" or similar agreement by any other name by the Defendant.

20.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials relating to the acquisition of gasoline stations operated under a "Commission Marketer Agreement" or similar agreement by any other name by the Defendant.

21.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials your decision not to renew the Commission Marketer Agreement which is the subject of this case.

22.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials relating to the criteria or guidelines utilized or related to the decision making process as to whether or not a Commission Marketer Agreement is extended, renewed, or canceled.

23.     Any and all documents, as that term is defined herein, relating to the financial performance of the gasoline station which is the subject matter of Plaintiff's Complaint.

24.     Any and all documents, as that term is defined herein, relating to the sales volume of the gasoline station which is the subject matter of Plaintiff's Complaint.

25.     Any and all documents, as that term is defined herein, containing communications between the parties.

26.     All operation manuals related to the gasoline station which is the subject of the complaint.

27.     All offers, counter-offers, contracts and similar documents with regard to the purchase, sale, or lease of the gasoline station or premises which are the subject of the Complaint.

28.     The entire personnel file of Jim Moran.

29.     The entire personnel file of Julie Andrews.

30.     The entire personnel file of Grace Pinzon.

31.     The entire personnel file of Joseph Tamayo.

32.     The entire personnel file of Michael Roach.

33.     All dealership agreements, franchise agreements, commission marketer agreements, which were renewed or extended within the State of Florida within the last five (5) years.

34.     All dealership agreements, franchise agreements, commission marketer agreements, which were terminated within the State of Florida within the last five (5) years.

35.     All internal documents, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials relating to communications (present, future, or contemplated) between Defendant, it agents, representatives, and/or employees and franchisees, retailers, and/or dealers of gasoline which will or maybe converted to seller of gasoline under a "Commission Marketers", i.e., retail sellers of gasoline governed by a "Commission Marketer Agreement" or similar agreement by any other name.

36.     All internal documents, business plans, strategy statements, financial forecasts, analysis, policy manuals or statements, minutes of any board of directors' meeting(s), directors' resolutions, memorandum, emails, operating manuals, educational materials relating to the location and/or possible location of any "BP Connect".

37.     Minutes of all board of directors meetings referencing "BP Connect".

38.     All maps, drawings, depictions, documents, and/or photographs depicting the gasoline station or location, which is the subject of this case.

39.     All maps, drawings, depictions, documents, and/or photographs depicting the current, future, or contemplated locations for BP Connect Stations, dealer locations, commission marketer locations, franchise locations and/or transitions or contemplated transition or comparisons of any type of gasoline station whatsoever whether listed above or not within the State of Florida from January 1, 1995 to the present.

# EXHIBIT "B"

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.      Please state the full name, current home street address, and telephone number of the person or persons answering, or assisting in the answering, of these Interrogatories.

2.      Set forth the factual basis for each and every affirmative defense and/or counterclaim to Plaintiff's complaint.

3.      Set forth the full name, street address, and telephone number of each and every individual who has knowledge, or claims to have knowledge, as to any of the allegations contained in Plaintiff's Complaint, or any defenses or counterclaims thereto.

4. Set forth the full name, street address, and telephone number of each and every individual you intend to call to testify at the trial in this cause.

5. Identify each and every document which you intend to offer or proffer into evidence in this cause.

6. Identify each and every document, as that term is defined herein, forwarded to the Plaintiff or received from the Plaintiff concerning the labor, materials, and services which are the subject of the Complaint.

7.    State the full name of each and every person who you believe acted on behalf of the Plaintiff with which you had any contact regarding the subject matter of Plaintiff's claim or any defenses, set-offs or counterclaims you have thereto.

8.    If you are a corporation, please state the full name, street address, and telephone number of each and every officer, director and any fictitious names by which the corporation has done business.

9. State the name, address, title, employer and telephone numbers of all persons who participated or had input into the decision not to renew or extend (or conversely to cancel) the subject Commission Marketer Agreement and for each person please state the substance of that individual's participation or input into that decision.

10. Please state specifically all reasons why the subject "Commission Marketer Agreement" was not extended or renewed (or conversely why it was canceled).

11.     State the full name, occupation and present residence and business addresses and phone numbers of all persons who have given statements, whether written or oral, relating to the claim described in Plaintiff's Complaint, and give the name, address and phone number of the person or entity in possession of said statements at the present time.

12.     Please state the name, address and telephone number of any individual employed by or affiliated with Defendant or any employee, representative, agent, servant, officer or director of Defendant, who in any manner whatsoever and at any time, had any discussions or communications with any employee, representative, agent or servant of Plaintiff.  Please state the date and substance of the communication, the duration of the communication and method of communication.

13.    Please state the full name of each and every person who you believe acted on behalf of Plaintiff with any of Defendant's employees, agents, representatives or servants with respect to the subject matter of Plaintiff's claim.  Please state the date, method, and substance of each such contact or communication.

14.    Please state with specificity every act and/or omission committed or omitted by Plaintiff which you contend was breach of the contract between the Plaintiff and Defendant in this case.

15. For each act or omission contained in your answer to the preceding interrogatory please date or dates of the acts and/or omissions, the person who committed or omitted same and the name and address of each and every witness who has knowledge of said act or omission.

16. For every act and/or omission stated in response to interrogatory number 14 above, please state with specificity what damages were allegedly sustained by the Defendant as a result of said act and/or omission. Please state the dollar amount of those damages and specify how damages were calculated. Finally, please identify the name and address of each person who has knowledge with respect to those damages and identify each document relied in calculating those damages with sufficient particularity so that same may be requested pursuant to Rule 1.350.

17.     Please state every duty you allege was owed by the Plaintiff to the Defendant outside of the contract between the parties.

18.     For every duty stated in response to the preceding interrogatory, please identify with specificity each act and/or omission by the Plaintiff which you allege constituted a breach of that duty.

19.     For each breach of duty specified in the response to the preceding interrogatory, please identify the name and address of every person who has knowledge of such breach of duty.

20.     For each breach of duty specified in interrogatory number 19, please identify each element of damage which you allege was proximately caused by such act and/or omission.

21.     For each element of damage specified in the preceding paragraph, please state the dollar amount you claim you are entitled to be compensated for each element and state with specificity how that number is calculated, the name and address of all persons with knowledge of that calculation, and identify all documents relied in that calculation with sufficient particularity so that same may be requested pursuant to Rule 1.350.

_____
(signature)

STATE OF FLORIDA        )
                        ) SS:
COUNTY OF _____ )

THE FOREGOING INSTRUMENT WAS ACKNOWLEDGED BEFORE ME

THIS_____ DAY OF _____ 2002, BY _____

who is personally known to me or has produced _____

_____ as identification, who did/did not take an oath, and who says that he/she

executed the foregoing Interrogatories and that the answers are true and correct to the best of

his/her knowledge and belief.

_____
Notary Public, State of Florida

My commission expires:

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing answers to

Interrogatories was mailed to ALLAN S. REISS, ESQ., at Levine & Partners, P. A., 1110

Brickell Avenue, 7th Floor, Miami, Florida 33131, this _____ day of _____

_____, 2002.

_____

_____

_____

4

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:                          02015707

YASMIN IRANI, an individual,

    Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

    Defendants.

_____/



## PLAINTIFF'S REQUEST FOR ADMISSION

    Plaintiff, YASMIN IRANI ("IRANI"), an individual, by and through undersigned counsel, requests an admission of the truth of the following matters relevant to the subject matter of the pending action and relating to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described herein, by Defendants, AMOCO OIL COMPANY, a Maryland corporation, n/k/a BP PRODUCTS NORTH AMERICA, INC. ("Amoco), and KATLIN BENNETT ("BENNETT"), an individual, in writing, within forty-five (45) days from service thereof and in accordance with Rule 1.370 of the Florida Rules of Civil Procedure.

Each matter of which an admission is requested shall be set forth separately and the matter will be admitted unless the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter within forty-five (45) days from service thereof.  If objection is made, the reasons shall be stated and the answer shall specifically deny the matter or set forth, in detail, the reason why the answering party cannot truthfully admit or deny the matter.

## REQUEST FOR ADMISSIONS

1.    Admit that this is an action for injunctive relief and monetary damages in excess of $15,000 (excluding interest and costs) and is within the jurisdiction of this Court.

2.    Admit that IRANI, an individual, is a resident of Palm Beach County, Florida and is over the age of the majority.

3.    Admit that Amoco is a corporation, that is organized and authorized to business under the laws of the state of Maryland and that has principal offices in Fort Lauderdale, Broward County, Florida and that is doing business and has agents and representatives in Broward County, Florida.

4.    Admit that BENNETT, Amoco's regional sales manager for South Atlantic area, resides and works in Broward County, Florida, is over the age of majority, and is otherwise sui juris.

5.    Admit that sometime in the year 1998, Amoco was in the process of converting gas service stations it previously contracted to franchisees protected under the Petroleum Marketing Practices Act ("PMPA") to stations run by independent "Commission Marketer" contractors. PMPA franchisees controlled the price of gasoline at the pump and retained all profits from the station. Commission Marketer contractors worked as independent contractors dispensing Amoco's gasoline at prices set by Amoco, and Amoco kept all profits from the gasoline sales, and paid the Commission Marketers a commission of certain cents per gallon for all gasoline sold, while the contractors ran the stations and retained the profits, inter alia, of the inside food sales. The insidious and

subversive purpose of Amoco's conversion was designed to avoid the PMPA's strictures precluding cancellation or non-renewal of Amoco's contractual relationship with franchisees except under certain limited circumstances. Those strictures are founded on the inherent grossly unequal position between a large oil company and a gas service station franchisee and the distinct potential that an oil company could abuse its position by, inter alia, enticing a franchisee to invest substantial sums to obtain a station and to build significant business and good will, only to have the oil company pull the rug out from the franchisee by canceling or failing to renew and reap the windfall of the franchisee's efforts.

6. Admit that in July or August 2000, IRANI met with Grace Pinzon at Borders Books near Hillsborough Boulevard and Powerline in Palm Beach County, Florida to discuss acquiring the gas service station that Cam Cornish operated at 8736 West Commercial Boulevard, Ft. Lauderdale, Florida 33334.

7. Admit that approximately a month later IRANI was informed that Amoco had decided that it did not want the station and declined its right of first refusal.

8. Admit that in or about September or October 2000, Amoco representative, BENNETT, contacted IRANI to arrange a meeting. The meeting was scheduled and occurred at the Denny's Restaurant located on Atlantic Boulevard in Ft. Lauderdale, Broward County, Florida.

9. Admit that at that meeting, acting for Amoco, BENNETT expressly represented that, if IRANI acquired the station, then, provided that she was a good operator, she would get the existing contract for the station with an initial term of 4 years (i.e., Amoco had an existing contract with Cam Cornish with an initial term of 4 years,

approximately 2 years of which remained), which contractual arrangement would automatically renew for 2 further consecutive terms of 4 years each thereafter, totaling 12 years in all. BENNETT made this representation in the presence of IRANI and her husband.

10.     Admit that in reliance on Amoco's and BENNETT's prior representation that she was purchasing an existing Commission Marketer franchise during the course of the initial 4-year term, which contractual arrangement would then automatically renew for 2 further consecutive terms of 4 years each thereafter, IRANI, on or about November 15, 2000, entered into a Commission Marketer Transfer Agreement ("Transfer Agreement"), inter alia, with Amoco, by which agreement Amoco approved and effected the transfer to IRANI of all of Cam Cornish's right, title, and interest in her existing Commission Marketer Agreement, Commission Marketer Lease and other related agreements between Amoco and Cam Cornish pertaining to the subject station; paid $85,000 (plus approximately $15,000 more for inventory) for Cam Cornish's right, title, and interest in those agreements and in the assets of the station's business; paid Amoco a $25,000 security deposit including first month's rent; additionally paid Amoco $3,500 for what was represented as a mandatory training course; and entered into other related agreements with and assumed other obligations respecting the station.

11.     Admit that At the time of signing the Transfer Agreement, the Commission Marketer Agreement (that she received through the Transfer Agreement) referenced only a 4-year "initial term," without specifying the 2 additional consecutive terms of 4 years each. BENNETT, however, had specifically represented to IRANI that the Commission Marketer Agreement being transferred to her was automatically

renewable and had convinced and told IRANI to sign the Transfer Agreement on that basis. Amoco thus engaged in a classic case of "bait and switch."

12.     Admit that But for Amoco's and BENNETT's misrepresentation that IRANI would receive a 12-year contract (including the balance of the existing initial 4-year term transferred from Cam Cornish) IRANI would not have made her substantial investment in the station and worked hard to increase volume of gas sales and revenues and build good will of the business. Amoco considered IRANI a very good operator of the station and further considered the business of the station profitable for Amoco. In fact, per attached Exhibit "A," Amoco frequently recognized and commended IRANI's consistent excellent performance.

13.     Admit that after IRANI invested her savings, at least doubled (and sometimes tripled) revenue from the time she purchased Cam Cornish's interest and entered into the Transfer Agreement, and further dramatically augmented the good will of the station, Amoco advised IRANI that it is terminating all of her rights to the station at the end of the initial 4-year term and forcing her to leave her station, without any compensation, by October 5, 2002. Thus, Amoco, through its and BENNETT's deceit, abused its position by enticing IRANI to invest substantial sums to obtain the station and to build significant business and good will, with the intent of not allowing (or, alternatively, without any intent of allowing) automatic renewal and the full 12-year term represented to IRANI--all with the intent that Amoco reap the windfall of IRANI's investment and arduous efforts.

14.  Admit that Amoco has further engaged in a business policy, pattern and practice of similarly deceiving, and abusing its position regarding, other Commission Marketers.

15.  Admit that IRANI justifiably relied on Amoco's and BENNETT's representation that Amoco would give her a 12-year term to run the stations and was thereby damaged.

16.  Admit that IRANI has retained undersigned counsel and has agreed and become obligated to pay said counsel a reasonable attorney's fees for services rendered in this proceeding.

17.  Admit that all conditions precedent to the bringing and sustaining this action have occurred or been waived.

18.  Admit that this is an action for fraud in the inducement.

19.  Admit that as a material inducement to enter into the Transfer Agreement and purchase the commission marketer franchise from an existing third-party franchisee, Amoco and BENNETT, through BENNETT, represented to IRANI that she would receive a 12-year term (including the existing initial term) to run the station.

20.  Admit that that representation was false, and Amoco and BENNETT knew it to be false when made or advanced that misrepresentation with reckless disregard as to its truth or falsity and never intended that Amoco would enter into a 12-year contract (including the existing initial 4-year term) with IRANI.

21.  Admit that Amoco and BENNETT made that representation with the intent to induce IRANI to act in reliance thereof.

22.   Admit that IRANI reasonably and justifiably relied upon the above-referenced representation, and acted upon it.

23.   Admit that IRANI was damaged as a proximate result of the foregoing misrepresentation.

24.   Admit that this is an action for negligent misrepresentation.

25.   As material inducement to enter into the Transfer Agreement and purchase the commission marketer franchise from an existing third-party franchisee, Amoco and BENNETT, through BENNETT, represented to IRANI that she would receive a 12-year term (including the existing initial term) to run the station.

26.   Admit that that representation was false, and Amoco and BENNETT should have known, but did not know whether or not the representation was false.

27.   Admit that Amoco and BENNETT made that representation with the intent to induce IRANI to act in reliance thereof.

28.   Admit that IRANI reasonably and justifiably relied upon the above-referenced representation, and acted upon it.

29.   Admit that IRANI was damaged as a proximate result of the foregoing misrepresentation.

30.   Admit that this is an action for violation of the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA")

31.   Admit that Amoco is involved in the conduct of trade or commerce as defined under the Florida Deceptive and Unfair Trade Practices Act, and Amoco and BENNETT have violated that Act, inter alia, by engaging in "unfair methods of

competition, unconscionable acts or practices, [or] unfair or deceptive acts or practices in the conduct of any trade or commerce" (Fla. Stat. § 501.204(1)) by:

      (a)    Defrauding or negligently representing to IRANI that he would have a contract to operate the service station for a 12-year term (including the existing 4-year initial term) and have an option to purchase the real property and improvements which were owned by Amoco; and

      (b)    "Baiting and switching," as described in paragraph 8 above.

32.    Admit that IRANI has been damaged by Amoco's and BENNETT's violation of the Florida Deceptive and Unfair Trade Practices Act.

33.    Admit that IRANI is entitled to actual damages, attorney's fees and costs of bringing this action pursuant to Fla. Stat. §§501.2105 and § 501.211.

34.    Admit that money damages will not fully compensate IRANI for Amoco's and BENNETT's aforementioned misconduct.

35.    Admit that IRANI has a clear legal right to a preliminary and permanent injunction prohibiting Amoco from terminating its commission marketer franchise arrangement with IRANI.

36.    Admit that IRANI has a substantial likelihood of succeeding on the merits of her claim(s).

37.    Admit that IRANI has no adequate remedy at law.

38.    Admit that IRANI has suffered and will continue to suffer irreparable harm by virtue of being deprived of the use, benefit, and enjoyment of her franchise which was promised for a 12-year period (including the initial 4-year term in progress at the time of her purchasing her interest in the station.

39.    Admit that it is in the public interest that IRANI be able to maintain her franchise with Amoco and pursue the business of her station.

40.    Admit that money damages will not fully compensate IRANI for Amoco's and BENNETT's aforementioned misconduct.

41.    Admit that IRANI has a clear legal right to a preliminary and permanent injunction compelling Amoco to honor a 12-year commission marketer franchise arrangement with IRANI.

42.    Admit that IRANI has a substantial likelihood of succeeding on the merits of her claim(s).

43.    Admit that IRANI has no adequate remedy at law.

44.    Admit that IRANI has suffered and will continue to suffer irreparable harm by virtue of being deprived of the use, benefit, and enjoyment of her franchise which was represented as being for a 12-year period (including the initial 4-year term in progress at the time of her purchasing her interest in the station.

45.    Admit that it is in the public interest that IRANI be able to maintain her franchise with Amoco and pursue the business of her station.

Dated this ⎧⎩ day of August, 2002.

                              LEVINE & PARTNERS, P.A.
                              1110 BRICKELL AVENUE
                              SEVENTH FLOOR
                              MIAMI, FLORIDA 33131
                              (305)372-1350
                              FAX: (305)372-1352

                              By: _____
                                  ALLAN S. REISS, ESQ.
                                  FLORIDA BAR NO. 858500

5

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:    02-15707 (05)

YASMIN IRANI, an individual,

      Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

      Defendants.
_____/

## NOTICE OF HEARING
## MOTION CALENDAR

      YOU ARE HEREBY NOTIFIED there will come on to be heard before the

Honorable Estella M. Moriarty, one of the Judges of the above Court, on THURDAY,

AUGUST 22, 2002, at 8:45 A.M., at the Broward County Circuit Courthouse, Room

1030B, 201 SE 6th Street, Fort Lauderdale, Florida 33301, or as soon thereafter as counsel

may be heard, the following:

      **PLAINTIFF'S EMERGENCY MOTION FOR EVIDENTIARY
      HEARING REGARDING THE PLAINTIFF'S MOTION FOR
      TEMPORARY PROHIBITORY AND MANDATORY INJUNCTIVE
      RELIEF AND MOTION FOR EXPEDITIED TRIAL DATE AND
      TO SHORTEN TIME TO RESPOND TO DISCOVERY**

      PLEASE BE GOVERNED ACCORDINGLY.

The undersigned states that a good faith effort has or will be made to resolve the issues which are the subject matter of this hearing prior to the scheduled hearing.

In accordance with the Americans with Disabilities Act of 1990, persons needing a special accommodation in this proceeding should contact Allan S. Reiss, Esq. no later than seven (7) days prior to the proceeding. Telephone the 305-372-1350 for assistance; if hearing impaired, telephone 1-800-955-8771 for assistance.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via Federal Express on this 20th day of August, 2002 to: MOISES MELENDEZ, ESQ., Attorneys for Defendant, 500 E Broward Boulevard, Fort Lauderdale, Florida 33394.

LEVINE & PARTNERS, P.A.
ATTORNEYS FOR PLAINTIFF
1110 BRICKELL AVENUE
7TH FLOOR
MIAMI, FLORIDA 33131
(305) 372-1350
FAX: (305) 372-1352

BY:
ALLAN S. REISS, ESQUIRE,

6

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND    FOR    BROWARD    COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

YASMIN IRANI, an individual,                    CASE NO. 02-15707 (05)

        Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

        Defendants.

_____/

## BP'S NOTICE OF FILING

    BP PRODUCTS NORTH AMERICA INC. herewith files the affidavit of Jimmy Moran as to commission marketer agreements.

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by facsimile and by U.S. Mail to: Allan S. Reiss, Esq., Levine & Partners, P.A., Attorneys for Plaintiff, 1110 Brickell Avenue, 7th Floor, Miami, FL 33131 this 21st day of August, 2002.

HEINRICH GORDON HARGROVE
WEIHE & JAMES, P.A.
Attorneys for Defendant, BP
500 East Broward Boulevard, Suite 1000
Ft. Lauderdale, FL  33394-3092
(954) 527-2800 (tel.) / (954) 524-9481 (facsimile)

By:_____
      John R. Hargrove, Esq.
      Florida Bar No. 173745
      Moises Melendez, Esq.
      Florida Bar No. 908835

LAW\82041\090\not filing AFFID-MORAN-IRANI.doc

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

YASMIN IRANI, an individual,  CASE NO. 02-15707 (05)

       Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

       Defendants.

_____/

## AFFIDAVIT OF JIMMY MORAN
## AS TO COMMISSION MARKETER AGREEMENTS

STATE OF FLORIDA
               SS:
COUNTY OF BROWARD

    1.    My name is Jimmy Moran. I am presently employed by Amoco Oil Company

(a/k/a BP Products North America Inc.) as its Florida Regional Sales Manager.

    2.    My duties at Amoco include monitoring the status of Amoco gasoline service

stations in Florida. I comply with these duties through my own efforts and the efforts of other

Amoco employees who report to me. I give this affidavit in my capacity as a representative of

Amoco Oil Company and based upon knowledge derived from my work at Amoco.

    3.    The attached Commission Marketer Transfer Agreement dated November 15,

2000, with all exhibits including the Commission Marketer Agreement dated October 6, 1998 and

the Commission Marketer Lease dated October 6, 1998, are true and accurate duplicates of the

original documents.

    4.    Further affiant sayeth naught.

Case No. 02-15707(05)

_Jimmy Moran_

STATE OF Florida

COUNTY OF Broward

    Sworn to (or affirmed) and subscribed before me this _20_ day of _August_ , by

Jimmy Moran.

Harry Bindschadler
MY COMMISSION # DD097568 EXPIRES
April 9, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

(SEAL)

Notary signature

_Harry Bindschadler_

                    Personally known                 _____

                      or Produced Identification      _____

             Type of Identification Produced    _____

G:\LAW\82041\pleadings\AFFID-MORAN-IRANI.doc

2

SS# 00006304

## AMOCO OIL COMPANY

## COMMISSION MARKETER TRANSFER AGREEMENT

This Transfer Agreement ("this Agreement"), made this _15ᵗʰ_ day of _November_, 2000, by and between **AMOCO OIL COMPANY**, a Maryland corporation having its principal place of business at **8736 West Commercial Boulevard, Lauderdale, Florida 33334** ("Amoco"), **Cam Cornish** ("Transferor"), and **Yasmin Irani**, ("Transferee").

## WITNESSETH:

WHEREAS, Amoco and Transferor are parties to a Commission Marketer Lease for a portion of the Amoco motor fuel premises located at **980 North Lake Boulevard, Lake Park, FL 33403** to sell non-**fuel** merchandise and/or services and a Commission Marketer Agreement for the operation of the motor fuel position of the premises on a commission basis under Amoco's trademark and service mark "Amoco" and related agreements (the Commission Marketer Lease, Commission Marketer Agreement and related agreements collectively referred to as the "Amoco Agreements"); and

WHEREAS, Transferee has purchased a controlling interest in Transferor; and

WHEREAS, Transferor desires to transfer to Transferee and Transferee desires to purchase all of Transferor's right, title and interest in and to the Amoco Agreements and the assets of the business conducted thereunder; and

WHEREAS, pursuant to the provisions of the Amoco Agreements, such transfer is subject to the consent of Amoco; and

WHEREAS, Amoco is willing to consent to the transfer subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

I.      EFFECTIVE DATE

This Agreement shall become effective on _November 15, 2000_ ("Effective Date").

- 1 -

II.     REPRESENTATIONS; CONSENT TO TRANSFER

    A.     Representations:

        1.     Transferor represents to Amoco that Transferor owns all right, title, and interest in and to the Amoco Agreements attached to this Agreement as Exhibit A;

        2.     Transferor represents to Amoco that Transferor has transferred, assigned and set over to Transferee all right, title, and interest in and to the Amoco Agreements, subject to the consent of Amoco;

        3.     Transferee represents to Amoco that Transferee has accepted all right, title and interest in and to the Amoco Agreements, subject to the consent of Amoco; and

        4.     Transferor and Transferee represent and warrant to Amoco that they each have the authority to execute this Agreement.

    B.     Amoco waives its right of first refusal under the Amoco Agreements and consents to the transfer by Transferor to Transferee of all right, title, and interest in and to the Amoco Agreements, subject to the following conditions:

        1.     That all ascertained or liquidated debts of Transferor to Amoco, its parent, subsidiaries and/or affiliates are paid in full as of the date of transfer of the assets of the Business;

        2.     That Transferee enter into a continuing Guaranty and Assumption of Obligations in the form attached to this Agreement as Exhibit B, guaranteeing all liabilities and obligations of Franchisee under the Amoco Agreements and agreeing to be bound individually by the Amoco Agreements; and

        3.     That Transferor expressly agrees and acknowledges, by execution of this Agreement, that Transferor is and remains legally bound to comply with the covenants contained in the Amoco Agreements, which expressly or by reasonable implication, are intended to apply to Transferor after the transfer or termination thereof.

III.    TRANSFEROR'S PAYMENTS

    A.     Upon execution of this Agreement, Transferor shall pay all sums due and owing to Amoco pursuant to the Amoco Agreements through the effective date of this Agreement.  Any outstanding balances on charges incurred by or against Transferor prior to the Effective Date of this Agreement but not received until after that time shall be paid out of Transferor's security deposit.

- 2 -

## IV.   INDEMNIFICATION; WARRANTIES

A.     Consent by Amoco hereunder does not constitute an endorsement of the transaction between Transferor and Transferee.  Any terms or conditions of the purchase and sale between Transferor and Transferee which may purport to bind Amoco shall not be valid and binding on Amoco unless agreed to by Amoco in writing.

B.     Transferor and Transferee, for themselves, their successors, assigns and agents, and each of them, do hereby agree to indemnify and hold harmless Amoco and its subsidiaries, devisees, successors, assigns, officers, directors, employees and agents, and each of them, against the following:

1.     Any and all liabilities, losses, damages, deficiencies, claims costs, or expenses of any nature resulting, directly or indirectly, from the following:   (i) any misrepresentations or breach of warranty or covenant on the part of Transferor or Transferee under this Agreement or otherwise; (ii) the non-fulfillment of any conditions under this Agreement or otherwise; and (iii) the transfer of the Amoco Agreements and the assets of the Business; and

2.     Any and all actions, suits (third party or otherwise), proceedings, investigations, demands, assessments, judgments, costs and expenses incident to the foregoing, including, but not limited to, reasonable legal and accounting fees.

## V.    GENERAL RELEASE

Transferor, for itself, its successors, and assigns does hereby remise, release and forever discharge Amoco and Amoco's parent, subsidiaries and/or affiliates and their respective successors, assigns, directors, officers, shareholders, managers, members, governors, and employees, of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action of every nature, character, or description, whether known or unknown, vested or contingent, which Transferor, or any of them, now owns or holds, or at any time heretofore owned or held, or may at any time own or hold, arising prior to and including the date of this Agreement.  Transferor and each of them hereby represent that no third party has or claims an interest in any claim released by this Agreement.

## VI.   MISCELLANEOUS

A.     Paragraph Headings; Pronouns.  The paragraph headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.  Each pronoun used herein shall be deemed to include the singular or plural, masculine or feminine, in accordance with the defined terms to which the pronouns refer.

B.     Entire Agreement.  This Agreement, the attachments hereto and to documents referred to herein, constitute the entire agreement among the parties with respect to the subject

- 3 -

matter hereof.  No amendment shall be binding unless in writing and signed by the party against whom enforcement is sought.

C.     Joint and Several.  If Transferor or Transferee consist of more than one (1) individual or entity, their liability under this Agreement shall be deemed to be joint and several.

D.     Survival.  All provisions of this Agreement which by their terms or by reasonable implication are intended to survive the closing of this transaction shall survive it.

E.     Non-Waiver.  No waiver of any covenant or condition or the breach of any covenant or condition by any party shall constitute a waiver of any subsequent breach of such covenant or condition or authorize the breach or nonobservance of any covenant or condition by any party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first and above written.

ATTEST:                                    AMOCO OIL COMPANY:

_____     By: _____

                                               Title: _____

ATTEST:                                    TRANSFEROR:  Cam Cornish

_____     By: _____

                                               Title: _____

ATTEST:                                    TRANSFEREE: Yasmin Irani

_____     By: _____

                                               Title: _____

i \law\oilgroup\commkt\contract\pend2000\fl-camtran.doc

- 4 -

## EXHIBIT A - ATTACH CURRENT AMOCO AGREEMENTS

### List Agreements:

1. Commission Marketer Transfer Agreement
2. Commission Marketer Agreement
3. Commission Marketer  Lease
4. Commission Marketer Printer Agreement (A)
5. Dealer/Jobber Credit Card Contract (POS)
6. Dealer/Jobber Debit Card Agreement

# COMMISSION MARKETER AGREEMENT

# TABLE OF CONTENTS

**SECTION**                                                          **PAGE**

1.  GENERAL OBLIGATIONS ...................................................................... 1

2.  TERM ........................................................................................................ 1

3.  RIGHT TO USE FUEL FACILITY ............................................................ 2

4.  OTHER BUSINESS OPERATIONS ......................................................... 2

5.  PERSONAL ATTENTION TO OPERATION ........................................... 2

6.  PERSONNEL AND TRAINING .............................................................. 2

7.  COMPENSATION .................................................................................... 3

8.  SECURITY DEPOSIT .............................................................................. 3

9.  CASH ......................................................................................................... 3

10. ACCOUNTING ........................................................................................ 3

11. AUDITING ................................................................................................ 4

12. OPERATING STANDARDS AND PROCEDURES ................................ 4

13. HOURS OF OPERATION ....................................................................... 5

14. CUSTOMER ACCESS ............................................................................. 5

15. LICENSES AND PERMITS ..................................................................... 5

16. TRADEMARKS ........................................................................................ 5

17. COMPLIANCE WITH LAW .................................................................... 6

18. LIABILITY ................................................................................................ 6

19. INVENTORY MEASUREMENTS .......................................................... 6

20. MAINTENANCE AND REPAIR ............................................................. 7

21. TAXES ....................................................................................................... 7

22. UTILITIES ................................................................................................ 7

23. TERMINATION AND NONRENEWAL ............................................................. 7

24. INSURANCE ........................................................................................... 9

25. NOTICE ................................................................................................. 10

26. RELATIONSHIP OF PARTIES ................................................................. 10

27. ASSIGNMENT, FIRST REFUSAL ............................................................ 11

28. ENTIRE AGREEMENT ............................................................................ 12

29. WAIVER ................................................................................................ 12

30. CONFIDENTIALITY ................................................................................ 12

31. FORCE MAJEURE .................................................................................. 12

32. SEVERABILITY ...................................................................................... 13

## EXHIBITS

EXHIBIT A    MAINTENANCE

EXHIBIT B    STATE ADDENDA



S. S. # <u>00006304</u>

SVB # _3045796_

# COMMISSION MARKETER AGREEMENT

## CMA 9704

**THIS AGREEMENT** dated _October 6_ , 19~~98~~, is between **AMOCO OIL COMPANY**, a Maryland corporation with offices at <u>600 Corporate Drive, Suite 500, Ft. Lauderdale, FL</u> Zip Code <u>33334-3607</u> ("Amoco") and <u>Cam Cornish</u> with an address of <u>980 Northlake Blvd., Lake Park, FL</u> Zip Code <u>33403</u> ("Marketer").

**WHEREAS,** Amoco owns or controls certain real estate located at <u>980 Northlake Blvd., Lake Park, FL 33403</u> upon which a retail sales facility is or will be located (the "Facility") which includes a motor fuels sales facility (the "Fuel Facility"); and

**WHEREAS,** Marketer wishes to lease from Amoco and operate an independent business upon a portion of the Premises (the "Leased Premises") pursuant to a lease (the "Lease"); and

**NOW THEREFORE IN CONSIDERATION OF** the mutual covenants, conditions and promises contained in this Agreement, Amoco and Marketer hereby agree as follows:

1.    **GENERAL OBLIGATIONS.**    Amoco hereby engages Marketer as an independent contractor and Marketer agrees to act as an independent contractor  to dispense motor fuels at the Fuel Facility in the name and on behalf of Amoco and furnish services related thereto in accordance with the terms of this Agreement.  Amoco shall supply or arrange for the supply of all motor fuels for sale at the Fuel Facility and shall provide and install all equipment necessary for the dispensing of motor fuels.  All inventories of motor fuels shall be owned by Amoco and shall be dispensed by Marketer on behalf of Amoco at retail prices established by Amoco.

2.    **TERM.**    This Agreement is for a term of four (4) years beginning on _October 6, 1998_ (the "Initial Term").

3.     **RIGHT TO USE FUEL FACILITY.**  Marketer acknowledges and understands that its right to use and dispense motor fuels from the Fuel Facility is only for the time period stated in this Agreement and is subject to the provisions of this Agreement.  Marketer specifically acknowledges that no representations of any kind have been made to the contrary.

4.     **OTHER BUSINESS OPERATIONS.**  Only business operations approved in advance in writing by Amoco may be conducted at the Facility.  Business operations subject to Amoco's approval include, without limitation, the installation of telephones for customer use, vending machines, ice machines and lottery machines.  Marketer shall not permit storage or short-term parking of vehicles or trailers at the Facility that is unrelated to the conduct of business at the Facility.

5.     **PERSONAL ATTENTION TO OPERATION.**  The undersigned individual shall devote his or her personal effort and attention to managing the business at the Fuel Facility and shall be physically present at the Fuel Facility for reasonable periods of time during normal business hours, excepting normal vacations.

6.     **PERSONNEL AND TRAINING.**  Marketer shall hire and properly train suitable personnel to efficiently and effectively operate the Fuel Facility.  All personnel shall be employees of Marketer ("Employees"), and Marketer shall have the sole right and discretion to hire, discipline and discharge the Employees, except as otherwise specified in this Agreement.  In the employment of Employees, Marketer shall exercise due care in selecting persons of integrity and reliability.

The Marketer shall cause all Employees to treat customers in a friendly, courteous and respectful manner.

The wages, salaries and fringe benefits paid or to be paid to the Employees shall be determined solely by Marketer.  Marketer shall pay its Employees all salaries, wages, fringe benefits and other forms of compensation and reimbursement when due.  Marketer shall report and pay when due all payroll and withholding taxes, social security and the like due as a result of such employment.

Marketer shall comply with all policies Amoco may establish from time to time required for the secure, safe and efficient operation of the Fuel Facility.

7.     **COMPENSATION.** The sole compensation to Marketer under this Agreement shall be the following Commission Fee which is based on the volume of motor fuels sold at the Fuel Facility, payable according to Amoco policies and procedures as may be amended from time to time:

> 9.9 cents per gallon on all self-serve grades
>
> N/A cents per gallon on all full-serve grades
>
> N/A cents per gallon on diesel fuel

Amoco may from time to time offer additional commission on all grades as a promotion which Amoco can implement and withdraw in its discretion.

8.     **SECURITY DEPOSIT.** Upon execution of this Agreement, Marketer shall post a security deposit in the amount of $24,000.00 as security for motor fuels stored in the ground and the proceeds from the sale of motor fuels. Amoco shall have the right to increase or decrease the security deposit upon thirty (30) days written notice in accordance with Amoco policy in consequence of Marketer's credit history, changing values of inventory or other business considerations. It is understood and agreed that Amoco shall not be required to pay to Marketer interest on the security deposit, except as otherwise required by law. Upon expiration or termination of this Agreement, Amoco shall retain an amount equal to fifteen percent (15%) of the security deposit for a period of one-hundred eighty (180) days to be used to satisfy any outstanding balances or charges incurred by or against Marketer prior to expiration or termination of this Agreement, but not received until after that time.

9.     **CASH.** Marketer shall permit no more than two-hundred dollars ($200.00) in cash from the sale of motor fuels to be kept in the cash drawer at any one time at the Facility and shall follow the cash procedures and security guidelines set by Amoco from time to time including, but not limited to, maintaining a locked door to any secured area. Amoco's loss is limited to two-hundred dollars ($200.00), regardless of the amount of cash in the cash drawer at any time.

10.     **ACCOUNTING.** Marketer shall promptly account to Amoco in the manner and at the times established by Amoco for all gross receipts from the sale of motor fuels. Amoco may require payments and/or credits be made through EFT. All sales proceeds and accounts receivable arising from the sale of all motor fuels shall at all times be and remain the property of Amoco. Amoco shall be responsible for credit card fees for the sale of motor fuels. Marketer shall be responsible for all other credit card fees for sales at the Facility.

Marketer shall properly prepare and submit all reports and statements relating to the operation of the Fuel Facility now or hereafter required by Amoco. To aid both parties in this accounts monitoring activity, Amoco may, at its option and at its expense, furnish electronic cash registers and/or other equipment for the Facility. Amoco shall pay seventy percent (70%) and Marketer shall pay thirty percent (30%) of the costs of installation of such equipment. Amoco assumes costs of maintenance and Marketer assumes costs of operation of such equipment,

including supplies such as paper, ink and the like. Marketer shall provide, install and maintain at its expense a printer which meets Amoco's specifications for use with said equipment.

In the event that Marketer fails to pay any moneys belonging to or owing to Amoco, Amoco may deduct such moneys from any compensation due or that may become due to Marketer or from the security deposit. This right shall be exercised at Amoco's option and shall be in addition to Amoco's other rights and remedies.

**11.     AUDITING.** Amoco shall have the right at all times to inspect motor fuels, books and records in the possession or control of Marketer to determine compliance with this Agreement and all related agreements.

**12.     OPERATING STANDARDS AND PROCEDURES.**

A.     Marketer shall perform motor fuel street price surveys, record and transmit the survey information and make sign and system price changes in the manner and at the times established by Amoco from time to time. Marketer agrees and understands that timely and accurate price changes and submission of survey information is an important part of this Agreement. Marketer shall be responsible for any loss to Amoco caused by Marketer's failure to properly or timely survey, record or transmit price information or to properly or timely make sign or system price changes. Marketer shall provide at Marketer's expense, a facsimile machine and dedicated line for use in communicating price related information and for other communications with Amoco.

B.     Marketer agrees to maintain the retail image standards and standards of appearance and cleanliness at the Fuel Facility as specified by Amoco from time to time and to follow all instructions of Amoco representatives relating thereto. This includes, but is not limited to, daily cleaning of the Fuel Facility including the fuel dispensing equipment; daily removal of debris from driveways; prompt trash removal; snow removal; landscaping care; routine cleaning of light fixtures; and all other routine maintenance as designated by Amoco. No signs or notices shall be displayed at the Fuel Facility unless they are authorized in advance by Amoco. All Employees of Marketer shall at all times be neat and clean and wear uniforms approved by Amoco.

C.     Marketer shall be responsible for the proper execution of gasoline promotion activities directed by Amoco from time to time including the proper display of P.O.P. materials.

D.     In its performance of the duties required under this Agreement, Marketer shall follow and shall cause all of its Employees to follow Amoco's policies and operating standards and procedures as may be amended by Amoco from time to time, including but not limited to those regarding delivery, receipt and sale of motor fuels; inventory measurements; security and safety; acceptance of credit cards; repair and maintenance of equipment; customer service and the proper handling of customer complaints. Marketer and its employees shall attend conferences and training programs as required by Amoco for which Amoco may elect to charge a fee.

E.  Marketer shall comply with and be bound by the audit and monitoring procedures which Amoco may from time to time create and modify to monitor, implement and enforce (i) Marketer's obligations under this Agreement, and (ii) Amoco's standards and policies. Marketer shall conduct all business operations at the Fuel Facility in a manner which meets Amoco's operating standards, policies and procedures and reflects favorably upon Amoco.

**13.  HOURS OF OPERATION.** Except as otherwise required by law, Marketer shall keep the Fuel Facility properly lighted, staffed and open for self serve-motor fuel sales 24 hours per day, seven days per week, including holidays, unless permission for lesser hours of operation has been granted in advance by Amoco in writing.

In addition, Marketer can provide full-serve gasoline service between the hours of N/A a.m. and N/A p.m. at fueling positions designated by Amoco from time to time.  During hours when said fueling positions are not being used for full-serve sales, they shall be used for self-serve sales.

**14.  CUSTOMER ACCESS.** Marketer shall ensure that driveways are not blocked and that customers have convenient access to fuel dispensing and sales areas, rest rooms, air hoses, vacuum equipment, car wash and other approved business operations, if any.

**15.  LICENSES AND PERMITS.** Marketer shall procure and maintain all licenses and permits necessary for the operation of the Fuel Facility, and Amoco shall reimburse Marketer for all fuel-related licenses.  If requested, Marketer shall assist Amoco in procuring and maintaining said licenses and permits.  Marketer shall comply with the terms of all Fuel Facility licenses and permits.  In the event such licenses and permits are revoked, this Agreement shall terminate.

**16.  TRADEMARKS.**

A.  Marketer understands and agrees that the AMOCO name and the Amoco Torch and Oval Design are trademarks, trade names and service marks exclusively owned by Amoco.  Marketer shall not acquire any right or license in or to said trademarks, trade names and service marks or to any other logo, trademark, trade name or service mark owned by Amoco (collectively, the "Marks"), and Marketer agrees that the Marks shall be displayed in accordance with Amoco's standards and policies.  Upon termination of this Agreement for any reason whatsoever, Marketer shall return all signs, labels and other items containing the Marks to Amoco.

B.  Prior to establishing a Website in connection with Marketer's operation of the Fuel Facility, Marketer must submit to Amoco a sample of the Website information in the form and manner prescribed by Amoco from time to time.  "Website" means an interactive electronic document contained in a network of computer linked by communications software. Marketer shall not establish a Website which has not been approved in writing by Amoco. Marketer must follow Amoco's standards and specifications for Websites as prescribed by Amoco from time to time in the Operations Manual.  If Marketer alters its Website previously approved

by Amoco, it must submit to Amoco a sample of such alterations and receive Amoco's approval prior to implementing such alternations to the Website.

    **17.**    **COMPLIANCE WITH LAW.**  Marketer shall comply with all applicable laws and regulations with regard to the operation of the Fuel Facility, including, but not limited to, all applicable employment, occupational, health, safety and environmental laws and regulations.

    **18.**    **LIABILITY.**  Marketer shall be liable for any loss, damage, injury or other casualty to the person or property of anyone, including Marketer, caused in whole or in part by any failure to comply with any term or provision of this Agreement or any law or regulation or by any negligence or fault of Marketer, its agents or employees in any way relating to the use, possession, or operation of the Fuel Facility.  Marketer, for itself, its agents, employees, heirs, personal representatives, successors and permitted assigns specifically agrees to indemnify and hold Amoco, its parent, affiliates and each of their respective agents, employees, officers, directors, successors and assigns harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorneys' fees, incurred by or imposed on Amoco in connection therewith) for any such loss, damage, injury or other casualty.  Amoco does not waive and Marketer is not released from any liability and/or obligation Marketer has or may have to Amoco or third parties under any prior agreement or lease.

    Marketer shall be responsible to Amoco for any cash shortages and any sales to customers who leave the Facility without paying for motor fuels.  Marketer shall be responsible for any losses due to robberies, unless Marketer followed all applicable regulations, instructions and procedures established by Amoco and otherwise had no fault; Amoco's loss is limited to two-hundred dollars ($200.00), regardless of the amount of any such loss.

    Marketer shall not be responsible for motor fuel inventory loss, tank leakage, fuel spills, gasoline fumes or under any hazardous waste statute, toxic waste cleanup statute or similar law or regulation, provided that Marketer has followed Amoco's instructions and procedures and performed all of its obligations hereunder regarding the detection and reporting of tank leakage and so long as the loss, leakage, spill or fumes are not caused in whole or in part by the negligence or fault of Marketer or its agents or Employees.

    In no event shall either party be liable to the other for any consequential, incidental, punitive or exemplary losses or damages suffered by the other party.  Any action by either party under this Agreement must be brought within one year after the cause of action arose. Each party irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

    **19.**    **INVENTORY MEASUREMENTS.**  In order to assist Amoco in detecting tank leakage, other causes of motor fuel shortage, and in order to assist Marketer and/or Amoco in complying with any legal requirements, Marketer, on a daily basis and whenever specifically requested by Amoco, shall take physical inventory measurements of the amount of motor fuels in storage at the Fuel Facility and check for the presence of water and shall report such measurements to Amoco in the manner and at the times established by Amoco.  Marketer shall report any detected or suspected shortage or tank leakage of motor fuel immediately to Amoco.

**20.    MAINTENANCE AND REPAIR.** Amoco shall be responsible for all repairs and maintenance required at the Fuel Facility, except for maintenance as set forth in Exhibit A to this Agreement. Marketer shall be diligent in monitoring the condition of the Fuel Facility and its need for maintenance and repairs. Marketer agrees to give prompt notice to Amoco when repair or maintenance is required by Amoco and shall follow-up with Amoco as necessary. Marketer shall be responsible for all maintenance set forth in Exhibit A to this Agreement and shall perform said maintenance in a timely manner and as set forth in policies and procedures which may be issued by Amoco from time to time. If Marketer fails to perform Marketer's maintenance and/or repair obligations as set forth in this Agreement and/or Exhibit A in a timely manner, Amoco shall have the right, in its discretion, to perform such maintenance and/or repairs and charge Marketer for the costs thereof.

Amoco shall not be responsible for maintenance and repairs necessitated by Marketer's or its agent's or employee's negligence or fault. Marketer shall exercise reasonable care in the operation and maintenance of the Fuel Facility and equipment owned by Amoco and shall be liable for any loss or damage for failure to do so.

**21.    TAXES.** Amoco shall pay all real estate taxes relating to the Facility. Amoco shall pay all taxes which are imposed upon Amoco's business operations, its property, equipment and fixtures at the Fuel Facility. Marketer shall pay all taxes which are imposed upon Marketer's business operations at the Fuel Facility, including but not limited to any income derived therefrom.

**22.    UTILITIES.** Marketer shall pay all bills for all utilities relating to the Facility, including, but not limited to, electricity, heating, air conditioning, telephone service, waste disposal, trash pick-up, sewer and water.

**23.    TERMINATION AND NONRENEWAL.**

A.    If any of the following events occur, Amoco may terminate or nonrenew this Agreement upon 90 days written notice or such shorter notice as is reasonable under the circumstances or otherwise required by state law:

1)    Breach of any provision of this Agreement or the Lease.

2)    Failure to maintain or follow any of the operating standards or procedures as provided in this Agreement or any operational standard or procedure issued by Amoco pursuant to this Agreement.

3)    Failure to properly or accurately perform price surveys or record or transmit prices or make sign or system price changes.

4)    Adoption of any law or regulation prohibiting the operation of motor fuel sales facilities by independent contractors such as Marketer.

5)    Death of Marketer, except that Marketer may designate in writing to Amoco a successor who must at the time of Marketer's death meet Amoco selection criteria for Commission Marketers.

6) A continuing severe physical or mental disability or alcohol or drug abuse of Marketer of at least three months duration (or such shorter duration which under the facts and circumstances constitutes an unreasonable period of time) which renders Marketer unable to provide for the continued proper operation of the Fuel Facility.

7) Failure of Marketer to devote Marketer's personal attention at the Fuel Facility, it being the essence of the parties' relationship that Marketer's personal, physical presence be at the Fuel Faculty as provided in this Agreement.

8) The incurring of unauthorized indebtedness on Amoco's behalf.

9) Condemnation or other taking, in whole or in part, preventing or materially affecting the use and/or operation of the Fuel Facility.

10) Destruction of all or a substantial part of the Fuel Facility.

11) Loss of Amoco's right to possess or operate the Fuel Facility.

12) Failure to comply with all applicable laws and regulations.

13) Insolvency of Marketer or the filing of a voluntary petition in bankruptcy by, or an involuntary petition in bankruptcy against Marketer, judicial determination that Marketer is bankrupt or insolvent or any other reasonably convincing evidence of financial distress of Marketer, such as, without limitation, appointment of a receiver for Marketer, assignment by Marketer for the benefit of creditors, giving of one or more insufficient funds checks and the like.

14) Decision by Amoco to sell the Facility for a use other than the sale of Amoco branded petroleum products. In such event Amoco shall make a bona fide sale offer or give a right of first refusal to Marketer.

15) Decision by Amoco to withdraw from Commission Marketer operations in the geographic area of the Facility. In the event Amoco specifically designates its decision to withdraw from Commission Marketer operations as the grounds for termination and Amoco has not also decided to withdraw from marketing through lessee-dealers in the geographic area of the Facility, Amoco shall offer Marketer the option to become a lessee dealer on Amoco's then-current forms.

**B.** If any of the following events shall occur, Amoco may terminate this Agreement immediately upon written notice:

1) Failure to properly deposit or account to Amoco for all gross receipts from the sale of motor fuels in a timely manner.

2) Conviction of Marketer of any felony.

3)      Fraud or criminal misconduct by the Marketer or Marketer's employees relevant to the operation of the Facility.

4)      Failure to comply with environmental and/or safety standards or procedures established by governmental authorities.

5)      Failure to operate the Fuel Facility for seven (7) consecutive days or such lesser period of time as may be reasonable under the circumstances.

6)      Failure to comply with standards or specifications more than twice in any twelve (12) month period, regardless of whether such defaults are cured.

C.      Amoco shall not be obligated to continue the sale of its motor fuels from the Fuel Facility covered by this Agreement if it should make a determination to withdraw from marketing of motor fuels under the Amoco trademark or trade name at retail outlets in the geographic area of the facility.  In such event, Amoco may terminate this Agreement upon one hundred eighty (180) days' notice.

D.      This Agreement shall terminate upon the termination, nonrenewal or expiration, for any reason, of the Lease.  Marketer acknowledges and understands that upon the termination, nonrenewal or expiration of this Agreement and/or the Lease, Amoco may discontinue operations at the Facility or may continue in possession of the Facility and operate it with its own employees or establish operations by a contractor, dealer and/or jobber and may, . without limitation, transfer, operate or use the Facility in any manner for any purpose.

E.      Marketer agrees to vacate the premises on the effective date of the termination or expiration of this Agreement or the Lease, remove any inventory, equipment, machinery, tools, goods, products and supplies belonging to Marketer, subject to the provisions of the Agreement and the Lease, and surrender the premises to Amoco in as good condition as when received, normal wear and tear excepted.  If removal of Marketer's property causes any damage, Amoco may repair such damage at Marketer's expense.  In the event Marketer fails to remove any such items owned by it within ten (10) days after the effective date of the termination or expiration of this Agreement or the Lease, title thereto shall pass to Amoco without notice and without cost or charge and Marketer waives any claims for such items.

**24.      INSURANCE.** During the term of this Agreement, Marketer shall maintain at this sole expense (i) Workmen's Compensation and Occupational Diseases insurance as required by any applicable law; (ii) Commercial General Liability insurance (if applicable) with a minimum combined single limit of One Million Dollars ($1,000,000.00) for each occurrence; and (iii) Business Auto Liability and Garagekeepers' insurance with a minimum limit of Five Hundred Thousand Dollars ($500,000.00) per occurrence.  The Commercial General Liability insurance shall be extended to provide Contractual Liability insurance specifically insuring Marketer against the liabilities assumed under this Agreement.

All policies of insurance required under this Agreement shall include Amoco as an additional insured.  Marketer shall furnish Amoco with certificates of insurance evidencing that all

insurance policies required under this Agreement are in force and effect and will not be canceled or changed without at least thirty (30) days' prior written notice to Amoco. At Amoco's request, Marketer shall provide Amoco with a copy of all insurance policies required under this Agreement. Maintaining the prescribed insurance shall not relieve Marketer of any other obligations under this Agreement.

Amoco shall have the right, at its election, to increase the minimum insurance coverage limits required herein by giving Marketer written notice thereof not less than ninety (90) days in advance.

**25.   NOTICE.** Any notice provided for herein shall be considered properly given if: (i) mailed by certified mail return receipt requested or private express mail service (such as Federal Express) to the other party at the address listed in this Agreement or at such other address as such party may from time to time designate by written notice to the other party; (ii) hand delivered to the Marketer or the Facility; or (iii) sent by facsimile provided that a confirmation copy is sent by private express mail service on the same day. The facsimile numbers of the parties for notice purposes are as follows:

Amoco:    <u>(954) 351-1071</u>    (facsimile number)

Marketer:  <u>(561) 626-2989</u>    (facsimile number)

The effective date of any notice shall be the first of (i) the date the notice is mailed by certified mail or private express mail service; (ii) the date of delivery of the notice to the Marketer or the Facility; or (iii) the time the notice is sent by facsimile.

**26.   RELATIONSHIP OF PARTIES.** This Agreement creates an independent contractor relationship and Marketer shall have no authority or right to incur indebtedness or to bind or commit Amoco. This Agreement is not intended to, nor does it create a joint venture, partnership or employer/employee relationship between the parties.

Marketer acknowledges and understands that in the absence of the personal commitment of the undersigned individual to the operation of the Fuel Facility for which Marketers qualifications and abilities are essential, Amoco would not have entered into this Agreement.

MARKETER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT DOES NOT CREATE, EXTEND OR RENEW A FRANCHISE UNDER ANY LOCAL, STATE OR FEDERAL LAW, INCLUDING BUT NOT LIMITED TO THE FEDERAL PETROLEUM MARKETING PRACTICES ACT.

Marketer agrees that it shall have no right, privilege or interest in or to the Fuel Facility or the property on which the Fuel Facility is located or in the business or goodwill of Amoco by virtue of this Agreement. Amoco, its agents and employees shall have unrestricted access to the Facility at all times. Amoco shall determine in its sole discretion the types of improvements and equipment to be located at the Fuel Facility and the number and the location of pay points. Amoco may make changes or additions to the Fuel Facility without obligation or

liability to Marketer. Amoco retains the right at all times to market motor fuels, merchandise and services in the area of the Facility at other locations, including but not limited to establishing its own employee operated retail facilities, dealer operated facilities, contractor operated facilities, other Commission Marketer facilities and/or jobber supplied retail facilities.

### 27.    ASSIGNMENT, FIRST REFUSAL.

A.    Marketer shall have the right to assign this Agreement after first obtaining the written consent of Amoco, which consent shall not be unreasonably withheld. No assignment approved and permitted by Amoco shall in any manner limit or release Marketer from its obligations under this Agreement.

B.    Amoco shall have a right of first refusal to purchase or otherwise acquire Marketer's interest in this Agreement and/or Marketer's business as related to this Agreement on the same terms and conditions as set forth in any contract entered into by Marketer in any bona fide arms-length transaction. Marketer agrees to submit to Amoco legible, fully executed copies of all contracts, agreements, side letters and undertakings related to any such transaction. Marketer further agrees to submit to Amoco such additional information, facts and data as Amoco deems necessary to assist Amoco in confirming the bona fide nature of the transaction and to provide Amoco with a basis for granting any consent to assignment or exercising any right of refusal as provided for herein. Amoco, at its election, may exercise its right of first refusal in accordance with the provisions of this section or may assign its right of first refusal and/or other rights hereunder to any other person or legal entity. Amoco has the option to substitute cash for any non-cash consideration offered by a prospective purchaser. Amoco shall be entitled to customary warranties and representations from Marketer. Amoco or its assignee shall have thirty (30) business days (i.e., Monday through Friday, excluding all state and federal holidays) from the receipt of fully executed copies of all contracts and related agreements between Marketer and the proposed purchaser and all additional information requested by Amoco to exercise its right of first refusal hereunder. During said 30 day period, Amoco's right of first refusal and right to assign such right shall be irrevocable.

C.    If Amoco does not elect to exercise its right of first refusal within the time period provided herein, Marketer may assign this Agreement if Marketer obtains Amoco's prior written consent, which shall not be unreasonably withheld. Amoco may condition its consent to assignment upon (1) the satisfaction by the proposed assignee of all of Amoco's then current requirements for the qualification of new Marketers; (2) the agreement of the proposed assignee to enter into an Amoco Lease Agreement regarding the Leased Premises; and (3) simultaneously therewith the execution by Marketer of a mutual cancellation of this Agreement and associated agreements.

D.    Marketer is the sole owner of the business operations regarding the Fuel Facility and shall not sell, assign or otherwise permit the change of any legal or beneficial interest in said business, including, but not limited to, any sale, conveyance, transfer or assignment of any such interest to a corporation, limited liability company or partnership owned or controlled by Marketer, without the express written consent of Amoco.

E.    Nothing in the above shall constitute a limitation in any manner on Amoco's right to reasonably withhold its consent to any proposed assignment by Marketer for reasons not mentioned herein or to impose other qualifications to the giving of such consent.

F.    It is expressly understood and agreed that Amoco shall have the right to sell the Fuel Facility and/or sell or assign this Agreement to a third party, including but not limited to an Amoco branded Jobber.

**28.    ENTIRE AGREEMENT.** This Agreement and the Lease cancel and supersede all prior written and unwritten agreements and understanding between the parties pertaining to the Facility. No obligation, agreement or understanding shall be implied from any course of dealing or from any of the terms and provision of the Agreement or the Lease, all obligations and understandings with respect to the subject matter hereof being expressly set forth in this Agreement and the Lease. No representations or statements other than those expressly set forth herein have been relied upon by the parties in entering into this Agreement. No modification or amendment of the terms of this Agreement shall be effective unless reduced to writing and signed by an authorized representative of each party.

**29.    WAIVER.** No waiver of the breach of any term or provision of this Agreement shall be construed to be a waiver of any preceding or succeeding breach of the same or any other term or provisions. The rights and remedies hereunder shall be without prejudice, and the exercise or enforcement of any one or more of them shall not preclude the exercise or enforcement of any other right or remedy.

**30.    CONFIDENTIALITY.** The specific provisions of the business relationship between the parties and this Agreement and Amoco's marketing plans and strategies are confidential and shall not be disclosed except to Marketer's attorneys and financial advisors and then only on the condition that they also be bound by this confidentiality provision. Upon the termination of this Agreement Marketer shall return all Amoco policies and procedures and any copies thereof.

**31.    FORCE MAJEURE.** Neither party shall be liable for delays or nonperformance caused by an event which cannot be reasonably foreseen or prevented, including without limitation, unavailability, failure or delay of transportation, labor difficulties, fire, riots, war conditions in any country, compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary), material or labor restrictions by any governmental authority or any Act of God affecting directly or indirectly either party's ability to perform hereunder. Settlement of strikes shall be at the discretion of the party so affected.

Amoco shall be excused from delay or nonperformance if Amoco is unable to meet the demand for motor fuels at Amoco's normal and usual source points for supplying the Fuel Facility (regardless of whether or not Amoco may have diverted certain supplies from such source points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of motor fuels or component necessary in the manufacture or production thereof.

In the event of any of the contingencies or conditions referred to above, Amoco shall have the right to curtail deliveries or allocate its supply of motor fuels and/or inventory in any manner which in its sole discretion is fair and reasonable in the circumstances and Marketer shall not hold Amoco responsible in any manner for any losses or damages that may accrue as a result thereof.

32. **SEVERABILITY.** If, for any reason any portion of this Agreement is held to be invalid, contrary to, or in conflict with any applicable present or future law, the remaining portions of this Agreement, to the extent practicable, shall remain in effect to the extent permissible under such law. If any applicable law requires a greater prior notice of termination or other action than is required hereunder or the taking of some other action not required hereunder, or if under any applicable law any provision of this Agreement or any specification, standard or operating procedure is invalid or unenforceable, such notice and/or other action required by such law shall be substituted for the comparable provisions hereof.

**AMOCO OIL COMPANY,**
a Maryland corporation

By: _____

Title: _____

**MARKETER**

By: _____

Cam Cornish

# EXHIBIT A

## MAINTENANCE

## COMMISSION MARKETER AGREEMENT

| ENVIRONMENTAL COMPLIANCE EQUIPMENT | Marketer | | Amoco | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| Observation wells - maintenance & repair | | | X | X |
| Monitoring wells - inspection | | | X | X |
| Monitoring well log/file at station | X | X | | |
| Cathodic protection test | | | X | X |
| Cathodic protection test log/file at station | X | X | | |
| Tank, line, Stage II test | | | X | X |
| Tank, line, Stage II test log/file at station | X | X | | |
| Leak detector test | | | X | X |
| Leak detector test log/file at station | X | X | | |
| 36-hour waste oil U/G tank test (if required) | X | X | | |
| Maintain true inventory reconciliation records (to be retained and made available upon request) | X | X | | |

### EQUIPMENT

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| ARSTA equipment: | | | | |
| - Earth station | | | X | X |
| - Satellite dish | | | X | X |
| Dispenser: | | | | |
| - Hoses | X | X | | |
| - Stage II hoses | X | X | | |
| - Nozzles | X | X | | |
| - Stage II nozzles | X | X | | |
| - Breakaways | X | X | | |
| - Initial ECD compliance expenditures | | | X | X |
| - ECD repair (includes replacement) | | | X | X |
| - Blackmer pump | | | X | X |
| - Valances/doors/endcaps | | | X | X |
| - Dial glass | | | X | X |
| - Displays | | | X | X |

| EQUIPMENT | Marketer | | Amoco | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| - Lights | | | X | X |
| - CRIND pad/printer | | | X | X |
| - Internal repairs | | | X | X |
| - Calibrations | | | X | X |
| - Total replacement | | | X | X |
| - Decals | | | X | X |
| - Pump filters | | | X | X |
| - Cash acceptors | | | X | X |
| Exhaust fans | X | X | | |
| Point of sale: | | | | |
| - Credit card imprinter* | X | | | X |
| - Debit equipment* | | | X | X |
| - Dispenser interface* | | | X | X |
| - ESP receipt printers (dealer owned)* | X | | | X |
| - POS device (MMX, Panasonic, etc.)* | | | X | X |
| - Sales authorization device (Pinstripe, ZON, etc., including modems & pinpads)* | | | X | X |
| *Covered under monthly POS/printer lease arrangement | | | | |
| Security cash drawer | X | X | | |
| Tanks & lines: | | | | |
| - Cover painting | X | X | | |
| - Fill pipes, caps & covers (includes replacement) | | | X | X |
| - Gauge sticks (includes replacement) | X | X | | |
| - Leak detectors & monitoring systems (includes replacement) | | | X | X |
| - Submersible pumps | | | X | X |
| - Sumps, piping, valves & fittings | | | X | X |
| - Tank repair | | | X | X |
| - Tank replacement | | | X | X |
| - Used oil removal | X | X | | |
| - Water removal | | | X | X |

| EQUIPMENT | Marketer | | Amoco | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| - Tank cleaning | | | X | X |

### EXTERIOR & YARD FACILITIES

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| **ACM:** | | | | |
| - Lamps | | X | X | |
| - Ballasts | | X | X | |
| - Wiring/breakers | | | X | X |
| - Lighted ACM face (includes replacement) | | | X | X |
| - Lighted ACM frame (includes replacement) | | | X | X |
| - ACM decals | | | X | X |
| **Canopy:** | | | | |
| - Paint | X | X | | |
| - Poles | | | X | X |
| - Mode signs | X | X | | |
| - Downspouts/gutters | X | X | | |
| - POP | X | X | | |
| - Total replacement of canopy | | | X | X |
| Canopy roof*/facia/decking | | | X | X |
| Cleaning of catwalks, drives & islands | X | X | | |
| **Driveway & curbing:** | | | | |
| - Asphalt/Concrete/Curbing repair over $3000 | | | X | X |
| - Asphalt/Concrete/Curbing repair under $3000 | X | X | | |
| - Pump island repair | | | X | X |
| - Seal coating | X | X | | |
| - Total asphalt replacement | | | X | X |
| - Total concrete replacement | | | X | X |

| SIGNS | Marketer | | Amoco | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| Misc. dealer service, merchandise, emblems, etc. | X | X | | |
| **Torch & Oval:** | | | | |
| - Lamps/ballasts | | X | X | |
| - Poles | | | X | X |
| - Base | | | X | X |
| - Paint | | | X | X |
| - Wiring/breakers | | | X | X |
| - Faces (oval/flame) | | | X | X |
| - Frame | | | X | X |
| **Price sign:** | | | | |
| - Lamps/ballasts | | X | X | |
| - Paint (frame) | | | X | X |
| - Fonts (#s, words) | X | X | | |
| - Font guide track | | | X | X |
| - Add-on signs | | | X | X |
| - Wiring/breakers | | | X | X |
| - Faces | | | X | X |
| - Frame | | | X | X |

**OTHER**

| | | | | |
|---|---|---|---|---|
| Gasoline licenses/permits/fees | | | X | X |

**EXHIBIT B**

**COMMISSION MARKETER AGREEMENT
STATE ADDENDA**

## ADDITIONAL STATE DISCLOSURES

      If the Leased Business is located in any of the following states, then the designated provision in the Agreement will be amended as follows:

### ILLINOIS

      The Agreement is amended by an additional "Miscellaneous" Section to the end of original language that appears therein:

      1.     "Section 4 of the Illinois Franchise Disclosure Act dictates that any provision in a franchise agreement which designates jurisdiction or venue in a forum outside of this state is void with respect to any cause of action which otherwise is enforceable in this state, provided that a franchise agreement may provide for arbitration in a forum outside of this state."

      2.     "Any governing law or choice of law clause granting authority to a state other than Illinois effectively negates the Illinois Franchise Disclosure Act.  Therefore, the franchise agreement will be interpreted and construed under the Illinois Franchise Disclosure Act."

      3.     "Section 41 of the Illinois Franchise Disclosure Act states that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void."

# COMMISSION MARKETER LEASE

# TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| 1. | LEASED PREMISES | 1 |
| 2. | AMOCO PARCEL | 1 |
| 3. | TERM | 1 |
| 4. | PURPOSE/USE/RENT | 2 |
| 5. | TENANT'S IMPROVEMENTS AND EQUIPMENT | 2 |
| 6. | TENANT'S USE OF AMOCO PARCEL | 2 |
| 7. | AMOCO'S USE OF LEASED PREMISES | 3 |
| 8. | PRIOR USE/ENTRY FOR REMEDIATION | 3 |
| 9. | OPERATING STANDARDS AND PROCEDURES | 4 |
| 10. | UTILITIES, TAXES, EXPENSES AND FEES | 5 |
| 11. | LAWS AND REGULATIONS | 5 |
| 12. | USE OF LEASED PREMISES | 6 |
| 13. | TRADEMARKS, TRADE NAMES AND SERVICE MARKS | 6 |
| 14. | LIABILITY, INDEMNITY | 7 |
| 15. | INSURANCE | 7 |
| 16. | MORTGAGE, SUBLETTING | 8 |
| 17. | ASSIGNMENT, FIRST REFUSAL | 8 |
| 18. | RIGHT-OF-ENTRY | 9 |
| 19. | GROUNDS FOR TERMINATION AND NONRENEWAL | 9 |
| 20. | TERMINATION, NONRENEWAL, REMEDIES | 11 |
| 21. | CONDEMNATION | 12 |
| 22. | MATTERS OF RECORD, ZONING | 12 |

23.  HOLDOVER .................................................................................... 12

24.  VACATION OF PREMISES, TENANT'S PROPERTY ............................... 13

25.  RELATIONSHIP OF THE PARTIES ..................................................... 13

26.  AUDITING ..................................................................................... 13

27.  SOFTWARE ................................................................................... 13

28.  NO WAIVER .................................................................................. 13

29.  NOTICES ....................................................................................... 14

30.  ENTIRE AGREEMENT ...................................................................... 14

31.  SEVERABILITY ............................................................................... 14

32.  FORCE MAJEURE ........................................................................... 14

ATTACHMENT 1,  DESCRIPTION OR DIAGRAM OF LEASED PREMISES

ATTACHMENT 2,  DESCRIPTION OR DIAGRAM OF LEASED PREMISES
                (Excludes Amoco Parcel)

ATTACHMENT 3,  PURPOSE AND USE OF LEASED PREMISES

ATTACHMENT 4,  RENTAL

ATTACHMENT 5,  TENANT'S IMPROVEMENTS

ATTACHMENT 6,  INVESTMENT SITE RIDER

ATTACHMENT 7,  STATE ADDENDA

ATTACHMENT 8,  CONSENT TO ASSIGNMENT OF LEASE AGREEMENT



S. S. # <u>00006304</u>

# LEASE AGREEMENT

(Commission Marketer Leased Business)

## CMLA 9704F

THIS LEASE dated _Oct 6_, 19<u>98</u>, is between Amoco Oil Company, a Maryland corporation with offices at <u>600 Corporate Drive, Suite 500, Ft. Lauderdale, FL</u> Zip Code <u>33334-3607</u> ("Amoco") and <u>Cam Cornish</u> with an address of <u>980 Northlake Blvd., Lake Park, FL</u> Zip Code <u>33403</u> ("Tenant").

IN **CONSIDERATION OF** the mutual covenants, conditions and promises contained in this Lease Agreement, Amoco and Tenant hereby agree as follows:

1.  **LEASED PREMISES**. Amoco hereby demises and leases to Tenant the premises situated in the City of <u>Lake Park</u>, County of <u>Dade</u>, and State of <u>Florida</u>, more particularly described in Attachment 1 attached hereto and made a part hereof, together with the buildings, fixtures, equipment, machinery and appliances, if any, located thereon, but expressly excluding the "Amoco Parcel" as hereinafter described (the "Leased Premises").

2.  **AMOCO PARCEL**. The Leased Premises are adjacent to and/or surrounded by a parcel of land used or to be used as a motor fuel sales facility as more particularly shown or described in Attachment 2 attached hereto and made a part hereof (the "Amoco Parcel"). Tenant shall operate the motor fuel sales facility ("Fuel Facility") according to the terms of the Commission Marketer Agreement ("CMA").

3.  **TERM**. This Lease is for a term of four (4) years beginning on _10-6-98_, _____ (the "Initial Term").

4.    **PURPOSE/USE/RENT**.

A.    <u>Purpose/Use</u>.    Tenant expressly understands that Tenant must use the Leased Premises to operate the business set forth in Attachment 3 and for the sale of Merchandise, if any, identified on Attachment 3, attached hereto and made a part hereof.

B.    <u>Rental</u>.    Tenant shall pay to Amoco as rent for the use of the Leased Premises the sum(s) set forth in Attachment 4, attached hereto and made a part hereof.

C.    <u>Hours of Operation</u>.    Except as otherwise required by law, Tenant shall keep the Leased Premises properly lighted and open for business <u>24</u> hours per day, seven days per week, including holidays, unless permission for lesser hours of operation has been granted in advance by Amoco in writing.

D.    <u>Finance, Service and Late Payment Charges</u>.    Amoco shall have the right, at its election, to assess finance charges on all amounts not paid by Tenant by the due date. Finance Charges shall be assessed at the monthly periodic rate established by Amoco. Amoco shall have the further right to impose a service and late payment charge for each check and/or other payment which is dishonored for insufficient or uncollected funds, whether or not subsequently paid by Tenant. Amoco shall also charge Tenant the sum of Fifty Dollars ($50.00) for every check that Tenant tenders to Amoco that is returned by Tenant's bank for not sufficient funds ("NSF"). If Tenant presents Amoco with NSF checks on two (2) or more occasions within any twelve (12) month period during the term of this Agreement, Amoco may terminate this Agreement.

E.    <u>Security Deposit</u>.    Upon execution of this Lease, Tenant shall post a security deposit in the amount of $<u>1,000.00</u> as security for the faithful performance of all the terms of this Lease. Amoco reserves the right to increase or decrease the amount of the security deposit upon thirty (30) days prior written notice. It is understood and agreed that Amoco shall not be required to pay to Tenant interest on the security deposit, except as otherwise required by law. Upon expiration or termination of this Agreement, Amoco shall retain an amount equal to fifteen percent (15%) of the security deposit for a period of one hundred eighty (180) days to be used to satisfy any outstanding balances or charges incurred by or against Tenant prior to expiration or termination of this Agreement, but not received until after that time.

5.    **TENANT'S IMPROVEMENTS AND EQUIPMENT**.    In connection with the operation of the Leased Premises, Tenant shall, at Tenant's expense and in strict accordance with plans and specifications approved by Amoco, install on the Leased Premises the improvements and equipment set forth in Attachment 5, attached hereto and made a part hereof.

6.    **TENANT'S USE OF AMOCO PARCEL**.

A.    <u>Ingress/Egress/Use</u>.    Amoco grants to Tenant during the term of this Lease for the use and benefit of Tenant's employees, agents, invitees and customers in common with others entitled to use same, a non-exclusive easement over the paved and unimproved portion of the Amoco Parcel for parking as designated by Amoco and for ingress and egress to and from the

Leased Premises (the "Access Area"), together with a license over the unimproved portion of the Amoco Parcel for the sole purpose of providing unrestricted access between the Leased Premises and the Amoco Parcel.

B.   Conditions of Use.   The easement and license rights granted over the Access Area and the Amoco Parcel are granted and may be exercised only in accordance with the following provisions:

1)   Amoco shall have the right at any time, and from time to time, to make any change whatsoever to the Access Area which Amoco in its sole judgment deems advisable, provided such change will not substantially limit Tenant's access or parking, unless Amoco provides reasonable alternative access or parking.

2)   Except for the right to terminate this Lease as hereinafter provided in the Condemnation section, Tenant shall not have, or claim any interest in, the Access Area in the event of eminent domain proceedings or settlement in lieu thereof, and if requested by Amoco, shall execute and deliver to Amoco an instrument evidencing same.

3)   Tenant shall not in any way interfere with the free flow of traffic over the Access Area, and shall use its best efforts to prevent any blocking of access to or from the pump islands or the Amoco Parcel.

C.   Utility Easement.   Amoco further grants to Tenant during the term of this Lease a non-exclusive utility easement for the purpose of tying into, installing, operating, maintaining, repairing or replacing any and all utility lines to serve the Leased Premises.   Such easement shall be limited to the area where such utility lines are presently located or to such other location as may be approved by Amoco in writing, which approval shall not be unreasonably withheld.

7.   **AMOCO'S USE OF LEASED PREMISES**.   Amoco reserves an easement and license over the unimproved portion of the Leased Premises for the purpose of providing unrestricted access between the Amoco Parcel and the Leased Premises for its use and the use of its agents, invitees, and customers in common with others entitled to use same, and a utility easement for the purpose of tying into, installing, operating, maintaining, repairing or replacing any and all utility lines to serve the Amoco Parcel.

8.   **PRIOR USE/ENTRY FOR REMEDIATION**.   Tenant expressly acknowledges that it understands that the Leased Premises and/or the Amoco Parcel have heretofore been used as a retail service station facility dispensing gasoline from underground storage tanks, and may have been impacted by hydrocarbon contamination.   Tenant acknowledges that Amoco has made no warranties or representations regarding the Leased Premises or the Access Area or the condition hereof, and Tenant agrees to accept the Leased Premises and the Access Area in "as is" condition.   Amoco reserves the right to enter upon the Leased Premises for the purpose of engaging in environmental assessment, inspection and remediation as necessary, or as required by governmental authorities.

9.    OPERATING STANDARDS AND PROCEDURES.

A.    Tenant shall follow and shall cause all of its employees to maintain Amoco's standards and to follow its policies and procedures as may be amended by Amoco from time to time, regarding image, merchandising, service, security and safety, acceptance of credit cards, POP signs, sales promotions, upkeep and operation of equipment, customer service and the proper handling of customer complaints. Amoco shall loan Tenant one (1) copy of an Operations Manual containing mandatory and suggested specifications, standards and operating procedures prescribed by Amoco from time to time and information relative to other obligations of Tenant pursuant to this Agreement. Amoco may modify the Operations Manual from time to time to reflect changes in specifications standards and operating procedures for the Leased Business. Tenant shall keep its copy of the Operations Manual current by immediately inserting all modified pages furnished by Amoco. If there is a dispute relative to the contents of the Operations Manual, the master copy maintained by Amoco at its principal office shall be controlling.

Tenant may not at any time copy or unlawfully disclose any part of the Operations Manual. All electronic equipment used in the operation of the Fuel Facility shall meet Amoco's specifications and standards as specified in the Operations Manual including, but not limited to, conversion compatibility to Year 2000 updating requirements, at Tenant's cost. Amoco may in its discretion, establish, modify and/or amend such standards, policies and procedures from time to time. Tenant shall pay Amoco for Amoco system help desk fees, if any. Tenant and employees of Tenant shall attend conference and training programs as required by Amoco for which Amoco may elect to charge a fee. All employees of Tenant shall at all times be neat and clean and wear uniforms approved by Amoco.

B.    Tenant shall perform upkeep and maintenance as needed to the Leased Premises, and in so doing shall follow any guidelines outlining proper maintenance which Amoco may from time to time provide to Tenant. Tenant shall keep the Leased Premises and Access Area, including adjoining areas, alleys, and sidewalks, in a clean, safe and healthful condition. Tenant agrees to maintain the standards of appearance and cleanliness at the Leased Premises as specified by Amoco from time to time. This includes but is not limited to, daily cleaning; daily removal of debris from driveways; prompt trash removal, snow removal; landscaping care; routine cleaning of light fixtures; and all other routine maintenance as designated by Amoco. No signs or notices shall be displayed at the Leased Premises unless they are authorized in advance by Amoco.

C.    Tenant shall not commit nor suffer waste to be committed upon the Leased Premises, and shall not erect or place on the Leased Premises any permanent or temporary buildings, structures, trailers, signs or pennants, nor make any permanent or temporary alterations in, or additions or attachments to the Leased Premises without first obtaining the written consent of Amoco. If such consent is granted, all such improvements, additions and alterations must meet Amoco's approved standards for location and appearance.

D.    Tenant shall be fully responsible for and shall repair, replace or reimburse Amoco for all costs of repair or replacement relating to damage occurring to any portion of the Leased Premises or to the building and fixtures located thereon which occurs during the term of this Lease. Tenant shall at the expiration of this Lease, or upon sooner termination thereof, surrender the Leased

Premises to Amoco in substantially as good condition as when received, ordinary wear and tear excepted.

E.    Tenant shall keep the Leased Premises and Amoco Parcel free and clear of all mechanics, materialmen and other liens on account of work performed by Tenant or persons claiming under Tenant. Tenant agrees to indemnify, defend and save Amoco harmless from and against all liability, loss, damage, costs or expense (including reasonable attorneys fees) incurred by reason of any claims of lien by laborers, materialmen or others for work performed or materials and supplies furnished to the Leased Premises for Tenant, or any persons claiming under Tenant.

F.    Any improvements made to the Leased Premises by Tenant with the consent of Amoco shall remain with the land and title thereto shall revert without cost to Amoco upon the expiration or sooner termination of this Lease.

G.    Tenant shall comply with and be bound by audit and monitoring procedures which Amoco may from time to time create and modify to monitor, implement and enforce (i) Tenant's obligations under this Lease and (ii) Amoco's operating standards, policies and procedures. Tenant shall conduct all business operations at the Fuel Facility in a manner which meets Amoco's operating standards, policies and procedures and reflects favorably upon Amoco.

H.    Amoco shall advertise the Leased Business on interstate directional signs and shall invoice Tenant for fifty percent (50%) of the total cost of such signage.

I.    Amoco reserves the right to require Tenant to procure and utilize computer systems, including backroom systems, compatible with any computer systems Amoco designates.

**10.    UTILITIES, TAXES, EXPENSES AND FEES.**

A.    Tenant shall pay all utilities including, but not limited to, sewer, water, light, heat and other operating expenses in connection with Tenant's use of the Leased Premises and the operation of the Fuel Facility.

B.    Amoco shall pay all real estate taxes on the Leased Premises.

C.    Tenant shall procure and maintain at its expense in Tenant's name all licenses and permits necessary for all business operations on the Leased Premises. Tenant shall pay any and all fees and occupation or privilege taxes upon or with respect to the maintenance and use of the Leased Premises or with respect to the business, occupation or privilege conducted or exercised upon or in connection with the Leased Premises, as well as any and all taxes upon property owned by Tenant and located thereon.

**11.    LAWS AND REGULATIONS.** Tenant shall comply fully with all federal, state, and municipal laws, rules, regulations, use permits and all conditions and restrictions with regard to the use and condition of the Leased Premises and with regard to Tenant's activities thereon. Except as expressly permitted herein, Tenant shall not store, handle, use or dispose of hazardous or regulated substances or materials on the Leased Premises. Without limiting the foregoing, Tenant shall comply with all requirements of federal, state and local occupational, health and

safety agencies, and environmental protection agencies concerning the receipt, storage, handling, use, sale and dispensing of regulated substances and the disposal of waste materials and Tenant's other activities on the Leased Premises.  Tenant shall indemnify and hold Amoco harmless from all claims, demands, damages, losses, liabilities, actions, costs and expenses (including consultants and attorneys fees) resulting from Tenant's failure to comply with such laws, rules, regulations and requirements.

12.     **USE OF LEASED PREMISES**.

A.     The Leased Premises shall be used by Tenant as described in Attachment 3 and for no other purpose without the prior written consent of Amoco.

B.     Tenant shall not store upon the Access Area or Leased Premises any wrecked or abandoned vehicles.

C.     Tenant shall not carry on or permit any offensive, dangerous or unduly noisy trade, business, manufacture or occupation or, any nuisance to the public or to adjoining neighbors.

D.     Tenant shall not use, store, rent or sell upon the Leased Premises any items of a nature which in Amoco's judgment, may offend an appreciable segment of the public.

13.     **TRADEMARKS, TRADE NAMES AND SERVICE MARKS**.

A.     Tenant is licensed to use on a limited and nonexclusive basis the Amoco trademarks, trade names and service marks designated by Amoco from time to time ("Amoco's Marks") in connection with Tenant's business operations on the Leased Premises during the term of this Lease.  Tenant's use of Amoco's Marks shall be governed by Amoco's guidelines, standards, policies and procedures as may be amended by Amoco from time to time.  Tenant understands and agrees that the AMOCO name and the Amoco Torch and Oval Design are trademarks, trade names and service marks exclusively owned by Amoco.  Except as expressly provided in this Lease, Tenant shall not acquire any right or license in or to said trademarks, trade names and service marks or to any other logo, trademark, trade name or service mark owned by Amoco (collectively, the "Marks"), and Tenant agrees that the Marks shall be displayed in accordance with Amoco's standards and policies.  Upon termination of this Lease for any reason whatsoever, Tenant shall return all signs, labels and other items containing the Marks to Amoco.

B.     Prior to establishing a Website in connection with Tenant's operation of the Fuel Facility, Tenant must submit to Amoco a sample of the Website information in the form and manner prescribed by Amoco from time to time.  "Website" means an interactive electronic document contained in a network of computer linked by communications software.  Tenant shall not establish a Website which has not been approved in writing by Amoco.  Tenant must follow Amoco's standards and specifications for Websites as prescribed by Amoco from time to time in the Operations Manual.  If Tenant alters its Website previously approved by Amoco, it must submit to Amoco a sample of such alterations and receive Amoco's approval prior to implementing such alternations to the Website.

**14.    LIABILITY, INDEMNITY**. Tenant shall be liable for any loss, damage, injury or other casualty to the person or property of anyone, including Tenant, caused in whole or in part by any failure to comply with any term or provision of this Lease or any law or regulation or by any negligence or fault of Tenant, its agents or employees in any way relating to the use, possession or operation of the Leased Premises and/or Access Area. Tenant, for itself, its agents, employees, heirs, personal representatives, successors and permitted assigns specifically agrees to indemnify and hold Amoco, its parent, affiliates and each of their respective agents, employees, officers, directors, successors and assigns harmless from and against all claims, demands, liabilities, suits or actions (including all reasonable expenses and attorneys fees, incurred by or imposed on Amoco in connection therewith) for any such loss, damage, injury or other casualty. Amoco does not waive and Tenant is not released from any liability or obligation Tenant has or may have to Amoco or third parties under any prior agreement or lease.

Amoco, its agents and employees, shall not be liable for any loss, damage, injuries or other casualty of whatsoever kind or by whomsoever caused, to the person or property of anyone (including Tenant) on or off the Leased Premises, arising out of or resulting from Tenant's use, possession or operation thereof, or from defects in the Leased Premises or the Access Area, or the building, fixtures, machinery, equipment or appliances thereon, whether apparent or hidden, or from the installation, existence, use, maintenance, condition, repair, alteration, removal or replacement of any equipment thereon, unless due to the sole negligence of Amoco, its agents or employees, and Tenant for himself and his agents, employees, heirs, personal representatives, successors and permitted assigns, hereby agrees to indemnify and hold Amoco, its parent, affiliates and each of their respective agents, employees, officers, directors, successors and assigns harmless from and against all claims, demands, liabilities, suits or actions (including all expenses and reasonable attorneys fees incurred by or imposed on Amoco in connection therewith) for any such loss, damage, injury or other casualty.

In no event shall either party be liable to the other for any consequential, incidental, punitive or exemplary losses or damages suffered by the other party. Any action by either party under this Lease must be brought within one year after the cause of action arose. Each party irrevocably waives trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

**15.    INSURANCE**. During the term of this Agreement, Tenant shall maintain at this sole expense (i) Workmen's Compensation and Occupational Diseases insurance as required by any applicable law; (ii) Commercial General Liability insurance with a minimum combined single limit of One Million Dollars ($1,000,000.00) for each occurrence; and (iii) Business Auto Liability and Garagekeepers' insurance (if applicable) with a minimum limit of Five Hundred Thousand Dollars ($500,000.00) per occurrence. The Commercial General Liability insurance shall be extended to provide Contractual Liability insurance specifically insuring Tenant against the liabilities assumed under this Agreement.

All policies of insurance required under this Agreement shall include Amoco as an additional insured. Tenant shall furnish Amoco with certificates of insurance evidencing that all insurance policies required under this Agreement are in force and effect and will not be canceled or changed without at least thirty (30) days' prior written notice to Amoco. At Amoco's request,

Tenant shall provide Amoco with a copy of all insurance policies required under this Agreement. Maintaining the prescribed insurance shall not relieve Tenant of any other obligations under this Agreement.

Amoco shall have the right, at its election, to increase the minimum insurance coverage limits required herein by giving Tenant written notice thereof not less than ninety (90) days in advance.

**16.    MORTGAGE, SUBLETTING.**  Tenant shall not mortgage or encumber this Lease, or sublet the Leased Premises, or any part thereof, and shall not allow any lien or encumbrance to be placed upon the Amoco Parcel or the Leased Premises or the leasehold interest hereby created or any part thereof, without first obtaining the written consent of Amoco. No subletting approved and permitted by Amoco shall in any manner limit or release Tenant from its obligations under this Lease. Tenant shall immediately pay or satisfy any judgment so as to prevent the Leased Premises from being, and shall not permit the Leased Premises or Tenant's leasehold interest hereunder to be, levied upon, executed upon or vested in any other party by operation of law, a judicial order or otherwise. Tenant shall reimburse Amoco for any costs and expenses, including attorney fees, which are incurred as a result of the violation of the provisions of this paragraph by Tenant.

**17.    ASSIGNMENT, FIRST REFUSAL.**

A.    Tenant shall have the right to assign this Lease after first obtaining the written consent of Amoco, which consent shall not be unreasonably withheld. No assignment approved and permitted by Amoco shall in any manner limit or release Tenant from its obligations under this Lease.

B.    Amoco shall have a right of first refusal to purchase or otherwise acquire Tenant's interest in this Lease and/or Tenant's business as related to this Lease on the same terms and conditions as set forth in any contract entered into by Tenant in any bona fide arms-length transaction. Tenant agrees to submit to Amoco legible, fully executed copies of all contracts, agreements, side letters and undertakings related to any such transaction. Tenant further agrees to submit to Amoco such additional information, facts and data as Amoco deems necessary to assist Amoco in confirming the bona fide nature of the transaction and to provide Amoco with a basis for granting any consent to assignment or exercising any right of refusal as provided for herein. Amoco, at its election, may exercise its right of first refusal in accordance with the provisions of this paragraph or may assign its right of first refusal and/or other rights hereunder to any other person or legal entity. Amoco has the option to substitute cash for any non-cash consideration offered by a prospective purchaser. Amoco shall be entitled to customary warranties and representations from Tenant. Amoco or its assignee shall have thirty (30) business days (i.e., Monday through Friday, excluding all state and federal holidays) from the receipt of fully executed copies of all contracts and related agreements between Tenant and the proposed purchaser and all additional information requested by Amoco to exercise its right of first refusal hereunder. During said 30 day period, Amoco's right of first refusal and right to assign such right shall be irrevocable.

C.    If Amoco does not elect to exercise its right of first refusal within the time period provided herein, Tenant may assign this Lease if Tenant obtains Amoco's prior written consent, which shall not be unreasonably withheld.    Amoco may condition its consent to assignment upon (1) the satisfaction by the proposed assignee of all of Amoco's then current requirements for the qualification of new tenants; (2) the agreement of the proposed assignee to enter into an Amoco Commission Marketer Agreement; and (3) simultaneously therewith the execution by Tenant of a mutual cancellation of this Lease and associated agreements.    In addition, Amoco may, at its election, condition its consent upon the satisfaction by Tenant of all indebtedness owed by Tenant to Amoco and upon the express agreement of Tenant to remain liable for the observance by the proposed assignee of all the terms and conditions hereof, including the payment of rental.

D.    Tenant is the sole owner of the business operations on the Leased Premises and shall not sell, assign or otherwise permit the change of any legal or beneficial interest in said business, including, but not limited to, any sale, conveyance, transfer or assignment of any such interest to a corporation, limited liability company or partnership owned or controlled by Tenant, without the express written consent of Amoco.

E.    Nothing in the above shall constitute a limitation in any manner on Amoco's right to reasonably withhold its consent to any proposed assignment by Tenant for reasons not mentioned herein or to impose other qualifications to the giving of such consent.

F.    It is expressly understood and agreed that Amoco shall have the right to sell the Leased Premises and/or sell or assign this Lease to a third party, including but not limited to an Amoco branded Jobber.

**18.    RIGHT-OF-ENTRY**.    At any time during the term of this Lease and any holdover period, Amoco shall have the right, without process of law and without any liability or obligation to the Tenant, to enter upon the Leased Premises and/or the Access Area at any time, with or without notice, for the purpose of inspection of the Leased Premises and/or Access Area, testing and sampling of motor fuels, installing, maintaining, reconditioning and/or replacing Amoco's underground storage tanks and lines or Amoco's other improvements or equipment, reading meters, measuring product inventory, or installing, removing or obliterating Amoco's Marks wherever displayed, or exercising any rights that Amoco may have in this Lease or in any other contract or agreement between the parties.

**19.    GROUNDS FOR TERMINATION AND NONRENEWAL**.

A.    If any of the following events occur, Amoco shall have the right to terminate or nonrenew this Lease upon ninety (90) day written notice, or such shorter notice as is reasonable under the circumstances or otherwise required by law:

1)    Breach by Tenant of any provision of this Lease.

2)      Failure to maintain or follow any of the Operating Standards and Procedures as provided in this Lease or any operating standard or procedure issued by Amoco from time to time.

3)      Abandonment of the Leased Premises by Tenant.

4)      Failure by Tenant to pay to Amoco in a timely manner when due all sums to which Amoco is legally entitled.

5)      Death of Tenant, except that Tenant may designate in writing to Amoco a successor  who must at the time of Tenant's death meet Amoco's selection criteria for operators of Commission Marketer leased businesses.

6)      A continuing severe physical or mental disability, or alcohol or drug abuse of Tenant of at least three months duration (or such shorter duration which under the facts and circumstances constitutes an unreasonable period of time) which renders Tenant unable to provide for the continued proper operation of the Leased Premises.

7)      The incurring of unauthorized indebtedness on Amoco's behalf.

8)      Insolvency of Tenant or the filing of a voluntary petition in bankruptcy by, or an involuntary petition in bankruptcy against, Tenant, judicial determination that Tenant is bankrupt or insolvent or any other reasonably convincing evidence of financial distress of Tenant, such as, without limitation, appointment of a receiver for Tenant, assignment by Tenant for the benefit of creditors, giving of one or more insufficient funds checks and the like.

9)      Removal of, or significant reduction in, Tenant's assets located on the Leased Premises to the prejudice of Amoco's right of distant.

10)     Destruction of all or substantially all of the Leased Premises.

11)     Loss of Amoco's right of possession of the Leased Premises.

12)     Failure to comply with all applicable laws or regulations.

13)     Decision by Amoco to withdraw from Commission Marketer operations in the geographic area of the Leased Premises.  In the event Amoco specifically designates its decision to withdraw from Commission Marketer operations as the grounds for termination and Amoco has not also decided to withdraw from marketing through lessee dealers in the geographic area of the Leased Premises, Amoco shall offer Tenant the option to become a Tenant dealer on Amoco's then-current forms.

14)     Decision by Amoco to sell the Leased Premises and Amoco Parcel for a use other than the sale of Amoco branded petroleum products.  In such event Amoco shall make a bona fide sale offer or give a right of first refusal to Tenant.

B.    If any of the following events shall occur, Amoco may terminate this Agreement immediately upon written notice:

1)    Conviction of Tenant of any felony.

2)    Fraud or criminal misconduct by the Tenant or Tenant's employees relevant to the operation of the Leased Premises.

3)    Failure to comply with environmental and/or safety standards or procedures established by governmental authorities.

4)    Failure to operate the business on the Leased Premises for seven consecutive days or such lesser period of time as may be reasonable under the circumstances.

5)    Failure to comply with standards and specifications more than twice in any twelve (12) month period, regardless of whether such defaults are cured.

6)    Failure to successfully complete the training program.

C.    Amoco shall not be obligated to continue the sale of its motor fuels from the Fuel Facility if it should make a determination to withdraw from marketing of motor fuels under the Amoco trademark or trade name at retail outlets in the geographic area of the Leased Premises. In such event, Amoco may terminate this Lease upon 180 days' notice.

D.    This Lease shall terminate upon the termination, nonrenewal or expiration, for any reason, of the Commission Marketer Agreement. Tenant acknowledges and understands that upon the termination, nonrenewal or expiration of this Lease and/or the CMA, Amoco may discontinue operations at the Leased Premises and Amoco Parcel or may continue in possession and operate them with its own employees or establish operations by a contractor, dealer and/or jobber and may, without limitation, transfer, operate or use the Leased Premises and Amoco Parcel in any manner for any purpose.

## 20.    TERMINATION, NONRENEWAL, REMEDIES.

A.    On the termination or expiration of this Lease or any renewal or extension thereof, Amoco, at any time thereafter, shall have the right, at Amoco's election, either with or without process of law, to enter upon the Leased Premises and Amoco Parcel and take possession of the same, and to remove any merchandise and other personal property situated thereon, including the right to use such force as may be necessary to effectuate the actual possession thereof in Amoco, and such entry shall not be regarded as a trespass or be sued for as such or be regarded as in any way unlawful.

B.    Amoco, in addition thereto, may, at its option, declare all unpaid rentals for the entire term of this Lease to be due and payable, offset against any sums due Tenant from Amoco and/or sue for and recover all damages accrued or accruing under this Lease, or arising out of any violation thereof, and Amoco may so offset and/or sue and recover without declaring this Lease void or entering into possession of the Leased Premises.

C.      Amoco may pursue any other remedies available at law or in equity for any violation of this Lease or any of its covenants by Tenant.

D.      The above enumerated remedies are concurrent and are at the option and discretion of Amoco, and the pursuit of any one shall not amount to an election or bar the pursuit of any other remedies, whether or not enumerated herein.  Termination of this Lease or the CMA shall not affect or abridge in any way the rights and obligations of the parties accruing prior to termination.

21.     **CONDEMNATION**.  If, during the term of this Lease, the entire or a substantial part of the Leased Premises, the improvements thereon or the Amoco Parcel are taken by eminent domain proceeding or similar proceeding or settlement in lieu thereof ("Condemnation"), or if access is taken by Condemnation and adequate substitute access not provided, then this Lease may be terminated by Amoco or Tenant as of the date of delivery of the condemned property to the condemning authority.  Such termination shall be made by notice to the other Party at least thirty (30) days prior to the date of delivery of possession, or such shorter notice as may be reasonable under the circumstances.  In the event that any part of the Leased Premises or improvements thereon are taken as a result of Condemnation, the total award thereof or proceeds thereof shall be distributed solely to Amoco with no reimbursement to Tenant; provided, however, that Tenant shall be entitled to, as Tenant's sole award for damages, (i) the value of any improvements and equipment constructed or installed on the Leased Premises by Tenant and taken as a result of Condemnation, and (ii) if a separate award was made by the condemning authority for relocation costs of Tenant, such award shall be distributed to Tenant, and (iii) if any compensation is received by Amoco specifically based upon loss of business opportunity or goodwill, Amoco shall fairly apportion such compensation between Amoco and Tenant.  In the event any part of the Access Area or the Amoco Parcel are taken as a result of Condemnation, the total award or proceeds thereof shall be distributed solely to Amoco with no reimbursement to Tenant.  If requested by Amoco, Tenant shall execute and deliver to Amoco an instrument evidencing the agreement set forth herein.  Tenant waives the provisions of any law, ordinance, statute or rule which would change the rights and obligations of the parties in the event of a Condemnation from that set forth herein.

22.     **MATTERS OF RECORD, ZONING**.  This Lease shall be subject to all mortgages, building and zoning regulations, use restrictions, and to any underlying leases, covenants, conditions, easements and other liens and encumbrances affecting Amoco's title to the Leased Premises or the Access Area at the date of execution hereof.  This Lease shall be subject to all zoning restrictions of every nature affecting the Leased Premises and the Access Area at the date hereof or hereinafter imposed during the term of this Lease.

23.     **HOLDOVER**.  In the event Tenant shall hold over beyond the expiration or any termination date of this Lease, such hold over tenancy shall be at sufferance and shall in no way color the Tenant's possession with any right of tenancy, and it is expressly understood and agreed between the parties that the rights accruing to either by reason of appropriate notice of termination shall not be waived and shall continue in full force and effect.  It shall be the responsibility of Tenant, if Tenant remains in possession without Amoco's consent, to pay as liquidated damages a sum, computed on a daily basis, equal to three times the last rental rate provided for herein.

24.    **VACATION OF PREMISES, TENANT'S PROPERTY**. Tenant agrees to vacate the Leased Premises and Amoco Parcel on the effective date of the termination or expiration of this Lease or the CMA, remove any inventory, equipment, machinery, tools, goods, products and supplies belonging to Tenant, subject to the provisions of this Lease and the CMA, and surrender the premises to Amoco in as good condition as when received, normal wear and tear excepted. If removal of Tenant's property causes any damage, Amoco may repair such damage at Tenant's expense. In the event Tenant fails to remove any such items owned by it within 10 days after the effective date of the termination or expiration of this Lease or the CMA, title thereto shall pass to Amoco without notice and without cost or charge and Tenant waives any claims for such items.

25.    **RELATIONSHIP OF THE PARTIES**. Tenant acknowledges and understands that in the absence of the personal commitment of the undersigned individual to the operation of the Leased Premises, Amoco would not have entered into this Agreement. Amoco retains the right at all times to market motor fuels, merchandise and services in the area of the Leased Premises at other locations, including but not limited to establishing its own employee operated retail facilities, dealer operated facilities, contractor operated facilities, other Leased Business facilities and/or jobber supplied retail facilities.

26.    **AUDITING**. Amoco shall have the right at all times to inspect motor fuels, books and records in the possession or control of Tenant to determine amounts owed Amoco and/or compliance with this Lease and all related agreements.

27.    **SOFTWARE**. Amoco hereby grants to Tenant a non-exclusive license to use any software provided to Tenant by Amoco for use in conducting Tenant's business under the Lease and the CMA. This license shall not be deemed to transfer any other right, title or interest in or to such software and all such rights, title and interest are expressly reserved by Amoco.

28.    **NO WAIVER**. No failure to act on an incident of breach, and no course of dealing shall be construed as the waiver of the right to act. The waiver of any breach of any covenant, condition or stipulation contained herein shall not be taken to be a waiver of any subsequent breach of the same or any other covenant, condition or stipulation. Any failure of Amoco to enforce rights or seek remedies upon any default of Tenant with respect to any of the obligations of Tenant hereunder, shall not prejudice or affect the rights or remedies of Amoco in the event of any subsequent default of Tenant.

29.    **NOTICES**. Any notice provided for herein shall be considered properly given if: (i) mailed by certified mail return receipt requested or private express mail service (such as Federal Express) to the other party at the address listed in this Lease or at such other address as such party may from time to time designate by written notice to the other party; (ii) hand delivered to the Tenant or the Leased Premises; or (iii) sent by facsimile provided that a confirmation copy is sent by private express mail service on the same day. The facsimile numbers of the parties for notice purposes are as follows:

Amoco: (954) 351-1071____ (facsimile number)

Tenant: (561) 626-2989____ (facsimile number)

The effective date of any notice shall be the first of (i) the date the notice is mailed by certified mail or private express mail service; (ii) the date of delivery of the notice to Tenant or the Leased Premises; or (iii) the time the notice is sent by facsimile.

30.   **ENTIRE AGREEMENT**.  This Lease cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Lease.  No obligation, agreement or understanding shall be implied from any course of dealing or from any of the terms and provisions of this Lease, all obligations, agreements and understanding with respect to the subject matter hereof being expressly set forth herein.  No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Lease.  No modification or waiver of, addition to, or deletion from the terms of this Lease shall be effective unless reduced to writing and signed by Tenant and a representative of Amoco authorized to execute this Lease.

31.   **SEVERABILITY**.  If, for any reason any portion of this Lease is held to be invalid, contrary to, or in conflict with any applicable present or future law, the remaining portions of this Lease, to the extent practicable, shall remain in effect to the extent permissible under such law.  If any applicable law requires a greater prior notice of termination or other action than is required hereunder or the taking of some other action not required hereunder, or if under any applicable law any provision of this Lease or any specification, standard or operating procedure is invalid or unenforceable, such notice and/or other action required by such law shall be substituted for the comparable provisions hereof.

32.   **FORCE MAJEURE**.  Neither party shall be liable for delays or nonperformance caused by an event which cannot be reasonably foreseen or prevented, including without limitation, unavailability, failure or delay of transportation; labor difficulties, fire, riots, war conditions in any country, compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary), material or labor restrictions by any governmental authority or any Act of God affecting directly or indirectly either party's ability to perform hereunder.  Settlement of strikes shall be at the discretion of the party so affected.

**WITNESS:**

_____

**AMOCO**

By: _____

Its: _____

**WITNESS:**

_____

**TENANT**

_____

Cam Cornish

ATTACHMENT 1                                SS # 00006304

# DESCRIPTION OR DIAGRAM
# OF
# LEASED PREMISES

Commencing at the North quarter corner of Section 20, Township
42 South, Range 43 East, said corner being the intersection of
the centerlines of Prosperity Farms Road and Lake Park West
Road (Northlake Boulevard) State Road No. 805; thence run
N88°28'03" W along the center line of Lake Park West Road
(Northlake Boulevard) State Road No. 805 and north line of
Section 20, Township 42 South, Range 43 East, for a distance of
491.27 feet to a point; thence run S01°31'57" W for a distance
of 61.00 feet to the Point of Beginning; thence run S 88°28'03"
E along the North line of said land, also being the Southerly
Right of Way line of Northlake Boulevard (State Road No. 805)
for a distance of 20.00 feet to a point, thence run S 02°09'43" E
for a distance of 105.70 feet to a point; thence run S
69°07'37"W for a distance of 29.00 feet to a point; thence run
N 01°31'57"E for a distance of 116.54 feet to the Point of
Beginning.

ATTACHMENT 2

SS # <u>00006304</u>

### DESCRIPTION OR DIAGRAM
### OF
### LEASED PREMISES
#### (Excludes Amoco Parcel)



i:\law\oilgroup\commkt\contract\pending\cornla.doc
4/1/98

ATTACHMENT 3                                    SS # <u>00006304</u>

# PURPOSE AND USE
# OF
# LEASED PREMISES

Use of Leased Premises:

<u>Food Shop and Car wash.</u> _____

_____

_____


General description of Merchandise and/or Services to be sold at the Leased Premises:

_____

_____

_____

_____

_____

_____

_____

_____

ATTACHMENT 4                                          SS # <u>00006304</u>

# RENTAL

**Tenant shall pay to Amoco as rent for the use of the Leased Premises, the following sum(s):**

**<u>$4,980.00</u> and applicable taxes per month.**

Said monthly rent shall become due without notice as follows:

on the first business day of each month by electronic funds transfer ("EFT") according to instructions issued by Amoco from time to time or by such other means as Amoco may from time to time designate in writing.  Amoco shall have the right, in its sole discretion to adjust the monthly rental for each Renewal Term.

**ATTACHMENT 5**

SS # 00006304

## TENANT'S IMPROVEMENTS

N/A

**ATTACHMENT 6**

SS# <u>00006304</u>

## INVESTMENT SITE RIDER

N/A

ATTACHMENT 7

SS # <u>00006304</u>

# COMMISSION MARKETER LEASE
# STATE ADDENDA

## ADDITIONAL STATE DISCLOSURES

If the Leased Business is located in any of the following states, then the designated provision in the Lease will be amended as follows:

### ILLINOIS

The Lease is amended by an additional "Miscellaneous" Section to the end of original language that appears therein:

1.    "Section 4 of the Illinois Franchise Disclosure Act dictates that any provision in a franchise agreement which designates jurisdiction or venue in a forum outside of this state is void with respect to any cause of action which otherwise is enforceable in this state, provided that a franchise agreement may provide for arbitration in a forum outside of this state."

2.    "Any governing law or choice of law clause granting authority to a state other than Illinois effectively negates the Illinois Franchise Disclosure Act.  Therefore, the franchise agreement will be interpreted and construed under the Illinois Franchise Disclosure Act."

3.    "Section 41 of the Illinois Franchise Disclosure Act states that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void."

**ATTACHMENT 8**

SS # <u>00006304</u>



# CONSENT TO ASSIGNMENT OF LEASE AGREEMENT

## (Commission Marketer Leased Business)

**N/A**

# PRINTER AGREEMENT (A)

# TABLE OF CONTENTS

**SECTION**                                                                                          **PAGE**

1.    LEASE .................................................................................................................. 2

2.    DEFINITIONS ...................................................................................................... 2

3.    SCOPE OF MAINTENANCE SERVICE ............................................................ 2

4.    PRINTER(S) COVERED ...................................................................................... 3

5.    MAINTENANCE SERVICE FEE AND REPAIR COSTS ................................... 3

6.    PROCEDURES FOR MAINTENANCE SERVICE ............................................ 3

7.    REPAIRS NOT COVERED BY THIS AGREEMENT ...................................... 4

8.    NOTICES .............................................................................................................. 5

9.    LIMITATION OF LIABILITY ............................................................................ 5

10.   EXCUSABLE DELAYS ....................................................................................... 5

11.   GENERAL ............................................................................................................ 5


      SCHEDULE A ...................................................................................................... 7

      SCHEDULE B ...................................................................................................... 8



S. S. # 00006304

SVB # 3045796.

# COMMISSION MARKETER

## PRINTER AGREEMENT (A)

**THIS AGREEMENT**, made this _16_ day of _October_, _1998_ by and between **AMOCO OIL COMPANY**, a Maryland corporation, having its principal office at 600 Corporate Drive, Suite 500, Ft. Lauderdale, FL 33334-3607 "Amoco," and Cam Cornish, "Marketer," whose motor fuel sales facility address is 980 Northlake Blvd., Lake Park, FL 33403 "Facility."

## W I T N E S S E T H:

**WHEREAS**, Amoco owns petroleum products and tanks located at the Facility; and

**WHEREAS**, Marketer sells Amoco's petroleum products at the Facility, and Amoco pays Marketer a commission for dispensing its petroleum products subject to a Commission Marketer Agreement ("CM Agreement"); and

**WHEREAS**, Amoco and Marketer have entered into a Commission Marketer Lease covering the Facility ("CM Lease"); and

**WHEREAS**, in connection with said sales Marketer uses certain Point of Sale ("POS") equipment, software and other technology including a printer, to process recordation of the sales and other necessary business information (collectively, "System"); and

**WHEREAS**, the System interfaces with Amoco's communications network and the parties desire to provide for a smooth interface between the System including, the printer, and Amoco's communication network; and

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged;

**IT IS HEREBY AGREED AS FOLLOWS**:

    **1.**    **LEASE**

        A.    Amoco shall lease to Marketer and provide maintenance for printers identified in Schedule A to this Agreement, ("Printer") in accordance with the terms and conditions contained therein.

        B.    The term of the lease shall commence on _October 6 1998_ and shall run until the CM Lease or the CM Agreement shall expire or be terminated for any reason, or this Agreement shall be terminated by either party pursuant to the terms hereof, whichever is earliest. Within fifteen (15) days after expiration or termination of this Agreement, Marketer shall return the Printer to Amoco in the same condition as when initially received, Normal Wear and Tear (as defined in Section 2.(b) of this Agreement) excepted, in accordance with Amoco's direction. In the event Marketer fails to comply with the provisions of this Section, Amoco may bill to Marketer's open account a sum equal to any cost, expense, damage or claim incurred by Amoco as a result of the Marketer's failure to return the Printer in accordance with the terms this Agreement.

        C.    The lease payments and maintenance fee for the Printer shall be _Thirty-one_ Dollars ($ _31.00_) per printer, per month, billed to Marketer's open account with Amoco. Amoco reserves the right to increase the rental fee when Replacement Printer(s) (as defined in Section 2(c) of this Agreement) are supplied by Amoco to Marketer and/or annually upon thirty (30) days prior written notice.

    **2.**    **DEFINITIONS**

        A.    The term "Maintenance Service" shall mean arranging for and/or providing repair to and/or replacement of Printer(s) pursuant to this Agreement.

        B.    The term "Normal Wear and Tear" shall mean wear and tear resulting from use of the Printer(s) for the purpose and in the manner for which it was intended. Normal Wear and Tear shall not include damage resulting from willful abuse or negligent or accidental damage such as, but not limited to, spillage of liquids into or onto the Printer(s), use of improper paper or ribbon or the improper insertion of paper or ribbon into the Printer(s), power surges, or collision of the Printer(s) with another object.

        C.    The term "Replacement Printer(s)" shall mean a reconditioned Printer(s). At Amoco's option, however, it may include new Printer(s) when provided to Marketer pursuant to Section 6.

    **3.**    **SCOPE OF MAINTENANCE SERVICE**

        Under this Agreement, Amoco is only obligated to arrange for and/or provide Maintenance Service for Normal Wear and Tear. Upon request of Marketer, however, Amoco may, in its sole discretion, arrange for and/or provide Maintenance Service necessary as a result of

causes other than Normal Wear and Tear, in which event Marketer shall pay Amoco as provided for in Section 6(d) below.

### 4.    PRINTER(S) COVERED

This Agreement shall cover _One_ Amoco-approved Printer(s) identified in Schedule A to this Agreement at the Premises and other Amoco-approved Printer(s) subsequently acquired for use at that location as set out in Section 6 below. Replacement Printer(s) shall be included under the definition of "Printer(s)" in this Agreement. Amoco reserves the right to replace existing Printer(s) at any time with replacement printers to be used at the Premises, and compatible with any System Amoco shall designate upon thirty (30) days notice to Marketer.

### 5.    MAINTENANCE SERVICE FEE AND REPAIR COSTS

A.    All monthly lease and maintenance fees shall be deemed earned by Amoco as of the first day of each calendar month. The costs for Printer repair which are warranted for ninety (90) days are listed on Schedule B attached hereto and incorporated herein. Marketer shall be billed on his/her open account with Amoco for such costs.

B.    All Amoco-approved Printers acquired by Marketer, including those acquired pursuant to Section 6 below, subsequent to the effective date hereof shall automatically be covered by this Agreement, and Marketer shall become obligated to pay Amoco the Maintenance Service fee set out in Section 1(c) above commencing on the first day of the month after the month of acquisition of each such Printer.

C.    The lease and maintenance fee set out in Section 1(c) above shall be subject to change by Amoco upon not less than thirty (30) days written notice to Marketer.

### 6.    PROCEDURES FOR MAINTENANCE SERVICE

A.    If Marketer determines that a problem exists with Printer(s) covered by this Agreement, Marketer shall telephone Amoco's Help Desk at such number as Amoco may specify from time to time with the following information; the station name, SVB number, address, telephone number, serial number of malfunctioning Printer, and nature of the malfunction.

B.    If Amoco determines after receipt of a telephone call from Marketer that Maintenance Service on a Printer(s) is necessary, then Amoco shall arrange for its service provider to ship to the Premises a Replacement Printer via United Parcel Service (UPS) Red Next Day Air Service. All requests received by the service provider by 4:00 p.m. Central Time will be shipped the same business day and requests received by the service provider after that time will be shipped the following business day. For purposes of this Agreement "business day" shall mean Monday through Friday, excluding UPS holidays. The Replacement Printer shipment will include a Printer, power module, AC power cord, interface cable, and instructions and a completed UPS A.R.S. GroundTrac label for the return of the malfunctioning Printer to the service provider. Marketer will comply with the return shipping instructions, affix the return shipping label to the return shipping carton, and arrange for the return shipment by calling 1-800-742-5877 or such other number as provided for a UPS pickup or by delivering the return shipment to a UPS office.

If Marketer returns the malfunctioning Printer by means other than as provided herein, Marketer shall be responsible for the freight charges and loss or damage to the Printer. If the malfunctioning Printer is not returned to the service provider within fifteen (15) days of Marketer's receipt of the Replacement Printer, Marketer shall pay to Amoco the then-current retail price for a new Printer. If anything other than the Printer and its accessories is returned, Marketer shall be responsible for all costs associated with the shipment and return of such items and Amoco shall have no liability for the contents of such shipment.

        C.     Marketer agrees that the determination of Amoco or its chosen service provider, at Amoco's election, shall be final and conclusive as to whether Maintenance Service is necessary, and if so, as to the type of Maintenance Service that is necessary, on Printer(s) covered by this Agreement.

        D.     In the event that Amoco should repair or replace any Printer damaged as a result of causes other than Normal Wear and Tear, then Marketer shall pay Amoco for all repairs required to the damaged Printer, or if the damaged Printer cannot reasonably be repaired, Marketer shall upon demand pay to Amoco the then-current retail price for a new Printer.

### 7. REPAIRS NOT COVERED BY THIS AGREEMENT

        The following Printer damage is not covered by the maintenance fee and the Marketer shall be billed on his open account with Amoco for the actual costs of parts and/or labor necessary to return the Printer to good operating order:

        - Clear damage resulting from customer disassembly, attempted repair and missing parts.

        - Broken case parts from dropping printer and carving.

        - Coffee, soda, juice, water and other liquid spills inside printer that cause damage.

        - Foreign debris or matter inside printer that normally does not belong at the System terminal or should be kept clear of or cleaned from the printer, provided such cleaning does not require any disassembly of the printer and can easily be done by persons untrained in printer maintenance.

        - Stickers, personal artwork/doodling and carving on case parts.

        - Cuts, splices and attempted repair that damage interface and/or power connectors.

        - Gear and ribbon drive damage resulting from the use of third party (clone) ribbon cartridges.

        - Acts of nature or war, lightening, floods, fires, other extreme physical damage.

i:\law\oilgroup\commkt\contract\pending\comprt.doc
1/14/98
        4

**8.     NOTICES**

Any notice provided for herein shall be consider properly given on the postmark date and shall be sent by first class mail duly addressed to Amoco, Attention: Retail Customer Support, Mail Code 0603, at the address specified above, or to Marketer at the address specified above, or to either party at such other address that one of the parties may hereinafter designate.

**9.     LIMITATION OF LIABILITY**

Marketer and Amoco agree that any liability by Amoco for any loss, damage, injuries or other casualty of whatsoever kind or by whomsoever caused, to the person or property of Marketer arising out of, resulting from, or in any way connected with the subject matter of this Agreement, including without limitation any loss, damage, injuries or other casualty resulting in whole or in part from any negligence by Amoco and/or its service provider in the inspection, repair or replacement, or in the failure to inspect, repair or replace any Printer(s), shall be limited solely and exclusively to the amount of Maintenance Service Fee already paid by the Marketer to Amoco during the calendar year in which the loss, damage, injuries or other casualty occurred. Furthermore, and without limiting the foregoing, AMOCO SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES RESULTING FROM ANY ACTS OR OMISSIONS OF AMOCO AND/OR ITS SERVICE PROVIDER IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY NEGLIGENCE BY AMOCO AND/OR ITS SERVICE PROVIDER, IN WHOLE OR IN PART, IN PROVIDING OR FAILING TO PROVIDE INSPECTION, REPAIR OR REPLACEMENT OF PRINTER(S) UNDER THIS AGREEMENT.

**10.     EXCUSABLE DELAYS**

If the performance of this Agreement or any obligation thereunder is prevented, restricted or interfered with by reason of fire or other casualty or accidents; strikes or labor disputes; inability to procure parts, supplies or power; war or other violence; any law, order, proclamation, regulation, ordinance, demand or requirement of any governmental agency; or any other act or condition whatsoever beyond the reasonable control of the affected party, the affected party shall be excused from such performance to the extent of such prevention, restriction or interference; provided, however, that the party so affected shall take all reasonable steps to avoid or remove such causes of nonperformance and shall promptly resume performance hereunder whenever such causes are removed.

**11.     GENERAL**

A.     This Agreement shall be governed by the laws of the State of Illinois.

B.     This Agreement constitutes the entire agreement and understanding between the parties concerning the subject matter hereof and supersedes all prior agreements, negotiations and understandings of the parties with respect thereof. Specifically; and without

limitation, this agreement supersedes any prior Printer Maintenance Agreement entered into between the parties.

        C.    This Agreement may not be assigned by Marketer without the express written consent of Amoco which may be granted or withheld in Amoco's sole discretion.

   **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed the date first written above.

**AMOCO OIL COMPANY,**
a Maryland Corporation

**MARKETER**

By: _____

Its: _____

                       Cam Cornish

# SCHEDULE A

<u>PRINTER</u>

<u>Model No.</u>    <u>Serial No.</u>

## SCHEDULE B

| Repair Procedures | Parts Price | Flat Repair Rate | Total Charges |
|---|---|---|---|
| Basis Repair (Adjustments, Sensors, Motor, P.M. Cleaning, Includes New Ribbon) | Included in maintenance fee | $ 87.50 | $ 87.50 |
| Printhead Repair/Refurbished Replacement | $ 60.00 | $ 87.50 | $147.50 |
| New Printhead Replacement | $100.00 | $ 87.50 | $187.50 |
| PCB Repair/Refurbish | $105.00 | $87.50 | $193.50 |
| Rewind Mandrel | $ 14.80 | TBD/Repair | |
| Supply Mandrel | $ 2.07 | TBD/Repair | |
| Power Cord | $ 10.28 | TBD/Repair | |
| Cover | $ 22.86 | TBD/Repair | |
| Power Supply | $ 95.00 | TBD/Repair | |
| Autograph Plate | $ 2.37 | TBD/Repair | |
| I/F Cable Connector | $ 7.38 | TBD/Repair | |
| Printhead | $120.00 | TBD/Repair | |
| Main Case | $ 35.12 | TBD/Repair | |
| Pedestal | $ 15.24 | TBD/Repair | |

S. S. #: _6304_.

**AMOCO**

Amoco Oil Company

**Dealer/Jobber Credit Card Contract (POS)**
28-613 (10-92) E

This Agreement, made the _6_ day of _October_, _1998_, by and between **Amoco Oil Company**, hereinafter called "**Company**," and _Carl Cornish_ _____ (Service Station No. if applicable), whose business address is _980 Northlake Blvd. Lake Park._ _____ , hereinafter called "**Dealer/Jobber**" and shall become effective _October 6 1998._ .

**Witnesseth:**

Whereas, **Dealer/Jobber** desires to deliver products to and perform services for persons holding Credit Cards and to sell the Sales Slips covering products so delivered or services so performed to **Company**; and

Whereas, **Company** is willing to purchase credit sales reflected on **Dealer/Jobber** Sales Slips on the terms and conditions hereinafter set forth:

Now, therefore, in consideration of the mutual promises herein contained, **Company** agrees to buy and **Dealer/Jobber** agrees to sell credit sales reflected on **Dealer/Jobber** Sales Slips on the following terms and conditions:

I.  Charges not complying with the provisions of this contract shall be subject to charge-back to **Dealer/Jobber** by **Company**.

**II. Definitions**

  A. The term "credit card," "credit cards" or "cards" as used herein shall mean:

    1.  A credit card issued by **Company** and shall include the Torch Club credit card, MultiCard, Amoco Carte Blanche and Amoco Transicard and any other credit card issued by **Company** and shown as acceptable on the Wall Chart provided by **Company** to **Dealer/Jobber**. and

    2.  Diners Club and Carte Blanche credit cards issued by Citicorp Diners Club, Inc., and

    3.  Universal Credit Cards issued by governments or governmental agencies, if the Amoco Oil Company is shown as a participating company on the credit card by either name or logo, or if the driver of the vehicle has documents indicating **Company's** approval for acceptance, and

    4.  Universal Credit Cards issued by corporations if the Amoco Oil Company is shown as a participating company on the credit card by either name or logo, or if the driver of the vehicle has documents indicating **Company's** approval for acceptance.

    5.  Any other credit card designated by **Company** time to time. Company will provide **Dealer/Jobber** with a means of identifying acceptable credit cards through special bulletins, special instructions, or additions or revisions to **Dealer/Jobber** Wall Charts.

  B. The term "Sales Slip" as used herein means the document or documents supplied by **Company** and used by **Dealer/Jobber** to record and evidence sales made on Credit Cards and when completed to evidence a Credit Card sale, the information recorded thereon.

  C. The term "Surcharge" as used herein means any charge imposed on a credit card holder which is not imposed on buyers who pay cash, but shall not include a discount for cash

**III. Merchandise and Services Authorized on Credit Cards**

  A. If **Dealer/Jobber** is a retail dealer, he shall honor Credit Cards only at the retail outlet identified above. If **Dealer/Jobber** is a wholesale jobber, he shall honor Credit Cards only at locations dispensing **Company's** gasoline and/or diesel fuel from dispensing equipment painted in **Company's** colors and displaying **Company's** trademarks and trade names in accordance with **Company** approved standards, which **Company** may change at any time.

  B. Unless other restrictions are shown on the Credit Card or prompted electronically to the dealer, **Dealer/Jobber** shall honor Cards for the purchase, on credit, of gasolines and diesel fuels sold under **Company's** trademarks and or other products normally sold, or services normally rendered, at service stations. They shall also be honored for minor mechanical services, including related parts for passenger cars and light trucks. **Dealer/Jobber** shall not honor Credit Cards for sales of any items not usually mounted on or use in or on a motor vehicle or for services not rendered in connection with a motor vehicle except for food items normally sold in service stations or convenience stores which sell Amoco gasoline.

  C. Unless other restrictions are shown on the Credit Card or prompted electronically to the dealer, total service work performed including related parts charged to the Credit Card for any one customer shall be limited to a Two Hundred Fifty Dollar ($250) maximum or other amount as may be established by **Company** from time to time for each general category or work included in each job; i.e., Engine Repair, Transmission, Exhaust System, and the like.

IV.  Handling Credit Card Sales

A.  Dealer/Jobber shall use only the Sales Slips provided and approved by Company to record Credit Card sales. Company shall from time to time provide Dealer/Jobber with directions as to the proper Sales Slips to be used by Dealer/Jobber through special bulletins, special instructions, or additions or revisions to Dealer/Jobber Wall Charts.

B.  A Credit Card must be presented by the customer for each sale, and it must be properly imprinted by Dealer/Jobber on an imprinting machine authorized by Company or the Credit Card must be passed through the magnetic strip reader of the electronic sales processing equipment. A clear, readable imprint of the customer's account number must be secured on the Sales Slip. If a clear imprint cannot be obtained from the Credit Card, the complete account number must be legibly hand printed.

C.  Dealer/Jobber shall not honor an expired Credit Card or a Credit Card that has been altered, or a Credit Card before its inception date if an inception date is shown thereon

D.  All information embossed on the face of the Credit Card must be shown on the Sales Slip, except for sales recorded electronically.

E.  Vehicle license number, if embossed on the face of the Credit Card must agree with the license number of the vehicle involved in the sale.

F.  Sales are limited to the purchase restrictions, if any, regarding products and services outlined on the front and back of the Credit Card, prompted electronically or outlined on the Dealer/Jobber Wall Chart or as provided herein.

G.  Each Sales Slip must be signed by the individual presenting the Credit Card. Sales on Diners Club, Carte Blanche, Amoco Torch Club, MultiCard or Amoco Carte Blanche Credit Cards may be made only to and the Sales Slip may be signed only by the person whose name is embossed on the Credit Card. The signature on the Sales Slip must be the same as the signature on the Diners Club, Amoco MultiCard, Torch Club or Amoco Carte Blanche Credit Card presented.

H.  Credit card sales processed through a Card Reader In Dispenser (CRIND) or Island Terminal Unit (ITU) does not require a customer's signature. Dealer/Jobber's responsibilities are same for a CRIND or ITU transaction as they are for a normal sales slip with a signature except customer's signature or verification of a signature.

I.  A general description of work performed or products sold or job ticket number must be shown on the Sales Slip.

J.  Dealer/Jobber must show an explanation on the Sales Slip if products sold were delivered to more than one vehicle.

K.  Dealer/Jobber must be satisfied that there is no suspicion of unauthorized or fraudulent use.

1.  Dealer/Jobber shall be strictly accountable for unauthorized or fraudulent use of Credit Cards which Dealer/Jobber knows of through the exercise of ordinary care should know about. All Sales Slips representing such use or any violation of any term of this Agreement may be charged back to Dealer/Jobber, at Company's election.

2.  Absolutely no cash shall be advanced to customers on Credit Cards, except that checks may be cashed under an approved program of the Amoco Motor Club.

3.  Expired revoked, or altered Credit Cards shall not be accepted. Any Sales Slip containing a forged signature or other; fraudulent charge knowingly accepted by Dealer/Jobber may be charged back to Dealer/Jobber by Company. This right of charge-back shall not derogate in any way from the criminal character of Dealer's/ Jobber's conduct or that of the person representing the Credit Card, and shall not relieve Dealer/Jobber or the person using the Credit Card from any criminal responsibility for this conduct.

4.  Except for the sale of motor oil and/or antifreeze, all automotive products sold by Dealer/Jobber on Credit Cards must be delivered to, mounted on or attached to the vehicle involved in the sale and shall not exceed the capacity of the vehicle.

5.  Dealer/Jobber shall not honor the same Credit Card for a series of purchases by different persons without securing Company's approval as set forth in Section V., K. of this Agreement; nor shall Dealer/Jobber honor a Credit Card for a frequent series of purchases by the card holder or anyone else under suspicious circumstances without securing Company's approval. Any Sales Slip generated by Dealer/Jobber under such circumstances without Company's approval are subject to charge-back.

6.  Company maintains an analysis of fraudulent credit sales by service station. In the event that dollar volume of fraudulent credit sales through Dealer's/Jobber's station is excessive in Company's opinion, it is Company's intention to exercise its right to cancel this Agreement as set forth in Section VII.

L.  Sales Authorization

1.  Except as indicated below, all sales on Credit Cards above the amount established by Company from time to time, must be processed through Company's sales authorization system and an approval code number obtained which must be written in the space provided on the Sales Slip. Company's required sales authorization procedures apply regardless of the Dealer's/Jobber's methods of obtaining approvals. The sales authorization procedures may be changed at any time in any manner by Company. Obtaining sales authorization does not relieve Dealer/Jobber from ny other responsibilities set forth herein.

2.  Except in the case of sales on Diners Club Credit Cards, an approval code shall be obtained by one of the following methods, as directed by Company from time to time:

a.  By phoning Amoco Sales Authorizations at the correct phone number and in accordance with instructions provided from time to time by Company; or

b.  By use of point of sale equipment in accordance with instructions provided from time to time by Company.

Authorization for sales of thirty-five dollars ($35.00) or more on Diners Club cards must be obtained by telephoning Diners Club Authorization Center as follows: Outside Colorado (Toll Free) 800-525-9040. Colorado 800-332-9340. Metropolitan Colorado 779-8235.

3.  Detailed instructions as to which of the preceding procedures to follow and how to obtain approval codes under the designated procedure shall be provided by Company. Dealer/Jobber shall obtain proper approval in all cases where sales exceed the amount at which authorization is required.

M.  Dealer/Jobber shall not impose a "surcharge" in connection with any Credit Card transaction.

N.  Company may, by written notice to Dealer/Jobber, require Dealer/Jobber to note purchaser's vehicle license number, including the state and year, and/or card holder's driver's license number, on each credit sale. If Dealer/Jobber is required to note vehicle license number, credit sales reflecting a fictitious, nonexisting or unissued license number shall be subject to charge-back.

## V.  Purchasing of Accounts Receivable

A.  Company will purchase Dealer's/Jobber's Sales Slips which comply with the terms and conditions of this Agreement and which are delivered to Company in accordance with Company's instructions as to form and manner of delivery within 30 days of the date of the transaction or, if delivery is by electronic means, upon completion of the sale.

B.  Company shall pay Dealer/Jobber at a discount from the total face value of Sales Slips. Said discount shall be in such amount as is established by Company at the time of delivery of the Sales Slip by Dealer/Jobber to Company. At its option, Company may elect to pay Dealer/Jobber by check, credit memorandum or may credit the purchase price to any balance, of any nature, owed to the Company by Dealer/Jobber.

C.  Company, when purchasing Sales Slips from Dealer/Jobber shall purchase them free of dispute.

1.  Any Sales Slip shall be subject to charge-back if the customer disputes or refuses to pay because of dissatisfaction with price, workmanship or materials. Such disputes are to be resolved between the customer and the Dealer/Jobber as an independent businessman.

2.  Company reserves the right to charge back to Dealer/Jobber any Sales Slip in connection with which the customer alleges that Dealer/Jobber used any unethical or deceptive practice to induce the transaction.

3.  Company stands behind the quality of all products and merchandise that it sells, whether manufactured by Company or by others. It cannot, however, assume any responsibility for the quality or performance of goods Purchased by Dealer/Jobber from other sources.

Therefore, if a customer refuses to pay for such goods because of dissatisfaction with quality or performance, Company reserves the right to charge back the full amount of the Sales Slip.

4.  Dealer/Jobber shall retain a copy of each job ticket paid by Credit Card for a minimum of one year.

D.  In the event that Sales Slips are improperly prepared, do not comply with the terms and conditions of this Agreement, or are not delivered to Company within the time limits provided in Section VI., A., Company shall not be obligated to purchase such Sales Slips. Dealer/Jobber acknowledges that Company normally accepts Sales Slips from Dealer/Jobber and reimburses him before Company can determine whether each Sales Slip conforms to the terms and conditions of this Agreement. Consequently, Company shall have the right to charge back to Dealer/Jobber, at any time, any Sales Slip which it has accepted from Dealer/Jobber which does not conform to the terms and conditions of this Agreement. Dealer/Jobber agrees to not attempt collection of any Sales Slip from card holders unless Company has charged back said Sales Slip under the terms and conditions of this Agreement.

E.  Any tax applicable to a credit sale which is not added to or included in the sales price shall be paid by Dealer/Jobber, and Dealer/Jobber will account for such tax to the proper tax authority. Company reserves the right to charge back taxes that are improperly charged to exempt customers.

F.  Purchase by Company of any Sales Slip which it is not obligated to purchase hereunder shall not be construed as a waiver of any of the terms or conditions of this Agreement and shall not create an obligation on the part of Company to purchase any noncomplying Sales Slips in the future. At its discretion, Company may attempt collection of noncomplying Sales Slips, but in the event collection efforts are unsuccessful Company reserves the right to charge back any such Sales Slips to Dealer/Jobber.

G.  Dealer/Jobber must retain dealer copies of all Sales Slips for a minimum of six (6) months. In the event a Sales Slip is lost prior to charging the customer's account, Dealer/Jobber shall deliver a copy of the Sales Slips to Company for reconstruction. Failure to retain this information may result in reimbursement being disallowed to Dealer/Jobber for the lost Sales Slip.

VI.  This Agreement shall remain in effect until cancelled by either party by giving ten (10) days' notice in writing to the other party except that this Agreement shall automatically terminate if Dealer/Jobber shall cease, for any reason whatsoever, to be a Dealer/Jobber in Amoco products. Paragraphs IX and X may be separately cancelled, on ten (10) days' written notice. This right is in addition to the right of charge-back provided herein.

VII. Any notice provided for herein will be considered properly given as of the postmark date and shall be sent by certified mail, duly addressed to:

**Amoco Oil Company**

P. O. Box 87707
Chicago, Illinois 60680-0707

Dealer/Jobber

## VIII. Point of Sale Equipment

A.  If Dealer/Jobber uses Point of Sale (POS) Equipment to access Company's sales authorization system or to access Company's sales authorization and to deliver Sales Slips to Company, such communications from Dealer/Jobber must conform to Company's prescribed transmission acceptance standards and procedures.

B.  In connection with the use of any POS Equipment hereunder, whether supplied by Company under subsection IX (C.) or otherwise, Dealer/Jobber shall use only such software as Company may, from time to time designate. Dealer/Jobber may use POS Equipment to obtain authorization of bank charge cards if a Form 26-614 is in effect. If POS Equipment is not supplied by Company under subsection IX (C.), the cost of software upgrades or changes shall be borne solely by Dealer/Jobber.

C.  Company may supply Dealer/Jobber with one Credit Card imprinter, one Credit Card Charge Recorder, and the POS Equipment described on attachment A (if any). Any such supplying of POS Equipment shall be on the following terms and conditions and the terms and conditions set out in paragraph XI.

1.  Dealer/Jobber shall pay a monthly fee of _____ -0- _____, plus applicable sales and use taxes, for such Equipment supplied by Company. This monthly Equipment fee shall be invoiced monthly to Dealer/Jobber. Company may change this monthly fee by written notice to Dealer/Jobber not less than 30 days prior to any anniversary date. Any such fee change shall then become effective on the anniversary date.

2.  Dealer/Jobber shall not alter the POS Equipment in any manner or in any way and shall not use the equipment to contact or use another processing agent or bank other than the one selected and/or approved by Company. Notwithstanding any other terms of this Agreement, and Dealer/Jobber alteration or change to the equipment will result in immediate termination of the Dealer/Jobber Credit Card Contract or revocation of this lease of the POS Equipment at Company's option. Company at its option may immediately repossess the equipment.

## IX. Additional Credit Plate Imprinter/Charge Recorders

Company will supply Dealer/Jobber with additional credit plate imprinter machines and Credit Card Charge Recorders. Dealer/Jobber agrees to use such equipment at each location to which this contract pertains. It is hereby agreed that any such supplying of additional equipment shall be on the following terms and conditions and the terms and conditions set out in paragraph XI:

Dealer/Jobber shall pay the following annual fee for each additional Credit Card imprinter and each additional Credit Card Charge Recorder, plus applicable sales and use taxes, payable in advance to Company at its offices located at

P. O. Box 9090
Des Moines, IA 50368-0098

| Imprinting Equipment Fees: | |
| --- | --- |
| Credit Card Imprinter............: | -0- |
| Credit Card Charge Recorder: | -0- |

## X. Credit Plate, Charge Recorders, and POS Equipment, Additional Terms and Conditions.

Dealer/Jobber agrees that the following terms and conditions shall apply to any imprinting equipment and/or POS Equipment supplied by Dealer/Jobber by Company.

A.  Company, its agents, employees, parent and affiliates, shall not be liable for any loss, damage, injuries or other casualty of whatsoever kind or by whomsoever caused, to the person or property of anyone (including Dealer/ Jobber) arising out of or resulting from the installation existence, use, maintenance, condition, repair, alteration or removal of POS Equipment, POS Equipment software or any item of imprinting equipment; and Dealer/Jobber for himself, his heirs, executors, administrators, successors and assigns, hereby agrees to indemnify and hold Company, its agents, employees, parent and ffiliates, harmless from and against all claims for such loss, damage, injury, or other casualty.

B.  Company will provide, through independent contractors or otherwise, repair and maintenance service necessary to keep the POS Equipment and/or Credit Card imprinting equipment in working order, including replacement of worn or broken parts, cleaning, oiling and adjustment when due to normal usage.

C.   In the event that any equipment supplied by **Company** hereunder is lost, destroyed or damaged while in the possession or control of **Dealer/Jobber**, Dealer/Jobber will pay to **Company** the following as applicable:

    1.   Imprinting Equipment replacement costs (defined as *Company's* single purchase price in effect at the time of loss or destruction).

    2.   For POS Equipment, reasonable market value on the date of loss or destruction of the terminal(s), and of any electronic cash register or other equipment with which said POS Equipment is connected.

    3.   All costs and expenses (except when caused by ordinary wear) incurred by **Company** to repair said equipment.

D.   **Company** shall have the right to repossess Point of Sale Equipment or any item of imprinting equipment or substitute new Point of Sale Equipment or imprinting equipment therefore or change terminal software at any time. In the event of any such change, repossession or substitution, the applicable annual fee shall be adjusted for the time the equipment was actually used by **Dealer/Jobber.**

E.   **Company** will pay any license, property or other tax or similar charge lawfully assessed against the imprinting equipment or POS Equipment.

F.   **Dealer/Jobber** shall maintain and use all POS Equipment and credit plate imprinting equipment supplied by Company, including additional equipment, only at the location(s) referred to in Section III (A) of this Agreement. **Company** shall have he right to repossess any POS Equipment or other equipment in use at locations other than those specified.

G.   Upon the termination of this Agreement by either party, **Dealer/Jobber** shall promptly return to **Company** all imprinting equipment and/or POS Equipment supplied by **Company** hereunder, including any electronic cash registers or other equipment with which said POS Equipment is connected.

XI.   This Agreement cancels and supersedes all prior agreements and understandings between the parties hereto pertaining to the subject matter hereof, and there are no other agreements, written or oral, between the parties pertaining to the subject matter hereof.

XII.   This Agreement shall not be modified except in writing, executed by both parties.

**In witness whereof,** the parties have caused these presents to be executed and made effective as of the day and year first above written.

**Dealer/Jobber**                                                         **Amoco Oil Company**

_____ (Name)     By: _____

By: _____        Title: _____



Attachment 1 to
Dealer/Jobber Credit Card Contract (POS)

**Electronic Sales Processor (ESP)**
**Equipment Rental Worksheet**

26-613-Att1 (8-94) E

Amoco Oil Company

Dealer Name: _Cam Cornish_

Account Number: _6304_

SVB Number: _30 45796._

| Equipment | Monthly Rental |
|---|---|
| Electronic Cash Register/Leased Line | $ — 0 — |
| Electronic Cash Register/Dial-up Line | $ |
| Electronic Cash Register/Companion Unit | $ |
| Sales Authorization & Data Capture/Lease Line | $ |
| Sales Authorization & Data Capture/Dial-up Line | $ |
| 1 - SVB Imprinter | $ N/C |
| 1 - SVB Charge Recorder | $ N/C |
| **Total Monthly Rental** | $ — 0 — |

Dealer: _A.C. Cut_          Date: _10.6.98_

Sales Manager: _Julie Andrews_          Date: _10.6.98._

Note:    Insert "Total Monthly Rental" amount in Section VIII of the Dealer/Jobber Credit Card Contract (26-613)

S. S. #  __6704__



**AMOCO**

Amoco Oil Company

Dealer/Jobber    Debit    Card    Agreement
26-896 (6-97) E

This Agreement, made and effective on this ____6th____ day of ____Oct.____, ____98____, is by and between Amoco Oil Company (hereinafter called "Company") and ____Cam Cornish____ whose business address is

____980  N. Lake  Blvd.    Lake Park, Fla.____
(hereinafter called "Dealer/Jobber").

WITNESSETH:

WHEREAS, Company and Dealer/Jobber wish to enable Dealer/Jobber to accept debit cards issued by member institutions of debit card networks (hereinafter referred to as "Debit Cards"), at the location(s) listed on Attachment 1 hereto, in payment for goods and services sold by Dealer/Jobber.

NOW THEREFORE, in consideration of the mutual promises contained herein, the parties agree as follows:

1. **Equipment.**
   a) Dealer/Jobber shall install and, at all times herein, keep active a Verifone 201 PIN Pad or successor machine ("PIN Pad") for customer use hereunder. The PIN Pad shall be connected to and used in conjunction with the Electronic Cash Register leased or used by Dealer/Jobber under the 26-613 Dealer/Jobber Credit Card Contract (POS). Hereinafter, the PIN Pad and Electronic Cash Register shall be referred to collectively as "Equipment."

   b) Dealer/Jobber shall use the PIN Pad only in conjunction with the Electronic Cash Register pursuant to Company's policies and guidelines and shall not alter or change the Equipment or any part thereof in any manner except in accordance with Company's instructions.

   c) In the event Dealer/Jobber needs to purchase a PIN Pad, it shall do so only from a Company-approved supplier.

2. **Use of Equipment.**
   a) Dealer/Jobber shall use and operate Equipment in accordance with written instructions issued by Company from time to time.

   b) Dealer/Jobber shall have Equipment available for use at the retail premises during all times premises are open for business.

   c) Dealer/Jobber agrees that customers desirous of using a Debit Card as a means of purchasing goods and/or services sold by Dealer/Jobber shall be given access to Equipment on a non-discriminatory basis equivalent to the access given to customers paying for goods and/or services with credit/charge cards or cash.

   d) Dealer/Jobber shall refer customers alleging errors in transactions processed through Equipment to the Electronic Sales Processor (ESP) Customer Help Line (1-800-421-5209).

   e) Dealer/Jobber shall render assistance and instructions to customers on use of the Equipment. Company will provide training to Dealer/Jobber on the operation of the Equipment.

   f) Dealer/Jobber shall not impose a surcharge in connection with any Debit Card transaction.

3. **Honoring Debit Cards.** Dealer/Jobber shall honor such Debit Cards as Company shall from time to time designate in writing according to the Rules and Guidelines issued by Company. Dealer/Jobber shall honor Debit Cards only at the participating location(s) approved by Company as set out in Attachment 1, attached hereto and incorporated herein. Company shall have the right to immediately remove a location from Attachment 1 for any violation of this Agreement.

**4.   Settlement.**

a)   Company shall pay Dealer/Jobber the full amount of debit transactions processed through Equipment, net of transaction fees, by deposit to Dealer/Jobber's bank account via electronic funds transfer or other means, in company's sole discretion.

b)   Dealer/Jobber shall be charged a transaction fee as established by company from time to time. Said transaction fee may be changed at any time by Company upon ten (10) days prior written notice.

c)   All debit transactions hereunder must be processed through Equipment electronically and approved through the appropriate network.

d)   All debit transactions hereunder shall be subject to chargeback to Dealer/Jobber including all "cash-back" or "cash only" transactions.

**5.   Returns.** If any goods are accepted for return, or any refunds or price adjustments are allowed for goods or services sold by the Dealer/Jobber, the Dealer/Jobber shall make the refund, replacement, or adjustment to the customer who purchased such goods or services with the Debit Card in the same manner as Dealer/Jobber would to any cash paying customer.

**6.   Complaints.** Dealer/Jobber shall be responsible for handling all claims or complaints asserted by any customer with regard to the goods and services sold by the Dealer/Jobber that are purchased with a Debit Card. All such claims or complaints shall be settled directly by Dealer/Jobber, and Dealer/Jobber shall indemnify and hold Company its agents, employees, parent, and affiliates harmless against any loss or liability on account thereof.

**7.   Term.** The term of this Agreement shall commence on the effective date and shall continue for one (1) year, provided however, that it shall automatically renew for successive periods each of one (1) year subject to the further provisions of this Paragraph 7. For the initial term of this Agreement and any renewal term, the Company may terminate this Agreement for any reason at any time upon ten (10) days prior written notice to Dealer/Jobber. After the initial one-year term, Dealer/Jobber may terminate this Agreement at any time upon ten (10) days prior written notice to Company. This Agreement shall automatically terminate in the event that the separate Dealer Lease, Dealer Supply Agreement, or Jobber Contract between the parties shall terminate or non-renew for any reason. Nothing in this Agreement shall be construed as a commitment by either party that any Dealer Lease, Dealer Supply Agreement, or Jobber Contract, shall be renewed or extended at the expiration of its term.

**8.   Service Marks and Trademarks.** Dealer/Jobber shall use any promotional materials which may be supplied to it by Company which contain the trademarks or service marks owned by a Debit Card network (hereinafter collectively called "Marks") in strict conformity with the Company's written instructions. Dealer/Jobber may utilize such Marks in Dealer/Jobber's own promotional and advertising materials provided Dealer/Jobber obtains Company's prior written consent for such usage. Dealer/Jobber shall not acquire any right, title, or interest in or to the Marks, and upon termination of this Agreement, Dealer/Jobber shall discontinue all reference to and display of the Marks.

**9.   Right to Inspect.** Company or its designee shall have the right, at its option, to review all activities at the participating location(s) and inspect all records of Dealer/Jobber in connection with the processing of Debit Card transactions, and the use of the Equipment and the Marks related thereto.

**10.   Indemnification.** Company, its agents, employees, parent, and affiliates, shall not be liable for any loss, damage, injuries, or other casualty of whatsoever kind or by whomsoever caused, to the person or property of anyone (including Dealer/Jobber) arising out of or resulting from Dealer/Jobber's processing of Debit Card transactions and/or the installation, existence, use, maintenance, condition, repair, alteration, or removal of the Equipment; and Dealer/Jobber on its own behalf and on behalf of its heirs, executors, administrators, successors, and assigns, hereby agrees to indemnify and hold Company, its agents, employees, parent, and affiliates, harmless from and against all claims for such loss, damage, injury, or other casualty.

**11.   Promotion.** During the term of this Agreement, Dealer/Jobber shall display the logotype of the Company-designated Debit Card networks wherever any credit/charge card or other debit card logotype is displayed, in each case (other than Amoco's private label consumer and commercial credit cards and the Amoco co-brand Visa), with the same or no lesser prominence as is given to each credit card and other debit card and logotype displayed.

**12.   No Agency, Joint Venture, or Partnership.** Neither Dealer/Jobber nor any Dealer/Jobber employee shall be deemed an agent of Company nor shall they have any authority to enter into any commitments on behalf of Company. This Agreement does not create a joint venture or partnership between the parties.

**13.   Compliance with Laws.** Dealer/Jobber agrees to comply with all applicable and valid laws and regulations relating to electronic banking. Dealer/Jobber shall indemnify and hold Company, its agents, employees, parent, and affiliates harmless from any and all penalties, losses, or liabilities of every nature whatsoever resulting from Dealer/Jobber's failure to comply with the provisions of this Paragraph 13.

**14.   Notices.** All notices given under this Agreement shall be deemed to be properly served if delivered in writing personally or sent by certified mail return receipt requested to Company at 200 East Randolph Drive, Chicago, Illinois 60601, Attention: Brand Manager, Payment Systems, Mail Code 0508, or to Dealer/Jobber at the address shown on the first page hereof. Date of service of a notice served by mail shall be the date the notice is deposited in the United States mail.

**15. Entire Agreement.** Company and Dealer/Jobber hereby agree that this Agreement as written represents the entire agreement between the parties and that there are no other agreements, written or verbal, between the parties pertaining to the subject matter hereof. This Agreement may not be amended or supplemented orally but only by an agreement in writing which has been signed by the party against whom enforcement of any such amendment or supplement is sought.

**16. Consent.** In any instance where the consent or approval of either party is required under the terms of this Agreement, such consent or approval shall not be unreasonably withheld. Company and Dealer/Jobber agree to execute and deliver any instruments in writing necessary to carry out any agreement, term, condition, or assurance in this Agreement whenever occasion shall arise and request for such instruments shall be made.

**17. Waivers.** One or more waivers by Company or Dealer/Jobber of a breach of any covenant or condition by the other of them shall not be construed as a waiver of the subsequent breach of the same covenant or condition, and the consent or approval by Company or Dealer/Jobber to or of any act by either requiring the other's consent or approval shall not be deemed to waive or render unnecessary either party's consent to or approval of any subsequent similar act by the other party.

**18. Multiple Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original for all purposes.

**19. Governing Law.** This Agreement shall be governed by and construed in accordance with the Laws of the State of Illinois, except where pre-empted by federal law.

**20. Severability.** If any provision of this Agreement shall be declared legally invalid or unenforceable, then the remaining provisions of this Agreement nevertheless shall continue in full force and effect and shall be enforceable to the fullest extent permitted by law.

**21. Delays in Performance.** The performance by Company and Dealer/Jobber of any of their respective obligations or undertakings provided for in this Agreement shall be excused and no default shall be deemed to exist in the event and so long as the performance of any such obligation or undertaking is prevented, delayed, retarded, or hindered by any act of God, act of war, riot, fire, explosion, accident, flooding, embargo, sabotage, telecommunications system malfunction; shortage of or significant fluctuations in electric power; delay or failure in performance on the part of the Debit Card network; governmental law, ordinance, rule, regulation, order or action; injunction or restraining order; or any other cause beyond the reasonable control of Company or Dealer/Jobber, as the case may be.

**22. Assignment.** Neither party shall assign this Agreement without the prior written consent of the other.

IN WITNESS WHEREOF, the parties hereto have set their hands the date and year first above written.

Dealer/Jobber

By: _____

Name: _____Casm Covvisn_____

Title: _____Dealer_____

Amoco Oil Company

By: _____Julie Andrew_____

Name: _____Julia Andrew_____

Title: _____AMC_____

Please fill in information for **each location** that will participate (**even if only one location**)

Include this completed Attachment when submitting the **Dealer/Jobber Debit Card Agreement**

Attachment 1
**Dealer/Jobber Debit Card Agreement**
**Participating Locations**
26-896-A (6-97) E

| | Location | | | | | SVB Number |
|---|---|---|---|---|---|---|
| **1** | Phone Number | Area Code 561 | 863 – 7347. | | | 3045796 |
| | Address 980 ~~Damhoke~~ Blvd. | | | | | |
| | City ~~hoke Park~~ | | State FL | Zip 33403 | | |
| **2** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |
| **3** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |
| **4** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |
| **5** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |
| **6** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |
| **7** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |
| **8** | Phone Number | Area Code | – | | | |
| | Address | | | | | |
| | City | | State | Zip | | |

## EXHIBIT B TO THE TRANSFER AGREEMENT

## OWNER'S GUARANTY AND ASSUMPTION OF TRANSFEREE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution of the foregoing Transfer Agreement (the "Agreement") by AMOCO OIL COMPANY, a Maryland corporation ("Amoco") each of the undersigned hereby personally and unconditionally (1) guarantees to Amoco and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Yasmin Irani ("Transferee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement. Each of the undersigned waives:

1. acceptance and notice of acceptance by Amoco of the foregoing undertakings;

2. notice of demand for payment of any indebtedness of nonperformance of any obligations hereby guaranteed;

3. protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

4. any right he may have to require that an action be brought against Transferee or any other person as a condition of liability;

5. all right to payment or reimbursement from, or subrogation against, the Transferee which he may have arising out of his guaranty of the Transferee's obligations; and

6. any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that:

1. his direct and immediate liability under this guaranty shall be joint and several not only with Transferee, but also among Guarantors;

2. he shall render any payment or performance required under the Agreement upon demand if Transferee fails or refuses punctually to do so;

3. such liability shall not be contingent or conditioned upon pursuit by AMOCO of any remedies against Transferee or any other person; and

4.  such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Amoco may from time to time grant to Transferee or to any other person including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement; and

5.  the written acknowledgment of Transferee, accepted in writing by Amoco, or the judgment of any court or arbitration panel of competent jurisdiction establishing the amount due from Transferee shall be conclusive and binding on the undersigned as Guarantors.

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

**WITNESS**                                              **GUARANTOR(S)**

_____                          _____

_____                          _____

_____                          _____

**7**

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

YASMIN IRANI, an individual,                    CASE NO. 02-15707 (05)

        Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

        Defendants.

_____/

### BP'S SECOND NOTICE OF FILING

    BP PRODUCTS NORTH AMERICA INC. herewith files the affidavit of Jimmy Moran

as to letter dated April 1, 2002.

### CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

facsimile and by U.S. Mail to: Allan S. Reiss, Esq., Levine & Partners, P.A., Attorneys for

Plaintiff, 1110 Brickell Avenue, 7th Floor, Miami, FL 33131 this _21st_ day of August, 2002.

        HEINRICH GORDON HARGROVE
        WEIHE & JAMES, P.A.
        Attorneys for Defendant, BP
        500 East Broward Boulevard, Suite 1000
        Ft. Lauderdale, FL 33394-3092
        (954) 527-2800 (tel.); (954) 524-9481 (facsimile)

By:_____
        John R. Hargrove, Esq.
        Florida Bar No. 173745
        Moises Melendez, Esq.
        Florida Bar No. 908835

LAW\82041\090\not filing AFFID-MORAN-IRANI2.doc

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND    FOR    BROWARD    COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

YASMIN IRANI, an individual,                CASE NO. 02-15707 (05)

        Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

        Defendants.

_____/

## AFFIDAVIT OF JIMMY MORAN
## AS TO LETTER DATED APRIL1, 2002

STATE OF FLORIDA
               SS:
COUNTY OF BROWARD

    1.    My name is Jimmy Moran. I am presently employed by Amoco Oil Company

(a/k/a BP Products North America Inc.) as its Florida Regional Sales Manager.

    2.    My duties at Amoco include monitoring the status of Amoco gasoline service

stations in Florida. I comply with these duties through my own efforts and the efforts of other

Amoco employees who report to me. I give this affidavit in my capacity as a representative of

Amoco Oil Company and based upon knowledge derived from my work at Amoco.

    3.    The letter to Yasmin Irani dated April 1, 2002 and the certified mail return

receipt attached hereto are true and accurate duplicates of the original documents.

    4.    Further affiant sayeth naught.

Case No. 02-15707 (05)

Jimmy Moran

STATE OF Florida

COUNTY OF Broward

Sworn to (or affirmed) and subscribed before me this _20_ day of _August_ _____, by

Jimmy Moran.

Harry Bindschadler
MY COMMISSION # DD097568 EXPIRES
April 9, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

(SEAL)

Notary signature

_Bindschadler, Harry_

Personally known                    _____

or Produced Identification        _____

Type of Identification Produced   _____

G:\LAW\82041\pleadings\AFFID-MORAN-IRANI2.doc

2

**bp**

## R. B. (Ronnie) Manton
Regional Vice President

BP Amoco Company
2475 Northwinds Parkway
Suite 400
Alpharetta, GA 30004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

April 1, 2002

Yasmin Irani
980 Northlake Blvd.
Lake Park, FL. 33403]

Direct 770 576 3069

**Service Station # 6304; Lake Park, FL. 33403**

Dear Mr. Yasmin Irani:

This letter serves as a reminder that the terms of your Commission Marketer Agreement, Commission Marketer Lease, and other related agreements (collectively, "CM Agreements") will expire on **10/5/2002** and are not renewable. Please make arrangements to conclude your business affairs and quit and deliver possession of the service station premises, together with all Amoco-owned equipment located thereon, on **10/5/2002.**

Please contact your Regional Account Executive if you have any questions.

Very truly yours,

Regional Vice President

cc:   Jimmy Moran, Regional Sales Manager
      Joe Eikenberg, Regional Account Executive
      Denise Flynn-Ortiz

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Bp
8736 West Commercial Blvd.
Lauderhill, FL 33351
Attn: Denise Flynn-ortiz

03

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Received by (Please Print Clearly)  B. Date of Delivery 4/3/02<br><br>C. Signature<br>X ☐ Agent ☐ Addressee<br><br>D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |
| 1. Article Addressed to:<br><br>Amoco Station #6304<br>Yasmin Irani<br>980 Northlake Blvd.<br>Lake Park, FL  33403 | |
| | 3. Service Type<br>☐ Certified Mail ☐ Express Mail<br>☐ Registered ☐ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D.<br><br>4. Restricted Delivery? (Extra Fee) ☐ Yes |
| 2. Article Number (Copy from service label)<br>7990-9066 | |

PS Form 3811, July 1999          Domestic Return Receipt          102595-00-M-0952

8

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

YASMIN IRANI, an individual,                    CASE NO. 02-15707 (05)

        Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
KATLIN BENNETT, an individual,

        Defendants.

_____/

## BP'S NOTICE OF FILING REGARDING
## RELATED ORDERS AND TRANSCRIPT

      Defendant, BP PRODUCTS NORTH AMERICA INC. ("BP") files the following orders

and transcript in similar cases related to the above-captioned action.

      1.     Transcript of hearing dated July 31, 2002 in the matter of Griveas v. Amoco Oil

Company n/k/a BP Products North America Inc., et al. (Case No. 02-13395 (05)) before Judge

Estella Moriarty.

      2.     Order denying Motion for Temporary Restraining Order dated August 9, 2002 in

the matter of Fernandez v. Amoco Oil Company n/k/a BP Products North America Inc., et al.

(USDC Case No. 02-22297-civ-Moore) entered by Judge K. Michael Moore.

      3.     Order dismissing the matter of Koutsodendris v. Amoco Oil Company n/k/a BP

Products North America Inc., et al. (USDC Case No. 02-61069-civ-Moore) entered by Judge K.

Michael Moore.

Case No. 02-15707(05)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

facsimile and by U.S. Mail to: Allan S. Reiss, Esq., Levine & Partners, P.A., Attorneys for

Plaintiff, 1110 Brickell Avenue, 7th Floor, Miami, FL 33131 this _21st_ day of August, 2002.

> HEINRICH GORDON HARGROVE
> WEIHE & JAMES, P.A.
> Attorneys for Defendant, BP
> 500 East Broward Boulevard, Suite 1000
> Ft. Lauderdale, FL  33394-3092
> (954) 527-2800 (tel.);  (954) 524-9481 (facsimile)
>
> By:_____
> John R. Hargrove, Esq.
> Florida Bar No. 173745
> Moises Melendez, Esq.
> Florida Bar No. 908835

LAW\82041\090\not filing Related Orders and Transcripts-IRANI.doc

2

Page 1

```
 1            IN THE CIRCUIT COURT
             OF THE 17TH JUDICIAL
 2           CIRCUIT IN AND FOR
             BROWARD COUNTY, FLORIDA
 3
 4  JOHN GRIVEAS, an individual,  )
                                  )
 5        Plaintiff,      )NO. 02-13395 (05)
                          )
 6  vs.                   )
                          )
 7  AMOCO OIL COMPANY, a Maryland, )
    Corporation, a/k/a BP PRODUCTS )
 8  NORTH AMERICA, INC. and JIMMY  )
    MORAN, an individual,       )
 9                        )
          Defendants.    )
10  _____)
11
           201 S.E. 6th Street
12         Fort Lauderdale, Florida
           July 31, 2002
13         9:35 o'clock a.m.
14      The above-styled cause came on for
15  hearing in chambers before the Honorable ESTELLA
16  M. MORIARTY, Circuit Court Judge, July 31, 2002,
17  commencing at or about 9:35 o'clock a.m.
18
    APPEARANCES:
19
    LEVIN & PARTNERS, P.A.,
20  BY: ALLAN S. REISS, ESQUIRE,
    Appearing on behalf of the Plaintiff.
21
    HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, P.A.,
22  BY: JOHN R. HARGROVE, ESQUIRE,
          and
23       MOISES MELENDEZ, ESQUIRE,
    Appearing on behalf of the Defendants.
24
25
```

Page 2

```
 1  Thereupon:
 2      The following proceedings were had:
 3      THE COURT: Okay. I read the
 4  motion, I read the documents that were
 5  furnished to me yesterday. So can I have
 6  a brief statement of what your positions
 7  are?
 8      MR. REISS: Good Morning, Your
 9  Honor. Allan Reiss of Levine & Partners
10  for the plaintiff John Griveas. Mr.
11  Griveas is here. Mr. Fernandez is also
12  here as another person who has the same
13  claim against Amoco.
14      Make your appearance?
15      THE COURT: In this case?
16      MR. REISS: No, in a separate case.
17      THE COURT: Is he going to testify?
18      MR. REISS: No, Your Honor. Today
19  we really didn't expect to have testimony.
20      THE COURT: How would I have an
21  injunction without any testimony?
22      MR. REISS: What we were asking for
23  is some time for -- there are three things
24  we were seeking to achieve today. We
25  wanted to get a specially set time where
```

Page 3

```
 1  we would have sufficient time to present
 2  evidence. We wanted to go ahead and
 3  commence depositions. Under the rules, we
 4  didn't obtain service until July 11, you
 5  can't start depositions for thirty days.
 6  We need to take three or four depositions.
 7      And we also wanted to shorten time
 8  to respond to our initial discovery, and
 9  so that we could present this to Your
10  Honor before September 7th, which is the
11  date that Amoco is seeking to eject my
12  client from his gasoline station. So
13  that's why we came before Your Honor.
14  And --
15      THE COURT: We're talking about
16  primarily an injunction?
17      MR. REISS: Well, that is what -- we
18  want to obtain an injunction.
19      THE COURT: An injunction requires
20  an evidentiary hearing.
21      MR. REISS: Right, and that's why we
22  came in to ask Your Honor for time to do
23  that but we'd like to get a little
24  discovery done first.
25      THE COURT: I'm leaving here for
```

Page 4

```
 1  vacation the last two weeks in August and
 2  the first week in September, so we're
 3  already almost at the first week of
 4  August, so you know --
 5      MR. REISS: Well, if you give us a
 6  little time at the end of the second week,
 7  Judge, I think we can take the three depos
 8  we need to take and be prepared to present
 9  the testimony we need to present. I think
10  it's important to have an opportunity to
11  depose some of Amoco's corporate
12  representatives who we think will strongly
13  support our position.
14      THE COURT: Okay. Mr. Hargrove.
15      MR. HARGROVE: May it please the
16  Court, Your Honor, John Hargrove on behalf
17  of BP Amoco and with me to my immediate
18  left is my partner Moises Melendez and to
19  his immediate left is Jimmy Moran,
20  regional sales manager for BP Amoco.
21      Your Honor, the -- it's difficult to
22  know where to start with the series of
23  cases that have been filed by opposing
24  counsel, there are seven that have just
25  been filed. This particular one before
```

1 (Pages 1 to 4)

Page 5

1   the Court relates to a very
2   straightforward, cut and dry commission
3   marketer's agreement signed on September
4   8th, 1998 and it expires by its own terms
5   on September 7th, 2002, which is about
6   five or six weeks away.
7       The trick that we have seen, you
8   know, in a number of other hearings that
9   they have had set before the divisions of
10  the court is to oversimplify what is going
11  on here. They have made it seem as though
12  the commission marketer's agreement is
13  something that basically sprung from an
14  infomercial type presentation by BP Amoco,
15  they're a bunch of hucksters trying to
16  prey on unwary people investing their
17  money and franchising them to sell
18  gasoline and we've done everything short
19  of kidnapping their children.
20      THE COURT: I don't think there is
21  any allegation of kidnapping.
22      MR. HARGROVE: Well, you should have
23  read the arguments before some of the
24  other divisions. But in any event what
25  they're doing is asking for seemingly

Page 7

1   founded in good faith.
2       The contract itself specifically
3   says that it's a four year term. There
4   are two integration clauses in it limiting
5   the rights to the term of the contract
6   itself and it's a signed acknowledgement
7   that the representatives have been made --
8   or representations have been made only in
9   the contract and there is nothing made
10  contrary to the terms of the contract.
11      The contract goes on in paragraph
12  23D and 23E to say that the agreement
13  actually terminates upon the date of
14  nonrenewal. It says it in clear English
15  and that the marketer, in this case the
16  plaintiff, understands and agrees to
17  vacate upon the expiration of the
18  agreement.
19      The agreement also says in paragraph
20  26 that the inducement to BP Amoco to
21  enter into this is the qualifications of
22  the marketer himself and in all cases
23  they've had experience distributing
24  petroleum products.
25      And then in paragraph 28 it's got

Page 6

1   benign relief, asking for pre-injunction
2   discovery to -- in order to make a case
3   for injunctive relief. But what they've
4   done is they have not attached a copy of
5   the very contract that they're suing on,
6   so we need to file that with the Court, we
7   had a notice of filing yesterday and
8   submitted it to Your Honor.
9       THE COURT: Yesterday.
10      MR. HARGROVE: They've also ignored
11  the fact that by certified letter, return
12  receipt requested which was acknowledged
13  by in this case Mr. Griveas February 26,
14  we said that the contract would expire on
15  its own terms, and of course we would not
16  be renewing it and to get ready to vacate.
17      So this time crisis comes down to
18  the wire and it becomes everybody's
19  emergency including mine. And the
20  contract itself I think explains why not
21  only is discovery not appropriate,
22  expedited discovery, but what they're
23  asking for in the form of preliminary
24  relief, which is sort of a predicate for
25  this preliminary discovery is really not

Page 8

1   this very clearly written second
2   integration clause which says that the
3   entire agreement is merged into the
4   writing itself and nothing has been
5   represented or nothing will have any
6   affect beyond the agreement.
7       The -- the thing that -- the thing
8   that they have failed to realize -- and I
9   understand the state of the law, the state
10  of the law says, okay, if you have been
11  fraudulently induced to enter into a
12  contract that gives rise to an independent
13  tort arising from a contractual
14  relationship.
15      But the research that I have done
16  shows very clearly, and in fact the most
17  recent case law is out of the Fourth
18  District, which I can share with the Court
19  if you want to see it, that a party cannot
20  recover in fraud for alleged
21  misrepresentations when the very points in
22  dispute as to the fraud and the inducement
23  are covered in the contract itself.
24      And in addition to the integration
25  of the merger rule, the cases also hold

2 (Pages 5 to 8)

Page 9

1  that there cannot be any justifiable
2  reliance as a matter of law where the
3  points explicitly addressed in the
4  contract negate any allegations that they
5  have made in their complaint, which is the
6  case here.
7      And of course they've asked for
8  expedited discovery, they want to depose
9  people, to offer our people as evidence of
10  what -- what the agreement really meant or
11  really said and they want to offer their
12  own people to say how they were
13  fraudulently induced.  But the agreement
14  is the agreement.
15      And as the Court knows the Parol
16  Evidence Rule is never -- it never springs
17  into effect, and Parol Evidence itself is
18  never admissible to create an ambiguity in
19  an otherwise unambiguous instrument, it's
20  only admissible when the court finds in
21  the first instance that the contract is
22  ambiguous.
23      So unless that there is an ambiguity
24  on the face of the complaint, what they're
25  relegated to is -- is what the contract

Page 11

1      Let's assume they find an exception
2  to that, let's assume they have tort
3  damages, nevertheless they've got damages.
4  The fact that they may have difficulty
5  proving it or that it may be hard to
6  calculate doesn't excuse their obligation
7  to prove it.  And it therefore doesn't
8  kick in their right for preliminary
9  injunctive relief.
10      Now, I -- I apologize for getting
11  ahead of the issue before the Court today
12  but I don't think that any of us can
13  understand why it is they want to expedite
14  discovery on such a short fuse unless it's
15  fully understood and clearly understood as
16  to where they're going with this expedited
17  discovery.
18      THE COURT:  Okay.  A couple of
19  things that jumped out at me and I don't
20  think either one of you addressed, this
21  was an assignment of the Aleman contract?
22      MR. REISS:  Yes, Judge.
23      THE COURT:  Was your original deal
24  with Aleman?
25      MR. REISS:  It was with Aleman

Page 10

1  says and what their rights are under the
2  contract rather than asking the Court to
3  rewrite an agreement to relieve them of,
4  you know, what they consider perhaps to be
5  an improvident bargain.
6      They've also talked in terms of
7  injunctive relief, when they have a
8  claim -- let's just now assume for the
9  moment that they can prove breach of
10  contract or indeed they can prove fraud.
11  They're asking for injunctive relief,
12  which we have a problem with because
13  equitable relief in the form of an
14  injunction is not a substitute for perhaps
15  a quantum of damages that they have
16  difficulty proving.
17      If you're looking for economic loss
18  you've got two streets you can go down,
19  you can go down the street of lost
20  business valuation or you can down the
21  street of lost profits.  You go one or the
22  other way and both are pretty difficult to
23  prove.  You know, you take a Hadley versus
24  Baxendale (phonetic) approach to it, you
25  got your contract damages and that's it.

Page 12

1  but --
2      THE COURT:  And then you asked --
3  Excuse me.
4      MR. REISS:  I'm sorry.
5      THE COURT:  Then you asked Amoco to
6  approve the assignment?
7      MR. REISS:  They had to approve the
8  assignment in order for the purchase.
9  Part of the transfer of the agreement was
10  representations --
11      THE COURT:  By Aleman?
12      MR. REISS:  By Mr. Moran right here
13  as to what the agreement was.  Counsel
14  made a couple of comments --
15      THE COURT:  Excuse me, I want to
16  finish my point.
17      MR. REISS:  Okay.
18      THE COURT:  Did you not have a copy
19  of this contract?
20      MR. REISS:  The contract is very
21  ambiguous, Judge, and let me tell you
22  why --
23      THE COURT:  What's ambiguous about
24  it?
25      MR. REISS:  Well, first of all let

Page 13

1   me tell you, the agreement says initial
2   term. And it was represented what initial
3   term meant. There is no reason why there
4   would be an initial term unless there were
5   subsequent terms.
6       THE COURT: It says there isn't any,
7   doesn't it?
8       MR. REISS: It simply says initial
9   term four years.
10      THE COURT: But doesn't it say --
11      MR. REISS: And then later as
12  counsel represented to Your Honor it says
13  it will terminate on the date of
14  nonrenewal. Well, why would there be a
15  nonrenewal if there was only a single term
16  and why would there only be an initial
17  term if there wasn't a second or third
18  term.
19      And all of this was represented to
20  my client by Mr. Moran as part of their
21  business policy. And it goes beyond just
22  this agreement, Judge. We've sued under
23  the Unfair and Deceptive Trade Practices
24  Act. You need to have a little bit of
25  background about the -- it's called the

Page 15

1   getting under the transfer agreement, plus
2   additional two four year terms, when these
3   letters went out -- this is no surprise to
4   Amoco, Amoco knew these lawsuits were
5   coming, all of these individuals --
6       THE COURT: I'm asking what you did,
7   not what Amoco did.
8       MR. REISS: Oh, I just got involved,
9   Judge, because --
10      THE COURT: Why did they wait?
11      MR. REISS: They waited because they
12  attempted to contact Amoco and say look,
13  what's the deal here, and there was a long
14  delay -- and if we have an opportunity to
15  discuss this with their reps in deposition
16  it's going to come out that they knew that
17  all of these people were disgruntled about
18  these letters --
19      THE COURT: They may know they're
20  disgruntled but why did you wait until
21  two -- until two weeks or three weeks
22  before the close of the --
23      MR. REISS: Well, Judge, here's
24  why --
25      THE COURT: -- the period?

Page 14

1   Federal Petroleum Marketers Protection
2   Act. And under the PMPA --
3       THE COURT: I don't have the Federal
4   statutes, there is nothing that
5   particularly addresses this in Florida
6   statutes, so show me the copy of the --
7       MR. REISS: I can provide a copy, I
8   don't have a copy of the entire act with
9   me, it's quite voluminous, Your Honor.
10  But I can tell you the bottom line of it
11  was -- and I may have it actually -- that
12  the -- that the petroleum companies can
13  only cancel these agreements under very
14  limited circumstances. And --
15      THE COURT: Well, can I see what the
16  limited circumstances are and when it says
17  they can't cancel them? I don't know
18  why -- I don't know why they waited from
19  February until --
20      MR. REISS: Here's why, Your Honor,
21  I can explain that as well, when the
22  letter came out in February, because the
23  representation had been made that if
24  you're a good marketer that you're going
25  to get the rest of the term that you're

Page 16

1       MR. REISS: -- we have nine clients
2   who gathered together as a group to
3   attempt to get a war chest together in
4   order to fight Amoco, one of the top
5   companies in the country. They came to us
6   in a group after failing in their
7   negotiations with Amoco in trying to
8   resolve it.
9       After they did that, you know, it
10  took us a little bit of time once we got
11  these nine people in to file nine separate
12  lawsuits and get in front of nine
13  different Judges.
14      THE COURT: Well, let me see -- let
15  me see the --
16      MR. REISS: I don't have a copy of
17  the act with me, Your Honor. I didn't
18  know that it would be pertinent to the
19  hearing. But I did want to address some
20  of the additional comments that counsel
21  made. If you do look at the contract
22  itself as I indicated it does say initial
23  term.
24      THE COURT: I saw that.
25      MR. REISS: And it does say that it

4 (Pages 13 to 16)

Page 17

1  terminates on the date of nonrenewal.
2  Well. if there had been no representations
3  concerning renewal why would that language
4  even be in there. The issue is, and the
5  evidence will show that Amoco went out and
6  told all of these franchisees to change
7  them from PMPA protected franchises to
8  commission marketers --
9      THE COURT: That wouldn't have been
10 you, that would have been Mr. Aleman.
11     MR. REISS: Except that the same
12 representations were made and my client
13 has sworn to it in affidavit and I think
14 the --
15     THE COURT: But he didn't have any
16 agreement.
17     MR. REISS: He had a transfer
18 agreement.
19     THE COURT: No, he had no agreement
20 at all.
21     MR. REISS: Directly with --
22     THE COURT: With Amoco.
23     MR. REISS: Well, he has the
24 agreement that was assigned to him. As
25 part of that assignment process they had

Page 18

1  to approve the agreement and these
2  representations were made.
3      THE COURT: But my point is that if
4  they -- if they unfairly --
5      MR. REISS: Induced --
6      THE COURT: -- terminated an
7  agreement with Mr. Aleman, in order to get
8  this agreement -- that's Mr. Aleman's
9  cause of action, not yours.
10     MR. REISS: Well, Judge, I think
11 that it would be even more important that
12 because -- if that's the view Your Honor
13 is taking, is that they -- these
14 inducements are outside of the contract
15 because they did induce my client to
16 transfer -- there is an accepted transfer
17 and assignment of this agreement, so
18 counsel's arguments about economic loss --
19     THE COURT: You didn't say they
20 induced you, you said that they agreed to
21 it.
22     MR. REISS: No, no, it's fraud in
23 the inducement, we sued for fraud in the
24 inducement --
25     THE COURT: They induced you to do

Page 19

1  what?
2      MR. REISS: To accept the transfer
3  of the Aleman agreement.
4      THE COURT: Well, you asked them to
5  accept the transfer.
6      MR. REISS: Yes, Your Honor, but
7  they induced us to accept the transfer.
8  It was a mutual -- we sat down and said
9  look, what are the terms of this going to
10 be, and the agreements were made, and
11 Mr. Moran represented to my client that if
12 you accept the transfer of this agreement
13 this is the initial term, there is four
14 years, and we're going to give you these
15 two renewals. It's not contrary to the
16 agreement, the agreement even somewhat
17 supports that position.
18     THE COURT: I don't think the
19 agreement supports it, sir. I think any
20 ambiguity -- you have to put all the terms
21 of the contract together. I don't think
22 it's ambiguous and I don't think you're
23 alleging -- you didn't allege that Amoco
24 asked you to buy from Mr. Aleman, you
25 asked -- you alleged that you asked Amoco

Page 20

1  to permit the sale.
2      MR. REISS: At the same time in
3  conjunction with those discussions, Your
4  Honor, there were these representations
5  made in order to induce. And, yes, it was
6  Amoco who asked us -- Amoco actually --
7  Judge, the allegations are made, they went
8  out and tried to solicit people to -- let
9  me just finish.
10     THE COURT: Let me see what the
11 allegations are.
12     MR. REISS: -- to convert the
13 dealerships to commission marketers.
14     THE COURT: They solicited you?
15     MR. REISS: Yes, Judge, they
16 solicited a lot of these --
17     THE COURT: I don't want to hear
18 what they solicited anybody else other
19 than you.
20     MR. REISS: Yes, Judge, they
21 solicited people because --
22     THE COURT: Not people, your client.
23     MR. REISS: Well, Judge, also I'd
24 like to let Your Honor know that their
25 business practice is admissible.

5 (Pages 17 to 20)

Page 21

1   THE COURT: Not unless you've got
2   something that happened to your client. I
3   can't sue -- having no Enron stock I can't
4   sue for what happened to Enron.
5   MR. REISS: Well, that's true except
6   for the fact that these representations
7   were made to my client in order to induce
8   him to accept and transfer this agreement.
9   MR. MELENDEZ: Your Honor, paragraph
10  67 of the complaint may be what you're
11  looking for, if that helps you.
12  MR. REISS: All right. Look at
13  paragraph 5 as well, Judge, because I
14  think it is relevant.
15  THE COURT: But you talk about that
16  they were in the process of converting, et
17  cetera, but I want to know what they did.
18  It says -- it says that your client met
19  with Aleman about acquiring.
20  MR. REISS: Right. And then 8 and 9
21  and 10 --
22  THE COURT: And then Aleman
23  contacted Amoco. Then it says -- then it
24  says Amoco after Aleman contacted Amoco
25  contacted Griveas.

Page 22

1   MR. REISS: Right, they contacted
2   him, Your Honor, to arrange the meeting.
3   THE COURT: Well, but that was
4   after --
5   MR. REISS: Paragraph 9 talks about
6   what the representations were concerning
7   what the agreement would be.
8   MR. MELENDEZ: Plaintiff had his
9   attorney --
10  COURT REPORTER: I'm sorry?
11  THE COURT: I'm sorry, wait a
12  minute, I'm not going outside the four
13  corners and Mr. Hargrove represents your
14  client, so I think you need one at a time.
15  And this says Moran represented that
16  if he was a good operator he would get an
17  existing contract with initial terms of
18  four years which would renew. Then it
19  says on 10 that he was purchasing an
20  existing franchise which contractual
21  arrangement would then automatically renew
22  and that is negated by the contract.
23  MR. REISS: It's really not, Your
24  Honor, the contract simply says it has an
25  initial term of four years.

Page 23

1   THE COURT: I'm sorry, sir, but I
2   think -- number one, I don't think you can
3   say it's an emergency when you've known
4   about this since February, your clients
5   have known about it since February.
6   Number two, if you -- if your original
7   agreement was with Amoco you might have a
8   cause of action but I don't think so,
9   because your initial agreement wasn't with
10  Amoco -- Amoco's initial agreement wasn't
11  with you, it was with Aleman and the
12  contract in my view of it specifically
13  says that it doesn't renew.
14  MR. REISS: If I may, Your Honor, we
15  haven't sued on the contract, we sued for
16  fraud in the inducement.
17  THE COURT: Fraud in the inducement
18  of what?
19  MR. REISS: Fraud in the inducement
20  of this contractual relationship.
21  THE COURT: What contractual
22  relationship?
23  MR. REISS: We are now in privity by
24  virtue of the assignment.
25  THE COURT: They didn't induce that.

Page 24

1   MR. REISS: Well, the testimony is,
2   Judge, in a sworn affidavit of Mr.
3   Griveas --
4   THE COURT: They didn't induce the
5   original --
6   MR. REISS: They induced my
7   client --
8   THE COURT: To do what?
9   MR. REISS: -- to purchase this
10  franchise from Mr. Aleman by virtue of
11  these representations.
12  THE COURT: I'm not going to grant a
13  summary judgment -- I'm not going to grant
14  a -- I don't think you have --
15  MR. REISS: There is two other
16  causes of action if I may briefly, Your
17  Honor. Negligent misrepresentation, but
18  very importantly is the Unfair and
19  Deceptive Trade Practices Act which --
20  THE COURT: Okay. I'm not granting
21  the injunction, sir. Number one, I don't
22  think you have a clear right to relief
23  which is one of the things in an
24  injunction, and I don't think that -- I
25  have -- I'm not going to dismiss it for

6 (Pages 21 to 24)

Page 25

1  failure to state a cause of action but I
2  think it's very close to that as to where
3  we are on this.
4      MR. REISS:  Well --
5      THE COURT:  Excuse me.  And I don't
6  think that -- I don't think you're timely
7  in doing this, and I'm not going to grant
8  it, so --
9      MR. HARGROVE:  Thank you, Your
10  Honor.
11      THE COURT:  -- the motion is denied.
12      MR. HARGROVE:  We'll prepare an
13  order.
14      (Thereupon, the hearing was
15  concluded at 9:55 o'clock a.m.)
16          ----------
17
18
19
20
21
22
23
24
25

Page 26

1          CERTIFICATE
2
State of Florida  )
3              ) SS.
County of Broward  )
4
5      I, ANDREA SIDWEBER, do hereby
6  certify that the foregoing transcript, pages 1 to
7  and including 26, is a true and correct
8  transcription of my stenographic notes of
9  proceedings had before the Honorable ESTELLA M.
10  MORIARTY, Circuit Court Judge, on July 31, 2002,
11  commencing at 9:35 o'clock a.m., in the City of
12  Fort Lauderdale, County of Broward, State of
13  Florida.
14      Dated this 1st day of August, 2002.
15
16
      _____
17      ANDREA SIDWEBER,
      Court Reporter
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED by AA

AUG  9 2002

CLARENCE MADDOX
CLER. U.S. DIST. CT.
S.D. OF FLA. - MIAMI

Case No. 02-22297-CIV-MOORE

JOSE A. FERNANDEZ, an individual,

    Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland
Corporation, n/k/a BP PRODUCTS NORTH
AMERICA INC. and JOSEPH TAMAYO, an
individual,

    Defendants.

_____/

**ORDER DENYING MOTION
FOR TEMPORARY
RESTRAINING ORDER**

THIS CAUSE is before the Court upon Plaintiff's Emergency Motion for Temporary

Restraining Order (filed August 7, 2002). Plaintiff has reincorporated the motion he previously

filed before the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County,

Florida before Defendants removed this matter to federal court. Although Plaintiff has notified

the Defendants of the motion for a temporary restraining order, Plaintiff has indicated to the

Court that he desires to proceed as if he filed this motion *ex parte*.

## BACKGROUND

Plaintiff has filed this action against Defendants Amoco Oil Company ("Amoco") and

Joseph Tamayo for fraud, negligent misrepresentation, and violation of the Florida Deceptive and

Unfair Trade Practices Act. He asserts that he was fraudulently induced to purchase a leasehold

interest in an Amoco gasoline station by the representation that he would receive a twelve-year

term at the gas station, inclusive of support and services from Amoco.

Defendant Amoco has recently informed Plaintiff that it is terminating his rights to the service station on August 12, 2002, as this date marks the end of his initial four year term agreement. Accordingly, Plaintiff has moved for a temporary restraining order to prevent Defendant from terminating his interest in the station.

## DISCUSSION

The Court has considered the Motion, Complaint, and affidavit submitted by Plaintiff, and is otherwise fully advised in the premises. The Court finds that Plaintiff has **not** met his burden of demonstrating that a Temporary Restraining Order is warranted.

In order to obtain a temporary restraining order, Plaintiff must demonstrate that (1) he will suffer irreparable harm unless the status quo is maintained; (2) he has no adequate remedy at law; (3) he has a substantial likelihood of success on the merits; and (4) a temporary injunction will serve the public interest. *Infinity Radio, Inc. v. Whitby*, 780 So.2d 248, 250 (Fla. 4th DCA 2001). The Court finds Plaintiff's motion deficient for all four requirements.

*Irreparable harm*

Plaintiff claims that he will be irreparably harmed, as he is in jeopardy of losing his service station and the attendant good will of ongoing business in that station. In support of his assertion that this loss is irreparable, Plaintiff cites to *U.S. 1 Office Corp. v. Falls Home Furnishings, Inc.*, 655 So.2d 209, 210 (Fla. 3d DCA 1995). The Court finds this reliance misplaced. In this case, the District Court of Appeal of Florida found that "evidence of a

2

potential destruction of a business, without a track record from which to calculate the potential loss and with harm of a continuing nature, may in some cases provide sufficient indicia of irreparable harm to support temporary injunctive relief." *Id.* at 210. Plaintiff Fernandez states in his affidavit that he increased business for the station and was recognized by Amoco for his achievements. Accordingly, it is apparent that calculation of Plaintiff's alleged loss is possible, based on Plaintiff's business track record during the time he retained an interest in the station.

### Adequate remedy at law

Plaintiff asserts that money damages will not fully compensate his loss, but Plaintiff does not provide further detail than this conclusory statement. "Clear, definite, and unequivocally sufficient factual findings" must support each of these four criteria before the court may enter the injunction. *City of Jacksonville v. Naegele Outdoor Adver. Co.*, 634 So.2d 750, 754 (Fla. 1st DCA 1994).

In addition, the Court finds that Plaintiff does have an adequate remedy at law; that of money damages from any breach he may have suffered. Plaintiff's simple argument that this is not the case does not suffice to persuade the Court otherwise.

### Substantial likelihood of success on the merits

Plaintiff argues that he has established a substantial likelihood of success on the merits in his action against Defendants. While the Court notes that Plaintiff has provided detailed factual allegations concerning his claims, he has not established that he will likely prevail in his action. The determination of whether Defendant made misrepresentations knowing them to be false, and

3

Plaintiff's subsequent alleged reliance on said misrepresentations, is not one appropriately made at this juncture. Plaintiff's allegations, standing alone, simply demonstrate that Plaintiff has a claim against Defendants. Plaintiff has not shown the Court however that he has a substantial likelihood of success on his claims.

### *Public interest*

As Plaintiff has failed to show that he is entitled to the relief he seeks, a temporary injunction would not be in the interest of the public.

## CONCLUSION

Based on the foregoing, it is ORDERED and ADJUDGED that Plaintiff's Motion for a Temporary Restraining Order is DENIED. It is further

ORDERED and ADJUDGED that Plaintiff's Motion for Oral Argument on its Motion for a Temporary Restraining Order (filed August 7, 2002) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this _9th_ day of August, 2002.

K. M. Moore

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

copies provided:
Allan S. Reiss, Esq., Counsel for Plaintiff
John Hargrove, Esq., Counsel for Defendant
Moises Melendez, Esq., Counsel for Defendant

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 02-61069-CIV-MOORE

DIMITRIOS KOUTSODENDRIS, an individual,

     Plaintiff,

vs.

AMOCO OIL COMPANY, a Maryland Corporation,
n/k/a BP PRODUCTS NORTH AMERICA, INC. and
JULIE ANDREWS, an individual,

     Defendants.

_____/



## ORDER

THIS CAUSE is before the Court *sua sponte*. The above-styled matter is related to

*Fernandez v. Amoco Oil Company, et al.*, Case No. 02-22297-CIV-MOORE, as stated by Defendants

in their notice of pendency of actions. Accordingly, it is

     ORDERED and ADJUDGED that Case No. 02-61069-CIV-MOORE is DISMISSED without

prejudice with leave to amend the Complaint in Case No. 02-22297 to reflect the claims raised in

Case No. 02-61069. The Clerk of the Court is directed to mark the above-styled matter as CLOSED.

     DONE AND ORDERED in Chambers at Miami, Florida, this *14th* day of August, 2002.

                     K. MICHAEL MOORE
                     UNITED STATES DISTRICT JUDGE

copies provided:
All counsel of record

AUG 1 6 2002

Rec'd in MIA Dkt _____